UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

JAMES MCMANUS ON BEHALF OF 1932
MCGRAW AVENUE, LLC, 47 POPLAR
OWNERS LLC, AND JAMES MCMANUS,
individually,

                         **Plaintiffs,**

          **-against-**

JOHN C. LETTERA, STEVE WISSAK, PAT
MARUGGI, BRIAN T. WALTER, ANTHONY
C. BALBO, FAIRBRIDGE MORTGAGE LLC
D/B/A FAIRBRIDGE CREDIT LLC,
FAIRBRIDGE ASSET MANAGEMENT LLC,
FAIRBRIDGE STRATEGIC CAPITAL LLC,
REALFI PRIVATE LENDING LLC, REALFI
CAPITAL FUNDING LLC, REALFI
NATIONAL LAND SERVICES LLC, REALFI
REAL ESTATE INVESTMENT TRUST LLC,
FB POPLAR LLC and FB CHURCHILL
FACILITY LLC,

                         **Defendants.**

---------------------------------------------------------------- x

:   **Case No. 25-cv-10573**

:   **Hon. Arun Subramanian**

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF <u>THEIR MOTION TO DISMISS THE AMENDED COMPLAINT</u>

 

**MELTZER, LIPPE, GOLDSTEIN &
  BREITSTONE, LLP**
**190 Willis Avenue**
**Mineola, New York 11501**
**Tel.: (516) 747-0300**

*Attorneys for Defendants*

**March 18, 2026**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ………………………………………………. v

PRELIMINARY STATEMENT …………………………………………….. 1

FACTUAL BACKGROUND …………………………………………….. 3

    A.  The Fairbridge Loans …………………………………………... 3

    B.  The 2021 Pledge Agreements ……………………………………. 4

    C.  The McManus Guarantees ………………………………………... 5

    D.  McGraw Fails To Satisfy Material Milestones in Connection
         With the Construction Project …………………………………….. 5

    E.  When McGraw Is Unable To Repay the Fairbridge Loans
         Upon Maturity in April 2023, Fairbridge Extends the
         Repayment Deadline on Multiple Occasions ………………………….. 5

    F.  Fairbridge Seeks Additional Security Through a Mortgage
         Loan on Property Owned By Poplar …………………………………… 6

    G.  Early 2024: At Fairbridge's Urging, McGraw Signs a Listing
         Agreement With Real Estate Broker Ariel To Market the
         McGraw Property ………………………………………………… 7

    H.  May 2025: McManus Brings To Fairbridge a Potential
         Third-Party Purchaser For the McGraw Property ……………………... 7

    I.  The Fairbridge Loans and Fairbridge-Poplar Mortgage
         Are Sold Into Mortgage Loan Repurchase Facilities…………………... 8

    J.  2024: Fairbridge Commences the Process of Foreclosing on the
         McGraw Membership Interests ………………………………………... 9

    K.  December 19, 2025: McManus Files Materially Identical Lawsuits ….. 11

    L.  February 13, 2026: In Response To Poplar's Default Under
         the Fairbridge-Poplar Mortgage, Fairbridge Commences
         Foreclosure Proceedings………………………………………….... 11

i

**Page**

THE LEGAL STANDARDS GOVERNING THE COMPLAINT'S
PURPORTED "FACTUAL ALLEGATIONS" ……………………………… 12

ARGUMENT ……………………………………………………………... 14

I. ALL CLAIMS ASSERTED ON BEHALF OF MCGRAW AND
POPLAR MUST BE DISMISSED BECAUSE MCMANUS
LACKS STANDING TO ASSERT THEM …………………………... 14

    A. McManus Is Not And Has Never Been a Member of McGraw .. 14

    B. McManus Fails To Plead the Prerequisites To Assert Claims on
       Behalf of Poplar ……………………………………………... 15

       (i) The Purported Derivative Poplar Claims ……………… 15

       (ii) The Purported Direct Poplar Claims …………………… 15

II. ALL OF THE CLAIMS ASSERTED BY MCMANUS AND
MCGRAW MUST BE DISMISSED BECAUSE THEY WERE
PREVIOUSLY RELEASED AND WAIVED …………………….... 16

III. THE PURPORTED RICO SECTION 1962(c) CLAIM ALLEGED
IN THE FIRST CAUSE OF ACTION FAILS AS A MATTER OF
LAW …………………………………………………………………... 19

    A. RICO Standing Has Not Been Pled ……………………………. 20

    B. RICO Causation Has Not Been Pled …………………………... 21

    C. No RICO Enterprise Has Been Pled …………………………… 21

       (i) The Alleged RICO Enterprise Contravenes the
          Person-Enterprise Distinctness Requirement ................. 21

       (ii) The Alleged RICO Enterprise is Not Separate and
          Distinct From the Alleged Pattern of Racketeering ……. 23

    D. Criminal "Predicate Acts" Supporting Alleged "Racketeering
       Activity" Have Not Been Pled …………………………………. 24

    E. A "Pattern" of Alleged "Racketeering Activity" Has Not
       Been Pled ………………………………………………………. 25

4908-8636-9176, v. 2

**Page**

IV.  THE RICO SECTION 1962(d) CONSPIRACY CLAIM
     ALLEGED IN THE SECOND CAUSE OF ACTION FAILS
     AS A MATTER OF LAW ……………………………………    25

V.   THE PURPORTED CLAIM UNDER NEW YORK ENTERPRISE
     CORRUPTION LAW § 460.20 FAILS AS A MATTER OF LAW ...   26

VI.  THE THIRD CAUSE OF ACTION FOR COMMON LAW
     FRAUD FAILS AS A MATTER OF LAW …………………………    26

VII. THE FOURTH CAUSE OF ACTION FOR ECONOMIC DURESS
     AND EXTORTION FAILS AS A MATTER OF LAW …………….    27

VIII. THE FIFTH CAUSE OF ACTION FOR INTENTIONAL
      INFLICTION OF EMOTIONAL DISTRESS FAILS AS A
      MATTER OF LAW ………………………………………………...    29

IX.  THE SIXTH CAUSE OF ACTION FOR FRAUD AND
     DECEIT FAILS AS A MATTER OF LAW…………………………    30

X.   THE SEVENTH CAUSE OF ACTION FOR MONEY
     LAUNDERING AND CONCEALMENT OF PROCEEDS
     FAILS AS A MATTER OF LAW……………….………………...    31

XI.  THE EIGHTH AND NINTH CAUSES OF ACTION ALLEGING
     A FRAUDULENT CONVEYANCE FAIL AS A MATTER OF
     LAW…………………………………………………………………    32

XII. THE TENTH CAUSE OF ACTION UNDER NEW YORK
     GENERAL BUSINESS LAW § 349 FAILS AS A MATTER
     OF LAW……………………………………………………………….    32

XIII. THE ELEVENTH CAUSE OF ACTION FOR UNJUST
      ENRICHMENT FAILS AS A MATTER OF LAW ………………...    33

XIV. THE TWELFTH CAUSE OF ACTION FOR AN
     ACCOUNTING FAILS AS A MATTER OF LAW ………………...    34

XV.  THE THIRTEENTH CAUSE OF ACTION FOR
     TORTIOUS INTERFERENCE WITH CONTRACT
     FAILS AS A MATTER OF LAW …………………………………...    35

iii

**Page**

XVI.  THE FOURTEENTH CAUSE OF ACTION FOR ALLEGED
      BREACH OF FIDUCIARY DUTY AND PROFESSIONAL
      MISCONDUCT FAILS AS A MATTER OF LAW…………………   36

    A.  The Investment Advisers Act of 1940 ...………………………..   36

    B.  New York Rule of Professional Conduct 1.12 …………………   37

XVII.  THE FIFTEENTH CAUSE OF ACTION FOR ALLEGED
       COMMERCIALLY UNREASONABLE UCC FORECLOSURE
       FAILS AS A MATTER OF LAW…………………………………...   37

CONCLUSION …………………………………………………………………   39

CLAIM-ELEMENTS CHART PROVIDED IN ACCORDANCE WITH
RULE 8.G(i) OF THE *INDIVIDUAL PRACTICES IN CIVIL CASES* OF
THE HONORABLE ARUN SUBRAMANIAN ………………………..   Appendix A

WORD-LIMITATION COMPLIANCE CERTIFICATE ……………………..   Appendix B

iv

4908-8636-9176, v. 2

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aiello v. Brown*,
  2021 WL 1225445 (S.D.N.Y. 2021) …………………………………………... 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) …………………………………………………………... 12, 26

*AT&T Corp. v. Atos IT Sols. & Servs., Inc.*,
  708 F. Supp. 3d 385 (S.D.N.Y. 2023) …………………………………………. 12-13

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ………………………………………………. 13

*Avile v. Feitell*,
  2008 WL 2139153 (S.D.N.Y. 2008) …………………………………………... 37

*In re Basic Food Grp., LLC*,
  2018 WL 5805943 (Bankr. S.D.N.Y. 2018) …………………………………... 34

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) …………………………………………………………... 12

*Bensky v. Indyke*,
  743 F. Supp. 3d 586 (S.D.N.Y. 2024) ………………………………………. 17-18

*Biberaj v. Pritchard Indus., Inc.*,
  859 F. Supp. 2d 549 (S.D.N.Y. 2012) ………………………………………… 29

*Bd. of Managers of Exec. Plaza Condo. v. Jones*,
  251 A.D.2d 89 (1st Dept. 1998) …………………………………………………… 29-30

*Boyle v. United States*,
  556 U.S. 938 (2009) …………………………………………………………. 23

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ………………………………………………….. 13

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) …………………………………………………………... 22

4908-8636-9176, v. 2

**Page**

*Centro Empresarial Cempresa S.A. v. Am. Movlip S.A.B. de C.V.,*
   17 N.Y.3d 269 (2011) …………………………………………………. 18

*Cooper Dev. Co. v. Friedman,*
   1994 WL 62846 (S.D.N.Y. Feb. 22, 1994) …………………………… 28

*Cordts-Auth v. Crunk, LLC,*
   815 F. Supp. 2d 778 (S.D.N.Y. 2011) …………………………………. 14, 15

*Crawford v. Franklin Credit Mgmt. Corp.,*
   758 F.3d 473 (2d Cir. 2014) …………………………………………… 33

*Cruz v. FXDirectDealer, LLC,*
   720 F.3d 115 (2d Cir. 2013) …………………………………………… 20, 23

*DAOL Rexmark Union Station LLC v. Union Station Sole Member, LLC,*
   772 F. Supp. 3d 373 (S.D.N.Y. 2025) …………………………………. 39

*Del Rosario v. Sazerac Co., Inc.,*
   2023 WL 6318083 (S.D.N.Y. 2023) …………………………………... 33

*Delo v. Fordham Univ.,*
2025 WL 2166087 (S.D.N.Y. 2025) …………………………………….. 30

*de Kwiatkowski v. Bear, Stearns & Co.,*
   306 F.3d 1293 (2d Cir. 2002) …………………………………………. 36

*Doe 1 v. Gov't of United States Virgin Islands,*
   771 F. Supp. 3d 379 (S.D.N.Y. 2025) ………………………………… 18

*Dubai Islamic Bank v. Citibank, N.A.,*
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) ………………………………… 31

*Eberhard v. Marcu,*
   530 F.3d 122 (2d Cir. 2008) ………………………………………….. 32

*Eliahu v. Jewish Agency for Israel,*
   919 F.3d 709 (2d Cir. 2019) …………………………………………... 28-29

*Eviner v. Eng,*
   2015 WL 4600541 (E.D.N.Y. 2015) ………………………………….. 26

*Elsevier Inc. v. W.H.P.R. Inc.,*
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) ………………………………… 19

vi

**Page**

*Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.,*
  328 F. Supp. 2d 443 (S.D.N.Y. 2004) ……………………………………… 33

*Fraser v. Fiduciary Tr. Co. Int'l,*
  417 F. Supp. 2d 310 (S.D.N.Y. 2006) ……………………………………… 31

*Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.,*
  333 F. Supp. 3d 307 (S.D.N.Y. 2018) ……………………………………. 34

*In re Fyre Festival Litig.,*
  399 F. Supp. 3d 203 (S.D.N.Y. 2019) ……………………………………… 35

*Goel v. Bunge, Ltd.,*
  820 F.3d 554 (2d Cir. 2016) …………………………………………………... 12

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,*
  2013 WL 3943267 (S.D.N.Y. 2013) …………………………………………... 19

*Howell v. New York Post Co.,*
  81 N.Y.2d 115 (1993) …………………………………………………….. 29

*Kamerman v. Steinberg,*
  891 F.2d 424 (2d Cir. 1989) ……………………………………………… 29

*Kelly v. L.L. Cool J.,*
  145 F.R.D. 32 (S.D.N.Y. 1992) ……………………………………………. 30

*Kounitz v. Slaatten,*
  901 F. Supp. 650 (S.D.N.Y. 1995) ………………………………………. 30

*In re Lehman Bros. Holdings Inc.,*
  416 B.R. 392 (Bankr. S.D.N.Y. 2009) ………………………………….. 9

*In re Livent, Inc. Noteholders Sec. Litig.,*
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ……………………………………… 13

*Louisiana Mun. Police Employees' Retirement System v. Hesse,*
  962 F. Supp. 2d 576 (S.D.N.Y. 2013) ……………………………………… 15

*Lundy v. Cath. Health Sys. of Long Island Inc.,*
  711 F.3d 106 (2d Cir. 2013) ……………………………………………… 24

*In re Mexican Gov't Bonds Antitrust Litig.,*
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) ……………………………………… 13

vii

**Page**

*Medical Marijuana, Inc. v. Horn,*
  604 U.S. 593 (2025) ………………………………………………………    21

*Midwest Grinding Co. v. Spitz,*
  976 F.2d 1016 (7th Cir. 1992) …………………………………………….    19

*MM Arizona Holdings LLC v. Bonanno,*
  658 F. Supp. 2d 589 (S.D.N.Y. 2009) …………………………………….    28

*Motorola Credit Corp. v. Uzan,*
  322 F.3d 130 (2d Cir. 2003) …………………………………………….....    20

*Owusu v. New York State Ins.,*
  655 F. Supp. 2d 308 (S.D.N.Y. 2009) ……………………………………    26

*Petrone v. Turner Publ'g Co. LLC*,
  2023 WL 7302447 (S.D.N.Y. 2023) ……………………………………...    29

*Rapillo v. Fingerhut*, 2016 WL 11705140
  (S.D.N.Y. 2016) …………………………………………………………...    37

*Red Fort Cap., Inc. v. Guardhouse Prods. LLC*,
  2020 WL 5819549 (S.D.N.Y. 2020) ……………………………………...    35

*RJR Nabisco, Inc. v. European Community*,
  579 U.S. 325 (2016) ……………………………………………………...    21

*Roy v. Bank of New York Mellon,*
  2018 WL 3912281 (E.D.N.Y. 2018) ……………………………………...    31-32

*Scheiner v. Wallace,*
  832 F. Supp. 687 (S.D.N.Y. 1993) ……………………………………...    20

*Simington v. Lease Fin. Grp., LLC*,
  2012 WL 651130 (S.D.N.Y. 2012) ………………………………………    30

*Spig Industry, LLC v. Novac Equities LLC*,
  2025 WL 3643955 (S.D.N.Y. 2025) ……………………………………...    23

*Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.,*
  2022 WL 836890 (S.D.N.Y. 2022) ………………………………………    34

*Transnat'l Mgmt. Sys. II, LLC v. Carcione*,
  2016 WL 7077040 (S.D.N.Y. 2016) ……………………………………...    34

viii

**Page**

*United States v. Turkette,*
    452 U.S. 576 (1981) …………………………………………………….. 23

*Ulit4less, Inc. v. Fedex Corp.,*
    871 F.3d 199 (2d Cir. 2017) ………………………………………….... 22, 23

*Valentini v. Citigroup, Inc.,*
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) ………………………………… 37

*Vicon Fiber Optics Corp. v. Scrivo,*
    201 F. Supp. 2d 216 (S.D.N.Y. 2002) ……………………………….. 25

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.,*
    33 Misc. 3d 1226(A), 939 N.Y.S.2d 745 (Sup. Ct. N.Y. Co. 2011) ……………… 27

**State Statutes**

N.Y. Debt. & Cred. Law § 273 ……………………………………………. 32

N.Y. Gen. Bus. Law § 349 ……………………………………………….. 32

N.Y. Penal Law § 460.20 …………………………………………………… 26

N.Y. Penal Law § 460.50 ………………………………………………… 26

N.Y. U.C.C. Law § 9-610 ……………………………………………….. 38

**State Rules**

N.Y. Rule of Professional Conduct 1.12 ……………………………………….. 36, 37

**Federal Statutes**

15 U.S.C. § 78j(b) …………………………………………………… 24, 31

15 U.S.C. § 80b-1 ………………………………………………… 36

15 U.S.C. § 80b-2 ………………………………………………… 36

18 U.S.C. § 1341 ……………………………………………………….. 24

18 U.S.C. § 1343 ……………………………………………………….. 24

18 U.S.C. § 1951 ……………………………………………………….... 24

4908-8636-9176, v. 2

**Page**

18 U.S.C. § 1956 …………………………………………………………………… 31, 32

18 U.S.C. § 1961 …………………………………………………………………... *passim*

18 U.S.C. § 1962 …………………………………………………………………... *passim*

18 U.S.C. § 1964 ……………………………………………………………........ 20, 21, 25

17 C.F.R. § 240.10b-5 …………………………………………………………….... 24, 25, 31

**Federal Rules**

Fed. R. Civ. P. 8(a)(2) …………………………………………………………… 1, 12

Fed. R. Civ. P. 9(b) ……………………………………………………………… 1, 13, 24

Fed. R. Civ. P. 10(c) …………………………………………………………….. 1, 12

Fed. R. Civ. P. 12(b)(6) ……………………………………………………………. 1

Fed. R. Civ. P. 23.1 ……………………………………………………………… 14, 15

Fed. R. Evid. 201 …………………………………………………………………... 1, 12, 17, 18

**Other Authorities**

Fairbridge Asset Management Website, accessible at
*https://fairbridgellc.com/about/*.............................................................................. 36

x

Defendants Fairbridge Credit LLC ("*Fairbridge*"); Fairbridge Mortgage LLC; Fairbridge Asset Management LLC; Fairbridge Strategic Capital LLC; Realfi Private Lending LLC, Realfi Capital Funding LLC, Realfi National Land Services LLC, Realfi Real Estate Investment Trust LLC, FB Poplar LLC and FB Churchill Facility LLC (collectively, the "*Fairbridge Entities*"); and John C. Lettera; Steven Wissak; Brian T. Walter; Anthony C. Balbo; and Patrick Maruggi (collectively, the "*Individual Defendants*") respectfully submit this Memorandum of Law, along with the accompanying Affidavit of John C. Lettera dated March 16, 2026 (the "*Lettera Affidavit*" or the "*Lettera Aff't*") in support of their motion, pursuant to Rules 8, 9(b), 10(c) and 12(b)(6) of the Federal Rules of Civil Procedure (the "*Rules*" or a "*Rule*") and Rule 201 of the Federal Rules of Evidence, for an Order dismissing with prejudice the Amended Complaint (the "*Amended Complaint*," the "*Complaint*" or the "*Cmplt*.") filed by plaintiff James McManus ("*McManus*" or the "*Plaintiff*") in both his individual capacity and his purportedly representative capacity on behalf of 1932 McGraw Avenue, LLC ("*McGraw*") and 47 Poplar Owners LLC ("*Poplar*").  The Fairbridge Entities and the Individual Defendants are referred to collectively hereinafter as the "*Defendants*."

## PRELIMINARY STATEMENT

McManus — *who, as a threshold matter, (a) lacks standing to sue derivatively on behalf of McGraw or Poplar (or to assert direct claims on behalf of Poplar) and (b) along with McGraw/Poplar, expressly released in writing all claims against Defendants* — attempts shamefully to shoehorn into the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("*RICO*"), as well as other equally inapplicable federal and state law theories, ordinary, lawful commercial loan transactions of the type engaged in every day by countless businesses and individuals in the commercial mortgage-lending and real estate industry.

Putting aside the fatal standing and release issues, the Amended Complaint reflects fundamentally McManus's utterly spurious assertion that, in response to the prolonged breaches of certain loan-repayment obligations under the detailed, carefully-negotiated contracts that Fairbridge entered into with McGraw and other sophisticated commercial parties who were represented by their own respective counsel, Fairbridge was somehow required to continue to endure the economic harm by forgoing the exercise of its contractual foreclosure rights.

The pleading blithely glosses over the material breaches by McGraw (and later, by Poplar) of its contractual repayment obligations to Fairbridge. In so doing, it attempts baselessly to smear as wrongful — indeed, as criminal — Fairbridge's routine, lawful (a) extension of certain commercial construction-related loans to McGraw, (b) entry into a separate mortgage-loan repurchase facility to finance said loans and (c) exercise, upon the borrowers' defaults, of foreclosure rights expressly contemplated by a set of arm's-length-negotiated loan contracts.

Fairbridge's foreclosure rights were exercised in late 2025 in response to McGraw's continued default of its contractual obligations to repay to Fairbridge by their April 2023 maturity date four construction-related loans made to McGraw in connection with the latter's failed efforts to construct at 1932 McGraw Avenue in the Bronx (the "***McGraw Property***"), a multifamily apartment building (the "***Construction Project***"), and then, in February 2026, in connection with Poplar's default under the terms of its separate mortgage loan with Fairbridge. On multiple occasions after the execution of the loan documents, both McManus and McGraw acknowledged these contractual obligations in additional signed writings.

2

4908-8636-9176, v. 2

The Amended Complaint substitutes for well-pled factual allegations a discombobulated litany of conclusory, personally vindictive and often directly contradicted assertions that are utterly frivolous. No matter how many ethnic and other *ad hominem* attacks and pejorative adjectives McManus sprinkles into his thoroughly defective conclusory assertions, and no matter how many extraneous third parties McManus references gratuitously therein, the Amended Complaint — like his Original Complaint — fails to plead a single viable claim.

If not voluntarily withdrawn by McManus (and, in every legal and practical sense, it is **McManus's pleading** and not that of McGraw or Poplar), the Amended Complaint — which constitutes McManus's **second** failed attempt to plead a viable claim — should be dismissed with prejudice in its entirety.

**FACTUAL BACKGROUND**

A.    **The Fairbridge Loans**

On or about October 28, 2021, Realfi Real Estate Investment Trust LLC extended to McGraw three loans in connection with the Construction Project: (1) a building loan in the amount of $1,394,000; (2) a land loan in the amount of $706,000; and (3) a subordinate loan in the amount of $200,000, all of which were memorialized in detailed, signed agreements negotiated with the guidance of the parties' respective counsel. *See* Lettera Aff't, Exs. 6–8. On or about June 3, 2022, Realfi Real Estate Investment Trust LLC (whose name had been changed to Fairbridge Real Estate Investment Trust LLC) extended an air-rights loan in the amount of $500,000 to McGraw in connection with the Construction Project, which, like the other three loans, was memorialized in an arm's-length negotiated agreement executed by sophisticated

3

parties represented by their respective counsel. *See id.* at Ex. 14.  The four loans are referred to collectively hereinafter as the "***Fairbridge Loans***" or the "***Loans***."

The respective agreements reflecting the four Fairbridge Loans, as well as the Pledge Agreements, the McManus Guarantees, the Loan Extension Agreements and the Forbearance Agreement, as defined in Subsections B, C, and E, below, are referred to collectively hereinafter as the "***Fairbridge Loan Agreements***."  *See* Lettera Aff't, Exs. 6-14.

Not only were McManus and the other parties to the Fairbridge Loan Agreements represented by their own counsel during the negotiation, drafting and execution of said Agreements, but their counsel delivered legal opinion letters in connection therewith.  *See, e.g.,* Lettera Aff't, Ex. 5.

On or about September 1, 2022, the Fairbridge Loans, totaling $2.8 million, were assigned to Fairbridge.  *See* Lettera Aff't, Ex. 15.  McGraw drew approximately $2,031,034 in principal proceeds under the Fairbridge Loans.  *See also* Cmplt. ¶ 41.

B.      **The 2021 Pledge Agreements**

On or about October 28, 2021, in connection with the Fairbridge Loans, the three individuals who held all of the ownership interests in McGraw — non-parties David DeLucia, Randylynn Rastello-McManus and Eliezer Torres (collectively, the "***Non-Party McGraw Members***") — executed respective Ownership Interests Pledge and Security Agreements (collectively, the "***Pledge Agreements***") pursuant to which, among other things, they pledged their ownership interests in McGraw as collateral for the Fairbridge Loans.  *See* Lettera Aff't, Exs. 1-3 at § 1.  Pursuant to the express terms of the Pledge Agreements that the Non-Party McGraw Members negotiated and executed with the guidance of their own legal counsel,

4

Fairbridge, upon McGraw's default under the Fairbridge Loan Agreements, was authorized to foreclose upon said Members' respective membership interests in McGraw. *See id.* at § 11(a).

### C.    The McManus Guarantees

In connection with the Fairbridge Loans, McManus executed two written guaranty agreements. One was a Conditional Guaranty dated as of October 28, 2021 and the other a Guaranty of Completion as of the same date (jointly, the "***McManus Guarantees***"). *See* Lettera Aff't, Exs. 9 & 10.

### D.    McGraw Fails To Satisfy Material Milestones in Connection With the Construction Project

Shortly after the Fairbridge Loans were extended, the value of the McGraw Property plummeted (which, of course, reduced the adequacy of the then-existing collateral for the Loans) because McGraw failed to satisfy several material milestones and compliance obligations in connection with the Construction Project, including failing to timely secure the necessary building permits and meet other requirements to qualify the Project for a critical residential housing tax exemption under Section 421-a of the New York State Real Property Law (or any successor program).

### E.    When McGraw Is Unable To Repay the Fairbridge Loans Upon Maturity in April 2023, Fairbridge Extends the Repayment Deadline on Multiple Occasions

Although the Fairbridge Loans matured on April 28, 2023, McGraw advised Fairbridge that it was unable to pay them off. Rather than immediately foreclose on the McGraw membership interests, as was its express right under the Pledge Agreements (Lettera Aff't, Exs. 1-3 at § 11(a)), Fairbridge, at McGraw's request, agreed to provide additional time to enable McGraw to come up with the money required to pay off the Loans.

5

Fairbridge's efforts to accommodate McGraw included entering into an extension agreement, made as of May 31, 2023 and effective as of April 28, 2023, in connection with each of the four Fairbridge Loans (collectively, the "***Loan Extension Agreements***"; *see* Lettera Aff't, Exs. 16-19), and a forbearance agreement, dated October 18, 2023 (the "***Forbearance Agreement***"; *see id.*, Ex. 20), which agreements ultimately extended through December 1, 2023 the deadline for McGraw's repayment of the Fairbridge Loans.

As the Guarantor under the McManus Guarantees, McManus was a party to each of the Loan Extension Agreements and the Forbearance Agreement.  *See* Lettera Aff't, Exs. 9-10 & 16-20.  In each of those executed Agreements, both McGraw and McManus expressly acknowledged that McGraw was in default under the Loans and confirmed their unconditional liability for all amounts owed in connection therewith.  *See, e.g.,* Lettera Aff't, Ex. 20 § 1.

**F.      Fairbridge Seeks Additional Security Through a
Mortgage Loan on Property Owned By Poplar**

In or about September 2024, after having extended the maturity date of the Fairbridge Loans on multiple occasions, Fairbridge sought additional collateral to mitigate its risks in connection with McGraw's ongoing default and the further impairment of its existing collateral.  Fairbridge therefore entered into discussions with McManus and Thomas Lee, McManus's non-party co-owner of Poplar, concerning certain Poplar real property with respect to which Fairbridge held a senior lien.  *See generally* Cmplt. ¶¶ 121-22.  Those discussions resulted in the execution of an Amended and Restated Construction Loan Agreement dated March 13, 2025, between Fairbridge, as lender, and Poplar, as borrower (the "***Fairbridge-Poplar Mortgage Agreement***," annexed as Ex. 26 to the Lettera Aff't).  Pursuant to the Fairbridge-Poplar Mortgage Agreement, Poplar granted Fairbridge a subordinate mortgage (in the amount of $1 million)

6

encumbering the real property owned by Poplar as additional security for the Fairbridge Loans

(the "*Fairbridge-Poplar Mortgage*").  *See* Lettera Aff't, Ex. 26, pp. 12 & 17.

**G.     Early 2024: At Fairbridge's Urging, McGraw Signs
a Listing Agreement With Real Estate Broker Ariel
To Market the McGraw Property**

In January 2024, when it became apparent to Fairbridge that McGraw was unable

to complete the Construction Project or pay off the Fairbridge Loans upon which McGraw had

defaulted, Fairbridge urged McGraw to enter into an agreement with Ariel Property Advisors

LLC ("*Ariel*") to market the McGraw Property (the "*Ariel Agreement*").  *See* Cmplt. ¶ 55;

Lettera Aff't, Ex. 21.  At this point, Fairbridge's only hope for mitigating some of its losses in

connection with the Fairbridge Loans was through the sale of said Property to a third-party

purchaser.

Ultimately, however, despite the fact that Ariel advised McGraw of its receipt in

August 2025 of a proposed offer to purchase the McGraw Property for a price in excess of $2

million (Cmplt. ¶ 97), "Plaintiff then informed defendant he had no desire to sell the [P]roperty."

Cmplt. ¶ 100.

**H.     May 2025: McManus Brings To Fairbridge a Potential
Third-Party Purchaser For the McGraw Property**

McManus fails to disclose in his Amended Complaint that, in May 2025, two

months before declaring a lack of interest in the sale of the McGraw Property, even at the

$2 million offer price communicated by Ariel in August 2025, McManus himself brought to

Fairbridge a potential third-party purchaser for the McGraw Property named Peter Serpico.  At

that time, Fairbridge decided that it was willing to cut its mounting losses in connection with the

Fairbridge Loans by selling said Loans (and, effectively, the McGraw Property) for $1.3 million,

7

a significantly lower amount than the approximately $2 million aggregate amount of the outstanding Loans.

It was McManus's counsel in this lawsuit who represented both McManus and Mr. Serpico in connection with Mr. Serpico's negotiations with Fairbridge (making counsel a witness in this lawsuit) that resulted in the drafting of a final, unexecuted Loan Sale Agreement dated May 2025 between Fairbridge and an entity controlled by Mr. Serpico, UpSide Consulting Group LLC, in which McManus may also have held an interest.  *See* Lettera Aff't, Ex. 27.  Said draft Agreement reflected a purchase price of $1.3 million.  On the eve of the scheduled closing, Mr. Serpico backed out of the purchase transaction.[1]

**I.      The Fairbridge Loans and Fairbridge-Poplar Mortgage
          Are Sold Into Mortgage Loan Repurchase Facilities**

Pursuant to routine provisions of the agreements reflecting the Fairbridge Loans, the Non-Party McGraw Members, on behalf of McGraw, authorized Fairbridge to, among other things, assign the Fairbridge Loans and the collateral in connection therewith to a repurchase ("***Repo***") facility.  *See, e.g.,* Lettera Aff't., Ex. 6 at § 40 ("Mortgagor [McGraw] acknowledges that Mortgagee [Fairbridge] may sell and assign participation interests or other types of interests in this Mortgage to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations . . . as may be selected by

---

[1]     The fact that Fairbridge urged McGraw on multiple occasions to sell the McGraw Property to potential third-party purchasers introduced by Ariel and by McManus himself completely undermines McManus's overarching assertion that Fairbridge's objective was to seize the McGraw Property.  *See, e.g.,* Cmplt. ¶¶ 24, 55.

Mortgagee in its sole and absolute discretion) on terms and conditions satisfactory to Mortgagee in its sole and absolute discretion").

Fairbridge therefore sold the Fairbridge Loans, as well as the Fairbridge-Poplar Mortgage defined in Background Section F, above, into respective Repo facilities (collectively, the "***Repo Transactions***").  *See, e.g.,* Lettera Aff't, Ex. 23; Cmplt. ¶¶ 28-29.

Despite McManus's misguided suggestion that the Repo Transactions (in particular, the one involving the Fairbridge-Poplar Mortgage) were somehow inherently nefarious (*see* Cmplt. ¶¶ 28-29, 37-39), the fact is that these ordinary and appropriate Repo Transactions were necessary to the facilitation of the Fairbridge Loans and the Fairbridge-Poplar Mortgage.  One court explained as follows:

> "***Repo agreements, such as the MRA [Master Repurchase Agreement], are essential sources of market liquidity and have become important components of a smoothly running financial system.***  The designation of those assets that are being transferred to a counterparty in consideration for the transfer of funds is a basic element of every repo agreement.  ***The repo market is a vital and vibrant source of liquidity for the financial system as a whole***.  ***Cash and financial assets are exchanged between financial institutions in the ordinary course of business based on standard documentation***[.]"

*In re Lehman Bros. Holdings Inc.*, 416 B.R. 392, 396 (Bankr. S.D.N.Y. 2009) (emphasis added; citations omitted).

### J.    2024: Fairbridge Commences the Process of Foreclosing on the McGraw Membership Interests

Recognizing that, although in default of its obligation to pay off the Fairbridge Loans, McGraw would continue to resist Fairbridge's suggestion that the McGraw Property be sold to a third-party purchaser, Fairbridge decided that it needed to put an end to this long saga to protect itself and its investors.  Accordingly, on or about February 5, 2024, Fairbridge served

9

upon McGraw a Notice of Default under Article 9 of the UCC, seeking to foreclose on the McGraw membership interests pursuant to the Pledge Agreements (the "*UCC Foreclosure Proceeding*").  *See* Lettera Aff't, Ex. 22; Cmplt. ¶ 56.

On June 5, 2024, after McGraw's failure to repay the Fairbridge loans had continued, Fairbridge issued to McGraw a second Notice of Default.  *See* Lettera Aff't, Ex. 24.

When, three months later, on September 9, 2024, McGraw had still not paid off the Fairbridge Loans, Fairbridge served upon McGraw a Notice of Disposition of Collateral, advising that, as provided for in the Pledge Agreements, an auction of the McGraw membership interests through the UCC Foreclosure Proceeding (the "*UCC Foreclosure Auction*" or the "*Auction*") was scheduled for October 25, 2024.  *See* Lettera Aff't, Ex. 25; Cmplt. ¶ 71.

After scheduling the UCC Foreclosure Auction for October 25, 2024, Fairbridge, relying upon McManus's representations that a sale of the McGraw Property was imminent, adjourned the Auction to June 30, 2025 to accommodate what it understood to be the impending sale.  *See* Cmplt. ¶ 74.

When June 30, 2025 arrived and McGraw had still not paid off the Loans or sold the McGraw Property, Fairbridge again accommodated McGraw's request to further adjourn the UCC Foreclosure Auction to October 14, 2025.  *See* Lettera Aff't, Ex. 28; Cmplt. ¶ 87.

Instead of paying off the Fairbridge Loans before the scheduled October 14, 2025 UCC Foreclosure Auction, McGraw rushed into Bronx Supreme Court on October 13, 2025, the eve of the Auction, seeking, by Order to Show Cause, to enjoin the scheduled Auction "pending a full accounting, reconciliation of payments, and determination of the lawful holder of the

10

mortgage note" in an action captioned *1932 McGraw Avenue LLC v. Fairbridge Capital, LLC, et al.,* Index No. 821769/2025E (Sup. Ct. Bronx Co. 2025) (the "***McGraw Injunction Attempt***").

The Bronx Supreme Court rejected the McGraw Injunction Attempt. *See* NYSCEF Doc. No. 13 at 2. The UCC Foreclosure Auction proceeded as scheduled on October 14, 2025 and Fairbridge, the sole bidder at the Auction, purchased the McGraw membership interests. *See* Cmplt. ¶ 115; Lettera Aff't, Ex. 31.

### K.    December 19, 2025: McManus Files Materially Identical Lawsuits

On December 19, 2025, McManus filed his Original Complaint in this lawsuit. *See* ECF No. 1. That same day, he filed a materially identical Complaint in Bronx Supreme Court, captioned *McManus, et al. v. Lettera, et al.,* Index No. 826379/2025E (Sup. Ct. Bronx Co. 2025) (the "***State Court Action***"). *See* NYSCEF Doc. No. 1. Both Complaints were amended on February 17, 2026. *See* ECF No. 24; State Court Action, NYSCEF Doc. No. 14.

### L.    February 13, 2026: In Response To Poplar's Default Under the Fairbridge-Poplar Mortgage, Fairbridge Commences Foreclosure Proceedings

Because Poplar defaulted on its payment obligation under the Fairbridge-Poplar Mortgage, Fairbridge, through FB Poplar LLC, commenced foreclosure proceedings in February 2026 pursuant to the express terms of the Fairbridge-Poplar Mortgage Agreement. *See* Lettera Aff't, Ex. 26; Cmplt., Ex. C.

11

4908-8636-9176, v. 2

## THE LEGAL STANDARDS GOVERNING THE
## COMPLAINT'S PURPORTED "FACTUAL ALLEGATIONS"

The Amended Complaint is fundamentally and fatally flawed because it is comprised of wholly conclusory, meritless assertions of fact and law — necessarily untethered to specific documents or other information — which are not entitled to any presumption of truth and do not come close to satisfying the requisite "plausibility" pleading standard.  *See, e.g.,* Rule 8(a); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (citations omitted).

The critical Fairbridge Loan Agreements and related documents that put the lie to Plaintiffs' claims are either ignored altogether in the Complaint or, when vaguely referenced, are cherry-picked and mischaracterized.  In connection with this motion, the Court may properly consider all such documents, which are annexed as exhibits to the accompanying Lettera Affidavit.  *See, e.g.,* Rule 10(c); Fed. R. Evid. 201; *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss"); *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 708 F. Supp. 3d 385, 397 (S.D.N.Y. 2023) ("a plaintiff cannot avoid judicial consideration of a document upon which it bases its complaint by the expedient refusal to attach it to the pleading or refer to it *in haec*

12

4908-8636-9176, v. 2

*verba*").  *Accord In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[T]he primary problem raised by looking to documents outside the complaint — lack of notice to the plaintiff — is dissipated '[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.' . . . Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").

While each of Plaintiffs' claims would have to be dismissed with prejudice even if the Court were to accept the Amended Complaint's factual assertions, the Court, as noted, need not and should not accord any presumption of truth to such assertions.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001) ("[a] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice").

Finally, in contravention of Rule 8, most of the Complaint is strewn with general, conclusory group-pleading assertions against "Defendants" collectively that fail to identify the specific wrongful conduct in which each entity or individual is alleged to have engaged.  *See, e.g., Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (Rule 8 was violated where the Complaint "lump[ed] all the defendants together in each claim and provid[ed] no factual basis to distinguish their conduct"); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim") (emphasis in original).  *See also* Rule 9(b).

13

## ARGUMENT

### I.

### ALL CLAIMS ASSERTED ON BEHALF OF MCGRAW AND POPLAR MUST BE DISMISSED BECAUSE MCMANUS LACKS STANDING TO ASSERT THEM

#### A.    McManus Is Not And Has Never Been a Member of McGraw

Each of the claims that McManus purports to assert derivatively on behalf of McGraw fails as a matter of law because the Complaint (*cf.* Cmplt. ¶¶ 5-6*)* does not (and cannot) allege that McManus was or is a member of McGraw.  A derivative claim "must allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law."  Rule 23.1.  *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 787, 792 n.11 (S.D.N.Y. 2011) ("New York courts have [held] . . . that membership in the LLC is a prerequisite for a member to have standing to bring a derivative action on behalf of the LLC").

As a matter of indisputable fact, the only members of McGraw prior to Fairbridge's UCC Foreclosure Auction in late 2025 were the three Non-Party McGraw Members. *See* Lettera Aff't, Exs. 1-3 (the Pledge Agreements executed by the Non-Party McGraw Members).  By the time McManus commenced this lawsuit on December 19, 2025, it was *Fairbridge* that owned 100% of the McGraw membership interests by means of its purchase thereof through the UCC Foreclosure Auction.  *See* Cmplt. ¶ 115; Lettera Aff't, Ex. 31 (Oct. 14, 2025 Certificate of Sale and Fact, reflecting Fairbridge's 100% ownership interest in McGraw).

14

**B.    McManus Fails To Plead the Prerequisites
To Assert Claims on Behalf of Poplar**

McManus's attempt to assert claims on behalf of Poplar is also defective as a matter of law.  It is unclear from the Complaint's ambiguously phrased case caption whether McManus purports to sue derivatively on behalf of Poplar or whether he is asserting that Poplar is suing directly in its own capacity.  Either way, the claims fail.

**(i)    The Purported Derivative Poplar Claims**

First, while it is believed to be the case, the Amended Complaint nowhere alleges that McManus currently holds an ownership interest in Poplar.  *Cf.* Cmplt. ¶¶ 1-258.  For the reasons addressed above, this pleading failure deprives McManus of standing to assert any claims on behalf of that entity.  *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d at 790.

Second, even if the Amended Complaint had pled McManus's ownership interest in Poplar, the Complaint would still fail because it nowhere pleads that McManus made a pre-suit demand upon Poplar to assert claims against Defendants or, in the alternative, that such a demand would have been futile.  *See* Rule 23.1(b)(3); *Louisiana Mun. Police Employees' Retirement System v. Hesse*, 962 F. Supp. 2d 576, 591 (S.D.N.Y. 2013) ("[s]ince Plaintiffs cannot establish demand futility, the Complaint is dismissed in its entirety").

**(ii)    The Purported Direct Poplar Claims**

To the extent the Complaint purports to plead a direct claim by Poplar against Defendants, it, too, fails because the Complaint does not assert that McManus's counsel was ever retained by or authorized to file any claims on behalf of Poplar.  Moreover, the Poplar Operating Agreement provides that "the affirmative vote of both members shall be required to approve any

15

matter coming before the Members."  Lettera Aff't, Ex. 12 at § 8.2.  The Complaint nowhere pleads compliance with the foregoing provisions of the Poplar Operating Agreement.  Absent such compliance, McManus's counsel is not authorized to file claims in Poplar's name in this lawsuit.

**II.**

### ALL OF THE CLAIMS ASSERTED BY MCMANUS AND MCGRAW MUST BE DISMISSED BECAUSE THEY WERE PREVIOUSLY RELEASED AND WAIVED

Apart from the lack of standing addressed above, all of the claims asserted in the Complaint by McManus individually, as well as those purportedly asserted by McManus on behalf of McGraw, must be dismissed because they were previously released and waived by both in an executed writing.

In his role as a Guarantor of the Fairbridge Loans pursuant to the McManus Guarantees (*see* Lettera Aff't, Exs. 9-10), McManus is a party to the Forbearance Agreement (*see id.*, Ex. 20) in which McManus and McGraw expressly acknowledged that McGraw "is in default under the [Fairbridge Loans] as set forth above and is absolutely liable and indebted to the Lender for all existing Indebtedness and future Indebtedness evidenced by the Loan Documents, without claim, counterclaim, right of recoupment, defense or set-off of any kind or nature whatsoever, which, as of the date hereof, is $2,060,405.60" and unconditionally reaffirmed that McGraw, as the borrower, and McManus, as a Guarantor, "remain unconditionally liable to [Fairbridge]" under the Fairbridge Loans.  *Id.*, Ex. 20 §§ 1(a) & 1(b).  Thereafter, in that same Forbearance Agreement, McManus and McGraw released Defendants from and waived all conceivable claims, including any and all claims arising out of or relating to the Fairbridge Loans (the "***Release & Waiver***"), as follows:

16

"(b)     Borrower [McGraw] and Guarantors [including McManus], as releasors, on behalf of themselves, their successors and assigns, and all those entities claiming by, through, or under them, as releasors, together with their successors and assigns (collectively referred to as the 'Releasors'), for good and valuable consideration, ***do hereby unconditionally remise, release, and forever discharge Lender [Fairbridge], its past and present officers, directors, shareholders, members, employees, agents, attorneys, parent corporations, subsidiaries, affiliates, successors, and assigns, and the heirs, executors, trustees, administrators, successors, and assigns of any such persons or entities, as releasees (collectively referred to as the 'Releasees'), of and from any and all manner of actions, causes of action, suits, claims, counterclaims, liabilities, obligations, defenses, and demands whatsoever, at law or in equity, if any, which any of the Releasors ever had, now has, or hereafter can, shall, or may claim to have against any of the Releasees for or by reason of any cause, matter, or thing whatsoever, arising from the beginning of the world to the date of execution of this Agreement***.

"(c)     ***Borrower and Guarantor hereby waive any rights of set-off, defenses[,] counterclaims or claims any of them may have against any Releasee with respect to the Loan and the Indebtedness due the Lenders by Borrower and the Guarantors***."

Lettera Aff't, Ex. 20 at §§ 3(b) & 3(c) (emphasis added).

In executing the Forbearance Agreement, including the Release & Waiver set forth therein, McGraw and McManus also represented and warranted that each was "represented by advisors of its own selection including but not limited to attorneys at law and accountants" and that "it has not relied upon any representation, warranty, agreement or information provided by [Fairbridge], its employees, agents or attorneys."  Lettera Aff't, Ex. 20 § 7(e)(v).  *See also id.* § 7(b) ("[t]his Agreement may not be changed orally").

The Release & Waiver executed by McGraw and McManus, which may properly be considered on this motion, bars each of the claims asserted by them against Defendants.  *See, e.g., Bensky v. Indyke*, 743 F. Supp. 3d 586, 592-93 (S.D.N.Y. 2024) (Subramanian, J.) (considering the plaintiff's release of claims under Fed. R. Evid. 201(b) even though it was "not

17

in the complaint, attached to it, mentioned in it, or relied on by it" and noting that said release

"released . . . 'any and all claims,' 'whether now existing, hereafter existing or revived in the

future,' 'including without limitation any and all claims or causes of action that arise or may arise

from or which otherwise concern acts of sexual abuse by Mr. Epstein.'  ***The release goes on,***

***making clear that it covers claims that 'Releasor does not know or suspect to exist in her favor,***

***which, if known by Releasor, would have materially affected her decision to enter into this***

***General Release.'  To put it bluntly, the release is about as broad and categorical as it gets***.")

(citations omitted; emphasis added).  *See also Doe 1 v. Gov't of United States Virgin Islands*, 771

F. Supp. 3d 379, 388 (S.D.N.Y. 2025) (Subramanian, J.) (the Court "may take judicial notice of

the release and consider it on a motion to dismiss").  *See also Centro Empresarial Cempresa S.A.*

*v. Am. Movlip S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) ("a release may encompass unknown

claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and

knowingly made'"); Fed. R. Evid. 201(b).[2]

———

In addressing below each of the causes of action alleged in the Amended

Complaint, Defendants expressly incorporate by reference the threshold defects identified in

Argument Sections I and II, above.

---

[2]    Additional releases were executed by McManus, McGraw and Poplar in favor of
Fairbridge.  *See* Lettera Aff't, Exs. 16-19 at § 15; Ex. 23 at § 15; Ex. 24 at § 16.

4908-8636-9176, v. 2

## III.

### THE PURPORTED RICO SECTION 1962(c) CLAIM ALLEGED IN
### THE FIRST CAUSE OF ACTION FAILS AS A MATTER OF LAW

McManus cannot transform into a RICO claim Fairbridge's exercise of its express, lawful contractual rights to foreclose on McGraw's membership interests in response to McGraw's continued default under the Fairbridge Loans.  If the contracts, defaults and ultimate foreclosures at issue here, involving sophisticated commercial parties represented by legal counsel and other professional advisors, can be twisted into a RICO claim, then every commercial actor forced to face the consequences of its failure to satisfy negotiated contractual obligations could assert such a claim and, without more, achieve its pernicious objective of publicly stigmatizing its commercial counterparties as quasi-criminals.  *See Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *9 (S.D.N.Y. 2013) (purported commercial wrongs "cannot be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal").

This Court, in its gatekeeping role, is empowered to reject such frivolous RICO claims.  *See, e.g., Elsevier Inc. v. W.H.P.R. Inc.*, 692 F. Supp. 2d 297, 300 (S.D.N.Y. 2010) ("***Allegations of racketeering have been described as a 'thermonuclear device.'  The mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants.  As a result, courts are charged with flushing out frivolous RICO allegations at the earliest possible stage of litigation***.") (citations omitted; emphasis added).  *See also Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1025 (7th Cir. 1992) ("civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions").

19

4908-8636-9176, v. 2

To plead a viable RICO claim under Section 1962(c), Plaintiffs must plead that "a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013). McManus's failure to satisfy any one of the RICO pleading requirements dooms the Amended Complaint. *See Scheiner v. Wallace*, 832 F. Supp. 687, 699 (S.D.N.Y. 1993) ("[t]he failure of any one element is fatal to a RICO claim"); 18 U.S.C. § 1962(c). Here, the Complaint fails to satisfy any of the RICO pleading requirements.

A.    **RICO Standing Has Not Been Pled**

Under RICO Section 1964(c), a plaintiff lacks standing to assert a civil RICO claim unless it establishes (a) that it is a "person," who (b) has been "injured" (c) "in his business or property" (d) by "a violation of [S]ection 1962." 18 U.S.C. § 1964(c). *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (same).

The Complaint's assertion that McManus, the "Plaintiff" (Cmplt. ¶ 5), suffered damages consisting of "lost property value" and "lost development profits" (*id.* ¶ 142) *fails as a matter of law because McManus was never and is not now a member of McGraw, and thus never held an ownership interest in the McGraw Property, and neither of the McManus Guarantees was ever called*. As a non-member of McGraw, McManus cannot claim as *his* injury the diminished value of the McGraw Property or the lost opportunity to develop said Property.

In addition, McManus's assertion that Fairbridge's lawful and routine foreclosure on the McGraw membership interest in response to McGraw's default under the Fairbridge Loans exacerbated his preexisting health issues (*see* Cmplt. ¶ 142) does not constitute a RICO injury to

20

"his business or property," as required under RICO Section 1964(c). *See Medical Marijuana, Inc. v. Horn,* 604 U.S. 593, 594 (2025) ("by explicitly permitting recovery for harms to business and property, [RICO Section 1964(c)] implicitly excludes recovery for harm to one's person"); *RJR Nabisco, Inc.* v. *European Community*, 579 U.S. 325, 350 (2016) ("RICO's private cause of action . . . exclude[es], for example, personal injuries").

### B.    RICO Causation Has Not Been Pled

Because the Complaint fails to plead a RICO injury, the pleading, by definition, cannot satisfy the requirement that Defendants' alleged conduct be the but-for and proximate cause of said injury. Even if McManus were somehow deemed to have had suffered a cognizable RICO injury (he has not), the Complaint fails to plead the requisite causation between the alleged injury and Defendants' alleged conduct because McManus (a) was not a member of McGraw; (b) was not an owner of the McGraw Property; (c) was not a party to the Pledge Agreements pursuant to which Fairbridge properly foreclosed on the Non-Party McGraw Members' membership interests; and (d) was not required by Fairbridge to make any payment under the McManus Guarantees.

### C.    No RICO Enterprise Has Been Pled

#### (i)    The Alleged RICO Enterprise Contravenes the Person-Enterprise Distinctness Requirement

The required "enterprise" that must be pled as part of a RICO claim "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). Under the Person-Enterprise Distinctness Requirement, the "enterprise" must be distinct from the "person"

21

who is alleged to have violated or conspired to violate RICO Section 1962(c), which person "includes any individual or entity capable of holding a legal or beneficial interest in property[.]" 18 U.S.C. § 1961(3). *See, e.g., Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001) ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name"); *Ulit4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) ("the same entity cannot be <u>both</u> the RICO person and the enterprise") (emphasis in original).

The Amended Complaint alleges that each of the "Defendants," including the Fairbridge Entities, is a RICO "person" that violated Section 1962(c). *See* Cmplt. ¶ 128. Notwithstanding the Complaint's random, gratuitous references to non-party individuals and entities — many of whom are victims of the shameful hyperbolic smears that permeate the entire Complaint in lieu of particularized well-pled facts — ***the <u>only</u> purported RICO "enterprise" that is actually alleged in the Amended Complaint consists of an association-in-fact among the Fairbridge Entities and the Individual Defendants, the latter of whom are/were the employees, partners, affiliates and agents of said Fairbridge Entities***. *See* Cmplt. ¶ 127 ("***Defendants constituted an 'enterprise' within the meaning of 18 U.S.C. § 1961(4)***") (emphasis added).

Plaintiff's RICO claim must therefore be dismissed on its face because it contravenes the Person-Enterprise Distinctness Requirement:

> "A corporation can act only through its employees, subsidiaries, or agents. So 'if a corporate defendant can be liable for participating in an enterprise comprised only of its agents — even if those agents are separately incorporated legal entities — then RICO liability will attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless.' . . . ***Accordingly, a plaintiff may not circumvent the distinctness requirement 'by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of***

22

4908-8636-9176, v. 2

*the defendant,' . . . that consists, in other words, of a corporate defendant 'corrupting itself.'"*

*Ulit4less,* 871 F.3d at 205 (emphasis added). *See Cruz,* 720 F.3d at 120 ("a corporate person cannot violate the statute by corrupting itself"); *Spig Industry, LLC v. Novac Equities LLC*, 2025 WL 3643955, at *13 (S.D.N.Y. 2025) ("[e]ntities are not distinct when the 'person' is a corporation and the 'enterprise' consists of the corporation associating either with 'its own employees or agents carrying on the regular affairs of the [corporation],' or with subsidiaries 'operat[ing] within a unified corporate structure'") (citations omitted).

### (ii)    The Alleged RICO Enterprise Is Not Separate and Distinct From the Alleged Pattern of Racketeering

The RICO claim additionally fails because the Amended Complaint does not plead the existence of an enterprise that is separate from the alleged pattern of racketeering activity and, instead, makes clear that the alleged enterprise has no existence apart from the (deficiently) pled pattern of racketeering activity. *See, e.g.,* Cmplt. ¶¶ 131-33 (Defendants' communications alleged to constitute predicate acts "demonstrate an association-in-fact enterprise"). *See United States v. Turkette,* 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. . . . [If] the alleged enterprise would not exist but for the alleged pattern of racketeering activity[,]" the RICO claim must be dismissed); *Boyle v. United States,* 556 U.S. 938, 940-41 (2009) (an "association-in-fact enterprise . . . must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages'").

4908-8636-9176, v. 2

**D.    Criminal "Predicate Acts" Supporting Alleged
<u>"Racketeering Activity" Have Not Been Pled</u>**

A RICO claim under Section 1962(c) must plead with particularity that the alleged RICO person engaged in "a pattern of racketeering activity" by engaging during the specified time period in two or more of the so-called "predicate" ***criminal acts*** listed in Section 1961(1).  In attempting desperately to manufacture a RICO claim out of routine commercial loan and foreclosure transactions that took place pursuant to detailed contracts negotiated among sophisticated business actors advised by legal counsel, the Complaint identifies without any basis whatsoever a handful of randomly listed criminal predicate acts, including mail fraud under 18 U.S.C. § 1341; wire fraud under 18 U.S.C. § 1343; extortion under the Hobbs Act, 18 U.S.C. §§ 1951, *et seq.*; and securities fraud under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder.  *See* Cmplt. ¶¶ 2; 183.

However, the Complaint nowhere pleads a single particularized fact, as opposed to conclusory assertions, addressing the respective elements of those criminal statutes, which are thoroughly inapplicable to the routine commercial loan and foreclosure transactions at issue here. *See, e.g.,* 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud require an intentional scheme to defraud); 18 U.S.C. § 1951 ("extortion" requires the "wrongful use of actual or threatened force, violence, or fear, or under color of official right").  *See also Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 119 (2d Cir. 2013) ("Plaintiffs' [RICO] allegations must also satisfy the requirement[s] [of Rule 9(b)].  . . .  So Plaintiffs must plead the alleged mail fraud with particularity, and establish that the mailings were in furtherance of a fraudulent scheme.  Plaintiffs' allegations fail on both accounts.").

24

Not only are Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 in no way implicated here, but the RICO statute itself makes it abundantly clear that alleged securities fraud cannot serve as the predicate act for a RICO claim.  *See* 18 U.S.C. § 1964(c) ("no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962").

    **E.**    **A "Pattern" of Alleged "Racketeering Activity"**
           **Has Not Been Pled**

Because, as demonstrated above, the Amended Complaint does not contain a single paragraph that alleges with particularity any predicate act whatsoever, the pleading cannot demonstrate the requisite RICO "pattern" of racketeering activity required under RICO Section 1962(c).

**IV.**

**THE RICO SECTION 1962(d) CONSPIRACY CLAIM ALLEGED IN THE SECOND CAUSE OF ACTION FAILS AS A MATTER OF LAW**

The Second Cause of Action, purporting to plead a RICO conspiracy claim under Section 1962(d), should be summarily dismissed because there can be no conspiracy where, as here, there is no viable underlying Section 1962(c) claim.  *See, e.g., Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 221 (S.D.N.Y. 2002) ("Plaintiff's second claim is for RICO conspiracy, in violation of 18 U.S.C. § 1962(d).  This claim fails because the underlying substantive RICO cause of action has been dismissed.").

The so-called conspiracy claim fails for the additional reason that it is supported by only McManus's continual slapping of pejorative labels on the lawful, routine exercise by Fairbridge of its contractual rights of foreclosure in response to loan defaults.  *See, e.g.,* Cmplt.

25

¶ 146 (referring ridiculously to the October 14, 2025 UCC Foreclosure Auction hosted at the office of Fairbridge's outside counsel as having been held in a "physical 'safe house'").

## V.

### THE PURPORTED CLAIM UNDER NEW YORK ENTERPRISE CORRUPTION LAW § 460.20 FAILS AS A MATTER OF LAW

The Complaint's purported claim under Section 460.20 of the New York State Enterprise Corruption Penal Law — which is improperly combined in the First Cause of Action with the Complaint's defective RICO Section 1962(c) claim — not only fails substantively, but, *as made clear on the face of the statute, can be alleged only by the government, not a private party*. *See* N.Y. Enterprise Corruption Penal Law § 460.50(1) (listing the state and local prosecutors who may prosecute "a charge of enterprise corruption"); *Eviner v. Eng*, 2015 WL 4600541, at *11 (E.D.N.Y. 2015) ("a private cause of action is not recognized" under the statute).

## VI.

### THE THIRD CAUSE OF ACTION FOR COMMON LAW FRAUD FAILS AS A MATTER OF LAW

The Third Cause of Action fails to plead any facts converting the carefully-negotiated commercial transactions at issue into a plausible fraud claim, which requires the particularized pleading under Rule 9(b) of "(1) [a] representation of a material fact, (2) falsity, (3) scienter, (4) reliance, and (5) injury." *Owusu v. N.Y. State Ins*., 655 F. Supp. 2d 308, 319 (S.D.N.Y. 2009). *See Iqbal,* 556 U.S. at 686-87.

Among several other fatal defects, the Complaint's allegation that unspecified "representations concerning loan modifications, funding commitments, and payoff obligations"

26

were "intend[ed] to induce Plaintiff's reliance" (Cmplt. ¶ 151) fails as a matter of law for at least two reasons. First, Fairbridge had an absolute right under the Pledge Agreements to foreclose on the McGraw membership interests when McGraw continued to default on its Fairbridge Loan obligations. *See* Lettera Aff't, Exs. 1-3 at § 11(a).

Second, Plaintiff could not have relied upon any statements allegedly made by Defendants in connection with the Fairbridge Loan Agreements in light of the Agreements' no-oral modification clauses. *See, e.g.,* Lettera Aff't, Ex. 19, at § 7(b) ("***This [Forbearance] [A]greement may not be changed orally but only by an agreement in writing signed by a duly authorized officer of [Fairbridge] and [McGraw LLC], and by [McManus]***, to the extent any such party is to be bound thereby") (emphasis added); *id.,* Exs. 16-19 at § 11.

Additionally, as a matter of law, Fairbridge could not have acted with the requisite *scienter* by seeking the repayment to which it was lawfully entitled under the Fairbridge Loan Agreements and, ultimately, foreclosing upon the collateral to which it was entitled under the Pledge Agreements. *See generally Zutty v. Rye Select Broad Market Prime Fund, L.P*, 33 Misc. 3d 1226(A), at *11 (Sup. Ct. N.Y. Co. 2011) ("Allegations of scienter are essential to a cause of action for fraud. . . . Scienter means an actual intent 'to deceive, manipulate, or defraud[.]'").

## VII.

### THE FOURTH CAUSE OF ACTION FOR ECONOMIC DURESS AND EXTORTION FAILS AS A MATTER OF LAW

Like the First Cause of Action, the Fourth Cause of Action improperly combines two claims, a purported claim for economic duress and a purported claim for extortion. Both fail as a matter of law.

4908-8636-9176, v. 2

A claim for economic duress requires the pleading of "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Kamerman v. Steinberg*, 891 F.2d 424, 432 (2d Cir. 1989). For all the reasons discussed herein, Fairbridge's enforcement of its lawful contractual rights under the Fairbridge Loan Agreements cannot form the basis of an economic duress claim. *See Cooper Development Co. v. Friedman*, 1994 WL 62846, at *4 (S.D.N.Y. 1994) ("[u]nder New York law, threats to enforce a party's legal rights under a contract — or even that party's interpretation of its rights — cannot constitute a wrongful threat sufficient to establish a claim of economic duress").

The purported extortion claim also fails. The fragmented, stream-of-consciousness assertions set forth in Paragraphs 156-70 of the Complaint are almost incomprehensible, but appear to take issue with Fairbridge's lawful, routine efforts to protect itself by seeking additional collateral for granting the multiple requests of the defaulting party, McGraw, to postpone the UCC Foreclosure Auction. *A contracting party is entitled to demand additional consideration in exchange for postponing (forbearing from) the exercise of its contractual right*. *See MM Arizona Holdings LLC v. Bonanno,* 658 F. Supp. 2d 589, 593 (S.D.N.Y. 2009) ("The agreement by Lender to forbear from pursuing its rights under the Guaranty is something of real value in the eye of the law. . . . Therefore, the agreed-upon forbearance period contained in the Forbearance Agreement is sufficient consideration for the release contained in that Agreement.").

Finally, in any event, an extortion claim cannot be pursued as a private right of action. *See, e.g., Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019) ("[w]ith

28

4908-8636-9176, v. 2

respect to the extortion claim, Plaintiffs have not identified a private cause of action under either federal or state law, and the Court is not aware of one").

## VIII.

### THE FIFTH CAUSE OF ACTION FOR INTENTIONAL
### INFLICTION OF EMOTIONAL DISTRESS FAILS AS A MATTER OF LAW

"Intentional infliction of emotional distress 'has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Petrone v. Turner Publ'g Co. LLC*, 2023 WL 7302447, at *3 (S.D.N.Y. 2023) (Subramanian, J.). *See Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993) ("[t]he first element filters out petty and trivial complaints and is most susceptible to determination as a matter of law"); *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 564 (S.D.N.Y. 2012) ("New York sets a particularly high bar for conduct that is so 'extreme and outrageous' that it is actionable under this tort . . . [and] [w]hether the conduct at issue is sufficiently 'outrageous' is susceptible to determination as a matter of law").

Stripped of its hyperbole, the Complaint makes clear that, far from seeking to cause emotional (or physical) distress to McManus, Defendants, facing a ticking clock, sought simply to exercise Fairbridge's lawful rights under the Fairbridge Loan Agreements for the purpose of mitigating the damages caused by the McGraw default and the devaluation of the McGraw Property. *See, e.g., Bd. of Managers of Exec. Plaza Condo. v. Jones*, 251 A.D.2d 89, 90 (1st Dept. 1998) (a condominium board's exercise of its By-Laws right "to foreclose on a lien filed for unpaid common charges and interest thereon . . . was not extreme and outrageous and

29

therefore does not, as a matter of law, support the counterclaim for intentional infliction of emotional distress").

**IX.**

**THE SIXTH CAUSE OF ACTION FOR FRAUD**
**AND DECEIT FAILS AS A MATTER OF LAW**

The Sixth Cause of Action fails because it is premised upon the wholly unsupported conclusory allegation that "Defendants defrauded American Life & Security ('ALSC') and Oaktree Capital" (Cmplt. ¶ 177) — neither of which is a named plaintiff in this lawsuit. *See Delo v. Fordham Univ.*, 2025 WL 2166087, at \*4 (S.D.N.Y. 2025) ("[a]lthough a party may seek redress for injuries done to that party, it may not for 'injures done to others'"); *Kounitz v. Slaatten*, 901 F. Supp. 650, 654 (S.D.N.Y. 1995) ("[i]t is well-settled, however, that a litigant may not claim relief for injury to a third party"); *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 39 n.8 (S.D.N.Y.1992) ("[a] plaintiff has failed to state a claim for fraud when he alleges merely that the misrepresentation in question was made to or relied on by a third party"), *aff'd,* 23 F.3d 398 (2d Cir.1994).

Moreover, even if the Sixth Cause of Action could be read as an assertion by McManus that he was somehow defrauded in connection with the Fairbridge Loan Agreements (he was not), such a cause of action improperly duplicates the Third Cause of Action for common law fraud and, like the Third Cause of Action, fails to plead fraud with any particularity whatsoever. *See, e.g., Simington v. Lease Fin. Grp., LLC*, 2012 WL 651130, at \*11 (S.D.N.Y. 2012) ("[t]he Court finds the deceit, fraud and/or misrepresentation claim (Count Four) duplicative of plaintiffs' common law fraud claim").

30

Finally, to the extent the Sixth Cause of Action attempts to plead some amorphous, unlabeled fraud claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (*see* Cmplt. ¶ 183), it fails as a matter of law because the Complaint contains no well-pled allegations of fraud, identifies no specific security and, even if it did, does not plead, as required, that McManus himself purchased or sold any such security. *See Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 317 (S.D.N.Y. 2006) ("[u]nder the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, only an actual purchaser or seller of securities has standing to assert claims under § 10(b) and Rule 10b-5"); *Aiello v. Brown*, 2021 WL 1225445, at *4 (S.D.N.Y.) (same), *aff'd*, 2021 WL 5505107 (2d Cir. 2021).

## X.

### THE SEVENTH CAUSE OF ACTION FOR MONEY LAUNDERING AND CONCEALMENT OF PROCEEDS FAILS AS A MATTER OF LAW

McManus's Seventh Cause of Action, which, like the rest of the Amended Complaint, consists of disjointed, conclusory assertions in lieu of well-pled, particularized facts and a cognizable legal theory, purports to be pled under 18 U.S.C. § 1956. *See id.* § 1956(a)(1) (requiring the conducting or an attempt "to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity"). The claim fails as a matter of law because none of the elements of this criminal statute are remotely applicable here and there exists no private cause of action under the statute. *See, e.g., Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (18 U.S.C. § 1956 "does not give rise to a private cause of action"); *Roy v. Bank of New York Mellon*, 2018 WL 3912281, at *6 (E.D.N.Y.) (there is "no

31

private right of action for money laundering under 18 U.S.C. § 1956"), *report and recommendation adopted*, 2018 WL 4771898 (E.D.N.Y. 2018).

## XI.

### THE EIGHTH AND NINTH CAUSES OF ACTION ALLEGING A FRAUDULENT CONVEYANCE FAIL AS A MATTER OF LAW

The Sixth and Seventh Causes of Action, purporting to allege claims under Sections 273–76 of the New York Debtor and Creditor Law, must be dismissed as a matter of law because they are inapplicable to the events at issue here and McManus lacks standing to assert such claims. ***Those statutory provisions are designed to protect, and claims thereunder can be properly pled only by, a creditor, and not a debtor***. Here, of course, Fairbridge was the creditor, and McGraw "was a debtor of Defendants[.]" Cmplt. ¶ 196. *See also id.* at ¶ 203 ("defendant was a creditor of plaintiff"). *See, e.g.,* New York Debtor and Creditor Law §§ 273(a) ("[a] transfer made or obligation incurred by a debtor is voidable as to a creditor"). *See also id.* §§ 274(a), 275 & 276(a); *Eberhard v. Marcu,* 530 F.3d 122, 129 (2d Cir. 2008) ("[i]t is well settled that in order to set aside a fraudulent conveyance, ***one must be a creditor of the transferor***") (emphasis added).

## XII.

### THE TENTH CAUSE OF ACTION UNDER NEW YORK GENERAL BUSINESS LAW § 349 FAILS AS A MATTER OF LAW

The Tenth Cause of Action purports to be pled under Section 349 of the New York General Business Law ("***GBL***"). While none of the conclusory allegations set forth in the Complaint satisfies any of the substantive elements of such a claim, the threshold fact that GBL § 349 applies only to ***consumer-oriented transactions*** destroys the claim altogether.

32

Notwithstanding the Complaint's spurious declarations to the contrary (*see, e.g.,* Cmplt. ¶¶ 214, 219-220), the Fairbridge Loans were certainly not "consumer-oriented." ***Indeed, in February 2021, McManus and the Non-Party McGraw Members executed an affidavit in which each expressly affirmed under oath that the Fairbridge Loans were not consumer-oriented***. *See* Lettera Aff't, Ex. 4 at 1 ("[the Fairbridge Loans] are not for personal, family, household . . . purposes but are for business and commercial purposes only").

The Fairbridge Loans were the product of arm's-length negotiations among sophisticated, private commercial actors in connection with the private Construction Project. *See, e.g., Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) ("***Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute.'  Likewise, Section 349 claims cannot be maintained with regard to business-oriented conduct***.") (emphasis added); *Exxonmobil Inter-America, Inc. v. Advanced Information Engineering Services, Inc.,* 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) ("***Courts have traditionally applied General Business Law § 349 in the context of consumer sales transactions***. . . . ***The statute*** . . . ***should not be permitted to become an adjunct to ordinary commercial litigation***[.]") (emphasis added).

## XIII.

### THE ELEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT FAILS AS A MATTER OF LAW

"A claim for unjust enrichment requires Plaintiff to show that (1) [the defendant] was enriched (2) at [the plaintiff's] expense, and (3) it is 'against equity and good conscience' to permit [the defendant] to keep the money [the plaintiff] gave it." *Del Rosario v. Sazerac Co., Inc.*, 2023 WL 6318083, at *3 (S.D.N.Y. 2023) (Subramanian, J.).  The Eleventh Cause of Action

33

for unjust enrichment fails as a matter of law because ***Fairbridge merely exercised its lawful, express contractual rights*** to foreclose on the McGraw membership interests in response to McGraw's default under the Fairbridge Loans (and to foreclose on the Fairbridge-Poplar Mortgage in response to Poplar's default thereunder).  *See Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*, 2022 WL 836890, at *10 (S.D.N.Y. 2022) ("[g]iven that the Lease is an enforceable contract, an unjust enrichment claim — even when brought by a non-party to the Lease, such as Qatar Group — is barred").

## XIV.

### <u>THE TWELFTH CAUSE OF ACTION FOR AN<br>ACCOUNTING FAILS AS A MATTER OF LAW</u>

The Twelfth Cause of Action for an equitable accounting fails because ***the transactions at issue arise out of an arm's-length commercial contractual relationship — and not a "fiduciary relationship" — between the purported  Plaintiffs, on the one hand, and Defendants, on the other***.  Nor does the Complaint allege such a fiduciary relationship.  *See, e.g., Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.,* 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (the initial element of an equitable accounting claim under New York law is the existence of 'a fiduciary relationship'"); *Transnat'l Mgmt. Sys. II, LLC v. Carcione*, 2016 WL 7077040, at *8 (S.D.N.Y. 2016) ("Plaintiffs' accounting claim fails at the initial step because, as explained above, the [plaintiff] does not allege the existence of a fiduciary relationship between plaintiff and the .  .  . defendants"); *In re Basic Food Grp., LLC,* 2018 WL 5805943, at *12 (Bankr. S.D.N.Y. 2018) ("***[i]t is well settled in New York that a lender does not owe any fiduciary duties to a borrower***'") (emphasis added).

**XV.**

**THE THIRTEENTH CAUSE OF ACTION
FOR TORTIOUS INTERFERENCE WITH
CONTRACT FAILS AS A MATTER OF LAW**

Under New York law, tortious interference with contract requires "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 221 (S.D.N.Y. 2019). The Complaint fails to plead any of these elements.

First, McGraw, and not McManus, was a party to the Ariel Agreement. *See, e.g., Red Fort Capital, Inc. v. Guardhouse Productions LLC*, 2020 WL 5819549, at *5 (S.D.N.Y. 2020) ("Dilley cannot maintain a claim of tortious interference with a contract to which he was not a party.").

The Complaint does not allege that Defendants interfered with or disrupted McGraw's contractual relationship with Ariel in any way whatsoever. In fact, the Complaint admits that, by September 2025, it was *McGraw* — not Ariel — that terminated the Ariel Agreement because McGraw decided it was no longer interested in selling the McGraw Property. *See* Cmplt. ¶¶ 100, 108.

Moreover, the Complaint concedes that Defendants were quite supportive of the broker's efforts to find a third-party purchaser for the McGraw Property (*see, e.g.,* Cmplt. ¶¶ 97-99) and, to that end, merely pressured *McGraw* to accept the purchase offer that Ariel brought to its attention (*see id.*). The tortious interference claim therefore fails in its entirety.

35

## XVI.

### THE FOURTEENTH CAUSE OF ACTION FOR ALLEGED BREACH OF FIDUCIARY DUTY AND PROFESSIONAL MISCONDUCT FAILS AS A MATTER OF LAW

The conclusory and self-contradictory Fourteenth Cause of Action, purportedly pled under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1, and New York Rule of Professional Conduct 1.12, should be summarily dismissed for failure to state a claim as a matter of law.

### A.    The Investment Advisers Act of 1940

The Investment Advisers Act of 1940 (the "*Advisers Act*") is wholly inapplicable to Defendants.  First, the statute applies only to an "investment adviser," which is defined as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities[.]"  15 U.S.C. § 80b-2(a)(11). None of the Defendants is an investment adviser as a matter of law, and the Complaint pleads not one fact to the contrary.  *Cf.* Fairbridge Asset Management Website ("[t]he Fairbridge team provides a deep and diverse set of skills to originate, underwrite, and manage a portfolio of customized and complex real estate bridge loans"), accessible at *https://fairbridgellc.com/about/*; *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1309 (2d Cir. 2002) (the defendant "did not in this case contract to serve in an advisory capacity" and thus "was not an 'investment adviser'" as defined by the Advisers Act).

Second, even if the Advisers Act were somehow applicable (it is not), the claim would still fail because the Amended Complaint does not plead that any of the purported Plaintiffs entered into an investment contract with Fairbridge (nor did they). *See Rapillo v. Fingerhut*, 2016 WL 11705140, at *9 (S.D.N.Y. 2016) ("[t]o bring a claim under … the Advisers Act, a plaintiff must have entered into a contract for investment advisory services with an investment adviser"); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 324 (S.D.N.Y. 2011) (same).

### B.   New York Rule of Professional Conduct 1.12

The Amended Complaint's cowardly, baseless character assassination of non-party attorney William Turkish — asserting recklessly that he violated New York Rule of Professional Conduct 1.12 (*see* Cmplt. ¶¶ 250-52) — must be dismissed for failure to state a claim. Not only is Mr. Turkish not a party to this lawsuit and not only is the claim not supported by a single well-pled factual allegation, but "[t]here is no private cause of action for violations of the New York Code of Professional Responsibility." *Avile v. Feitell*, 2008 WL 2139153, at *3 (S.D.N.Y. 2008).

### XVII.

### THE FIFTEENTH CAUSE OF ACTION FOR ALLEGED COMMERCIALLY UNREASONABLE UCC FORECLOSURE FAILS AS A MATTER OF LAW

The misguided assertions set forth in the Fifteenth Cause of Action for an alleged "commercially unreasonable" UCC foreclosure do not state a viable claim and are wholly contradicted by the executed Fairbridge Loan Agreements and related documents that the Amended Complaint deliberately ignores. *See* Lettera Aff't, Exs. 1–8.

Even if McManus could properly assert a claim on behalf of McGraw or Poplar (he cannot), the UCC Foreclosure Auction most certainly complied fully with New York UCC

37

§ 9-610, which makes clear that, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing" and, "[i]f commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms" and "may purchase collateral . . . at a public disposition[.]"  N.Y. U.C.C. Law § 9-610(a)–(c).

The UCC Foreclosure Proceeding and the subsequent Auction were undeniably commercially reasonable.  First, the Pledge Agreements expressly permitted Fairbridge to "***sell the [McGraw LLC membership interests] or any part thereof in one or more parts at public or private sale, at any recognized exchange or broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable***."  Lettera Aff't, Exs. 1-3 at § 11(a) (emphasis added).

Second, while asserting falsely that "Defendants provided defective or invalid access to remote bidding" (Cmplt. ¶ 254), the Complaint deliberately conceals from the Court the critical facts that, on September 18, 2025 (26 days before the October 14, 2025 UCC Foreclosure Auction), Fairbridge's counsel sent to McManus and the Non-Party McGraw Members via e-mail and UPS Overnight Mail the following written notice of the Auction:

> "Notice is hereby given that Lender [Fairbridge] will, in accordance with Section 12(a) of the Pledge Agreement, sell the Collateral [the McGraw membership interests] to the highest qualified bidder at a public sale in accordance with the provisions of the Uniform Commercial Code as in effect in the State of New York. The sale will take place beginning on October 14, 2025 at 1:00 p.m. (Eastern Time) at the offices of Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, *which you may attend*, and simultaneously by remote auction via Zoom, as follows [Zoom login credentials].

> "The sale will be conducted by Mannion Auctions, LLC, Matthew D. Mannion,
> licensed auctioneer (DCA #1434494)."

Lettera Aff't, Ex. 28 at 2-3 (italicized emphasis in original).

On September 20 and 24, 2025 and October 1, 2025, additional notice of the UCC Foreclosure Auction was published by Fairbridge in the *Wall Street Journal* and the *New York Daily News*. *See* Lettera Aff't, Exs. 29 & 30. On October 14, 2025, the UCC Foreclosure Auction was conducted by Mr. Mannion. *See id.*, Ex. 30.

The UCC Foreclosure Auction was conducted in a textbook commercially reasonable manner. *See, e.g., DAOL Rexmark Union Station LLC v. Union Station Sole Member, LLC*, 772 F. Supp. 3d 373, 405-406 (S.D.N.Y. 2025) ("The foreclosure sale was conducted in a commercially reasonable manner. Notice of the foreclosure sale was reasonable. The Foreclosure Sale Notice was provided to the borrower on May 13, 2022, over a month before the scheduled sale. The UCC Public Sale Notice provided sufficient information regarding the sale to potential purchasers. Notice of the sale was published in The New York Times, The Washington Post and several commercial real estate sources. . . . Ultimately, only one bidder participated in the auction. But the fact that only a single bidder participated in the auction does not undermine the conclusion that the sale itself was conducted in a commercially reasonable manner."). *See also id.* at 407-408 (the UCC "does not permit a debtor to seek injunctive relief to unwind a foreclosure sale that has been consummated").

## **CONCLUSION**

For all the reasons set forth above and in the exhibits annexed to the accompanying Lettera Affidavit, Defendants respectfully request that each claim alleged in the Amended Complaint be dismissed with prejudice in its entirety.

Dated:  March 18, 2026
           Mineola, New York

MELTZER, LIPPE, GOLDSTEIN &
   BREITSTONE, LLP

By:  */s/ Robert A. Alessi*
     Robert A. Alessi (*ralessi@meltzerlippe.com*)
     Matthew R. Ross (*mross@meltzerlippe.com*)
     Preston S. Scherr (*pscherr@meltzerlippe.com*)
190 Willis Avenue
Mineola, New York 11501
Tel.: (516) 747-0300

*Attorneys for Defendants*

40

**APPENDIX A**

**CHART SUBMITTED PURSUANT TO
JUDGE SUBRAMANIAN'S *INDIVIDUAL PRACTICES IN
CIVIL CASES*, RULE 8.G(i), LISTING THE SPECIFIC ELEMENTS
OF EACH CLAIM THAT DEFENDANTS CONTEND HAVE
NOT BEEN PLAUSIBLY PLED IN THE AMENDED COMPLAINT**

| Alleged Claim | Element(s) of Claim Not Plausibly Alleged |
|---|---|
| First Cause of Action (Alleged Violation of RICO Act, 18 U.S.C. § 1962(c)) | 1. Injury to Business or Property<br>2. But-For and Proximate Causation<br>3. Conduct of an Enterprise<br>4. Predicate Acts<br>5. Pattern of Racketeering Activity |
| First Cause of Action (Alleged Violation of New York Enterprise Corruption Penal Law § 460.20) | 1. Governmental Criminal Prosecution<br>2. Knowledge of Criminal Enterprise<br>3. Intentional<br>4. Conduct or Participation in Criminal Enterprise<br>5. Pattern of Criminal Activity<br>6. Causation |
| Second Cause of Action (Alleged Violation of RICO Act, 18 U.S.C. § 1962(d)) | 1. Injury to Business or Property<br>2. But-For and Proximate Causation<br>3. Conduct of an Enterprise<br>4. Predicate Acts<br>5. Pattern of Racketeering Activity<br>6. Conspiracy |
| Third Cause of Action (Alleged Common Law Fraud) | 1. Misrepresentation/Omission<br>2. Of a Material Fact<br>3. Defendants' Knowledge of Falsity<br>4. Intentional Inducement of Reliance<br>5. *Scienter*<br>6. Reasonable Reliance<br>7. Injury |
| Fourth Cause of Action (Alleged Economic Duress) | 1. Wrongful Threat<br>2. Preclusion of Free Will |

| **Alleged Claim** | **Element(s) of Claim Not Plausibly Alleged** |
|---|---|
| Fourth Cause of Action (Alleged Extortion) | 1. Governmental Criminal Prosecution<br>2. Threat or Use of Force<br>3. Under Color of Right<br>4. With *Mens Rea*<br>5. To Coerce<br>6. Performance of an Act or Provision of Something of Value<br>7. Causation |
| Fifth Cause of Action (Alleged Intentional Infliction of Emotional Distress) | 1. Extreme and Outrageous Conduct<br>2. Intent to Cause Severe Emotional Distress |
| Sixth Cause of Action (Alleged Fraud and Deceit) | 1. Misrepresentation/Omission<br>2. Of a Material Fact<br>3. Defendants' Knowledge of Falsity<br>4. Intentional Inducement of Reliance<br>5. *Scienter*<br>6. Reasonable Reliance<br>7. Injury |
| Seventh Cause of Action (Alleged Money Laundering and Concealment of Proceeds) | 1. Can be Asserted Only By the Government in a Criminal Proceeding; No Private Cause of Action in a Civil Lawsuit<br>2. Knowledge<br>3. Proceeds Obtained by Felony<br>4. Participation in<br>5. Transaction |
| Eighth Cause of Action (Alleged Fraudulent and Voidable Transfer; Real Property) | 1. Plaintiff is a Creditor of Defendant<br>2. Defendant is a debtor of Plaintiff<br>3. Absence of Fair Consideration<br>4. Defendant's Insolvency or Prospective Insolvency |
| Ninth Cause of Action (Alleged Fraudulent and Voidable Transfer; LLC Membership Interests) | 1. Plaintiff is a Creditor of Defendant<br>2. Defendant is a debtor of Plaintiff<br>3. Absence of Fair Consideration<br>4. Defendant's Insolvency or Prospective Insolvency |
| Tenth Cause of Action (Alleged Deceptive Acts and Practices Under New York General Business Law § 349) | 1. Consumer-Oriented Act or Practice<br>2. Against the Public<br>3. Misleading or Deceptive Act by Defendant<br>4. Resulting Injury |

2

| Eleventh Cause of Action (Alleged Unjust Enrichment) | 1. Defendant is Enriched at Plaintiff's Expense<br>2. It Is Against Equity and Good Conscience To Permit Defendant To Keep the Money It Received From Plaintiff |
|---|---|
| Twelfth Cause of Action (Demand for Accounting) | 1. A Fiduciary Relationship Between Plaintiff and Defendant<br>2. Demand and Refusal (or Futility) |
| Thirteenth Cause of Action (Alleged Tortious Interference with Contract) | 1. Defendant Induced a Breach of a Contract To Which Plaintiff Was a Party<br>2. Breach of said Contract<br>3. But-For Causation<br>4. Resulting Damages |
| Fourteenth Cause of Action (Alleged Breach of Fiduciary Duty) | 1. Existence of a Fiduciary Relationship<br>2. Misconduct<br>3. Damages to Plaintiff Arising from Misconduct |
| Fourteenth Cause of Action (Alleged Professional Misconduct Under Rule 1.12 of the New York Rules of Professional Conduct) | 1. Does Not Create a Private Cause of Action in a Civil Lawsuit<br>2. A lawyer<br>3. Accepts Private Employment<br>4. In Matter Where He Has Acted in Judicial or Otherwise Neutral Capacity<br>5. And, in the case of the Latter, Has Not Obtained Informed Consent |
| Fifteenth Cause of Action (Alleged Commercially Unreasonable Foreclosure Under UCC §§ 9-610 and 9-625) | 1. Unreasonable Notice of Foreclosure<br>2. Unreasonable Foreclosure<br>3. Injunctive Relief Adjudicated Prior to Sale |

3

**APPENDIX B**

**WORD-COUNT CERTIFICATION
PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

In reliance upon the word-count feature of the word-processing system on which *Defendants' Memorandum of Law in Support of Their Motion To Dismiss the Amended Complaint* (the "***Brief***") was prepared, the undersigned hereby certifies that, pursuant to Local Civil Rule 7.1(c) and the March 2, 2026 Order of this Court increasing the applicable word limitation for this Brief to 11,000 words (ECF No. 35), the Brief contains 10,954 words, excluding (a) the case caption page, (b) the Table of Contents, (c) the Table of Authorities, (d) the dated signature block on the final page of the Brief, (e) the Claim-Elements Chart annexed as Appendix A and (f) this Word-Count Certification.

/s/ *Matthew R. Ross*
**Matthew R. Ross**