# **EXHIBIT 12**

**OPERATING AGREEMENT**
**FOR**
**47 POPLAR OWNERS LLC**

**THIS OPERATING AGREEMENT** is made and entered into effective as of the ___day of December, 2021 ("Effective Date"), by and between Thomas Lee ("Partner") and James McManus  ("Partner"), each of whom shall be referred to from time to time in this document collectively as the "Members" and individually as a "Member," to govern the operation and management of the multifamily project to be built at 47 Poplar Avenue, New Milford Connecticut for limited liability company known as 47 Poplar Owners LLC ("Company").

**W I T N E S S E T H:**

**WHEREAS,** Articles of Organization ("Articles") were filed on December  ,2021 with the office of the Secretary of State of the State of Connecticut in order to form the Company as a limited liability company pursuant to the provisions of the relevant Chapter of Connecticut Statutes,  and

**WHEREAS,** pursuant to the Articles, the business and management of the Company is to be conducted in accordance with the Articles and in accordance with the provisions of an operating agreement; and

**WHEREAS,** the parties have entered into the Limited Liability Company Agreement as of the Effective Date ("Agreement") to recognize the investment of Partners in the Company and each Member admittance; and

**WHEREAS,** the Members desire to enter into this Agreement in order to set forth the terms and conditions that will regulate and govern the operation and management of the Company and regulate and govern the respective rights and obligations of the Members with respect to the Company, it being understood that the terms and provisions of this Agreement are subject in all respects to the terms and conditions of the Articles, and in the event of any conflict between the Articles and this Agreement, the provisions of the Articles shall govern.

**NOW, THEREFORE,** in consideration of the foregoing, which shall be deemed to be incorporated as an integral part of this Agreement and not mere recitals hereto, and the mutual covenants and agreements contained herein, the Members (for themselves and their respective successors and assigns) hereby agree as follows:

5411549v1

## ARTICLE 1
## DEFINITIONS

As used herein, the following terms shall have the following meanings:

**1.1**    "**Act**" shall mean Limited Liability Chapter and Statutes, of the formation state as amended from time to time, or any other statute of similar import.

**1.2**    "**Affiliate**" means, with respect to any Person, (a) any other Person which, directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person, or (b) any Person who is a director or officer (i) of such first Person, (ii) of any Subsidiary of such first Person, or (iii) any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote fifty percent (50%) or more of the capital stock or other equity interests having ordinary voting power for the election of directors (or comparable equivalent) of such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Control may be by ownership, contract, or otherwise.

**1.3**    "**Administrative Manager**" shall mean Thomas Lee

**1.4**    "**Agreement**" shall mean this Operating Agreement, as amended from time to time.

**1.5**    "**Annual Operating Budget**" shall contain an operating budget for the Company, for the next fiscal year, setting forth (i) estimated revenues and expenses of the Company (including payment of operating and administrative expenses of the Company), (ii) a capital budget and sources of funds in connection therewith, including the projected timeline for completion of such capital improvements, (iii) as relevant, a leasing plan for the Project including projected rental income, and (iv) identification of any material events anticipated at the Project.

**1.6**    "**Approved Development Budget**" means the budget for acquisition and development of the Project on the Property, and other Project-related expenditures which shall be adopted as part of the Development Plan which Development Plan shall be attached as Exhibit C hereto and made a part hereof, once approved by the Members.

**1.7**    "**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(i)    the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross fair market value of such Company asset as of the date of such contribution;

(ii)    immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross fair market value as of the date of such distribution;

(iii)    the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values (as determined giving effect to Treasury Regulations Section 1.704-1(b)(2)(iv)(h)(2)) in connection with any permissible revaluation event under Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) or 1.704-1(b)(2)(iv)(s);

(iv)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment pursuant to paragraph (iii) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv); and

(v)    if the Book Value of a Company asset has been determined pursuant to paragraph (i) or adjusted pursuant to paragraphs (iii) or (iv) above, such Book Value shall thereafter be adjusted to reflect the Depreciation taken into account with respect to such Company asset for purposes of computing Profits and Losses.

**1.8**    "**Capital Account**" shall mean an individual account that is maintained for each Member; such account shall be credited with the amount of a Member's actual cash contributions and the agreed fair market value of any other property (less any liabilities assumed in connection with the contribution or to which the property is subject) contributed to the Company and any Profits (and other items of income and gain) allocated to such Member hereunder, and shall be reduced by any Losses (and other items of loss and expense), the amount of any cash distributions and the fair market value of any property (less any liabilities assumed in connection with the distribution or to which the property is subject) allocated or distributed to such Member hereunder.    Each Member's Capital Account shall be further maintained and adjusted in accordance with the Code and the Regulations, including any adjustments to capital accounts required by the Regulations issued under Code Section 704(b) and any adjustments to the allocation of profits and losses resulting from an audit by the Internal Revenue Service.

**1.9**    "**Capital Contributions**" shall mean with respect to each Member the aggregate capital contributions made to the Company by such Member pursuant to Article 3 hereof.

**1.10**    "**Capital Event**" shall mean (i) a transaction pursuant to which the indebtedness secured by the Project is financed or refinanced (excluding, specifically, (i) any Member Loans or (ii) the initial Mortgage Loan), (ii) a sale, condemnation of all of the Project or other disposition (voluntary or involuntary) of the Project or the final sale or dissolution of any Subsidiary, (iii) a sale of easements, rights-of-way, or similar interests in the Project, or (iv) the receipt of insurance proceeds (other than proceeds of business interruption insurance) or other damage recoveries in respect of the Project or any portion thereof.

**1.11**    "**Capital Proceeds**" shall mean the distributable proceeds derived from a Capital Event after deducting (i) all costs and other expenses related thereto, (ii) the amount of any indebtedness being refinanced or discharged in connection therewith, (iii) the amount of any other Project or third-party Company indebtedness, (iv) a capital reserve as reasonably

# 5411549v1                                   3

determined by the Members, and (v) any other needs of the Company for such funds as determined in the reasonable discretion of the Members.

1.12    **"Cash Flow"** shall mean that sum of cash resulting from normal business operations of the Company, and from any other income or funds derived from Company property which the Members reasonably determine to be available for distribution to the Members after payment of all cash expenditures, including, but not limited to, to the extent applicable, taxes, principal and interest payments on all third-party Company indebtedness, rent, insurance and other ordinary and necessary business expenses and the setting aside of any amounts which are reasonably necessary as a reserve.

1.13    **"Change of Control"** shall be deemed to have occurred if a transfer of a portion or all of the Percentage Interest by a Member would result in the Member's new Percentage Interest being less than Fifty-One percent (51%) of such Member's original Percentage Interest.

1.14    **"Closing"** shall mean the funding of the Mortgage Loan and the Preferred Equity or the Common Equity.

1.15    **"Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time. All references herein to specific sections of the Code shall be deemed to refer also to any corresponding provisions of succeeding Codes.

1.16    **"Company"** shall mean [name here].

1.17    **"Contributed Capital Percentages"** shall mean, as to any Member, a fraction expressed as a percentage, where the numerator is the capital contribution of such Member, divided by the total aggregate capital contributions of the Members.

1.18    **"Depreciation"** means, if there is no difference between the fair market value and the adjusted tax basis of property upon the contribution of such property to the Company or upon the revaluation of such property pursuant to Regulations Sections 1.704-1(b)(2)(iv)(f) or 1.704-1(b)(2)(iv)(s), depreciation, depletion or amortization, as the case may be, allowed or allowable for federal income tax purposes; otherwise, Depreciation shall mean book depreciation, depletion or amortization as determined under Regulations Section 1.704-1(b)(2)(iv)(g).

1.19    **"Development Plan"** shall mean that document, approved by the Members, which contains (i) a description of the scope of the Project, (ii) the Approved Development Budget for the Project, (iii) a schedule of milestone events, (iv) the construction schedule for the Project, (v) the approved Plans and Specifications for the Project, and (vi) the architectural and engineering plans filed with the City of New Milford Connecticut; all of the foregoing are attached hereto and incorporated herein as Exhibit "C".

1.20    **"Equity"** shall mean a mezzanine or institutional investor providing fixed cost capital preferred equity and/or loan which, along with the Mortgage Loan, to the extent pursued or as otherwise agreed by the Members; either in the form of a pari passu investor (**"Common Equity"**) or in the form of a preferred return (**"Preferred Equity"**).

# 5411549v1                                        4

**1.21** **"Fiscal Year"** shall mean the Company's fiscal year, which shall be the same as a calendar year and shall end on December 31 of each year.

**1.22** **"General Contractor"** shall mean JCT Development  or a third-party licenses general contractor, who shall be engaged by the Company under a GMP or fixed price form contract ("GC Contract").

**1.23** **"Member"** shall mean each person (whether a natural person or an entity) holding a Percentage Interest in the Company from time to time in full compliance with this Agreement.

**1.24** **"Mortgage Lender"** shall mean Real-Fi ("Mortgage Lender").

**1.25** **"Mortgage Loan"** shall mean the approximately $650,000 (Six Hundred and Fifty Thousand Dollars) acquisition loan combing with $4,550,000 (Four Million Five Hundred an Fifty Thousand Dollars nonrecourse construction loan from the Mortgage Lender to be secured by a first priority lien contemplated at 75% LTV/LTC encumbering the Property, or other terms acceptable to the Members.

**1.26** **"Percentage Interest"** shall mean the interest of a Member in the Company. Initially, the Percentage Interest of each Member is as set forth on Exhibit "A" attached hereto and made a part hereof.

**1.27** **"Person"** shall mean any individual, partnership, company, corporation, limited liability company, trust, estate, unincorporated association, syndicate, joint venture or unincorporated organization, or any other entity.

**1.28** **"Plans and Specifications"** shall mean those plans and specifications approved and incorporated in the Development Plan.

**1.29** **"Profits"** or **"Losses,"** as the case may be, of the Company for each Fiscal Year shall be an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:  (a) any income of the Company that is exempt from federal income tax and is not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss; (b) any expenditure by the Company described in Section 705(b)(2) of the Code or treated as a Section 705(b)(2) expenditure pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and is not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss; (c) in the event the gross fair market value of any Company asset is adjusted pursuant to paragraphs (iii) or (iv) of the definition of Book Value, the amount of such adjustment shall be taken into account as gain or loss on disposition of such asset for purposes of computing Profits or Losses; (d) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for such Fiscal Year; and (e) to the extent (and only to the extent) that an adjustment made to the adjusted tax basis of any Company asset pursuant to Section 732, Section 734 or Section 743 of the Code is required to be taken into account in determining Capital Accounts pursuant to Treasury Regulations

Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment shall be treated as an item of gain or loss (as the case may be) for purposes of computing Profits or Losses; provided, however, that any items which are specially allocated pursuant to Section 4.1(b) or otherwise pursuant to this Agreement shall not be taken into account in computing Profits or Losses. Any items to be specially allocated pursuant to pursuant to Section 4.1(b) or otherwise pursuant to this Agreement shall be determined by applying rules analogous to those set forth in the preceding paragraphs (a) through (e).

      1.30      **"Project"** shall mean the 32 unit multifamily project located at 47 Poplar Avenue, New Milford, Connecticut.

      1.31      **"Property"** shall mean the real property consisting of approximately 1.024 acres located within City of New Milford , Connecticut, more particularly described in Exhibit "B".

      1.32      **"Property Management Agreement"** shall mean the third-party multifamily residential property management agreement for the leasing and property management of the residential units and commercial space.

      1.33      **"Property Manager"** shall mean the entity serving as Property Manager under the Property Management Agreement.

      1.34      **"Regulations"** or **"Treasury Regulations"** shall mean the Treasury regulations promulgated under the Code, including temporary regulations, as such regulations are in effect from time to time. All references herein to specific provisions of such regulations shall be deemed to refer also to any corresponding provisions of succeeding regulations.

      1.35      **"Subsidiary"** shall mean, with respect to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock of each class or other ownership interests having ordinary voting power (other than stock or other interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, by such Person or by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person. A Subsidiary shall be deemed wholly owned by a Person who owns directly or indirectly all of the voting shares of stock or other ownership interests of such Subsidiary having voting power under ordinary circumstances to vote for directors or other managers of such corporation, partnership or other entity, except for directors' qualifying shares.

      1.36      **"Unreturned Capital Contribution"** shall mean the sum of all Capital Contributions of a Member less all distributions to said Member pursuant to Section 5.2(c) or 5.2(e), as applicable, and, with respect to Partner, distributions to said Member pursuant to Section 3.1(b).

**ARTICLE 2**
**THE COMPANY**

**2.1    Name.** The name of the Company shall be "47 Poplar Owners LLC", or such other name as may be selected by the Members from time to time.

**2.2    Registered Office, Registered Agent.** The location of the registered office of the Company shall be 815 Eldorado Avenue, Clearwater, Connecticut 33767 and thereafter at such other location as the Members may designate. The Company's registered agent shall be Thomas Lee_ and thereafter shall be such other person or entity as the Members may designate.

**2.3    Business Purposes of the Company.** The purpose for which the Company is organized is to develop, own, lease, manage, operate, sell, transfer or take any other actions with respect to the Project and to transact any and all lawful business, whether direct or indirect, which is related to the Project.

**2.4    Principal Place of Business.** The location of the principal place of business of the Company shall be 399 Knollwood Road, Suite 206, White Plains, NY 10603, or such other place as the Members from time to time may select.

**ARTICLE 3**
**CAPITAL CONTRIBUTIONS**

**3.1    Initial Contributions/Distributions.**

(a)    At Closing, each Member shall contribute to the Company the amounts of cash and/or property set forth on Exhibit "A" under the Capital Contribution column.

**3.2    Additional Capital Contributions.** Except as set forth in Section 3.1, no Member shall be required to make any Capital Contributions to the Company, cure any deficit in such Member's Capital Account, lend any funds to the Company, or guaranty, agree to or accept personal liability on any indebtedness of the Company.

**3.3    Additional Capital Contributions – Company Shortfalls.**

(a)    If at any time or from time to time after all of the Initial Capital Contributions have been contributed as set forth in Section 3.1, the Administrative Manager determines that additional funds are required to (i) pay other costs which are not provided for in the Development Plan, (ii) meet the ongoing obligations, liabilities, expenses or reasonable business needs of the Company in accordance with the then applicable Development Plan, or (iii) pay Necessary Expenses (each of the foregoing, a "Shortfall"), each of the Members may contribute its pro rata share of such Shortfall as an Additional Capital Contribution; provided, however, no Member shall be required to make any Additional Capital Contribution. Each Member's pro rata share for purposes of making any Additional Capital Contributions under this Section 3.3(a) shall be based on its Percentage at the time of the request. Any Additional Capital Contribution requested pursuant to this Section 3.3(a) shall be due from each Member within fifteen (15) Business Days after the date requested. If any Member (the "Non-Contributing Member") fails to timely make all or any portion of any Additional Capital Contribution as required pursuant to this Section 3.3(a), then each other Member (the "Contributing Member")

may make such Additional Capital Contribution (any such Additional Capital Contribution made by a Contributing Member on behalf of a Non-Contributing Member, a "Substituted Capital Contribution"), in proportion to the Percentages of all Contributing Members or as they otherwise may agree. In such an event, such Substituted Capital Contribution shall be deemed an Additional Capital Contribution made by the Contributing Member subject to the remaining provisions of this Section 3.3.

(b)    In the event that a Member becomes a Non-Contributing Member, the Percentage of each Member shall be adjusted at such time, but subject to Section 3.3(c) below, to equal the percentage equivalent of the quotient determined by dividing:

(A)    the positive difference, if any, between:

(i)    the sum of (1) one hundred percent (100%) of the Gross Capital Contributions (excluding Substituted Capital Contributions) then or theretofore made or deemed to be made by such Member to the Company, plus (2) one hundred ten percent (110%) of the Substituted Capital Contributions then or theretofore made by such Member to the Company (the excess of one hundred ten percent (110%) of each Member's Substituted Capital Contributions over such Member's Substituted Capital Contributions is referred to herein as the "Excess Amounts"); minus

(ii)    the Excess Amounts attributable to the Substituted Capital Contributions, if any, then or theretofore made by all of the other Members to the Company; by

(B)    one hundred percent (100%) of the sum of the Gross Capital Contributions and Substituted Capital Contributions then or theretofore made or deemed to be made by all of the Members to the Company.

(c)    If a Contributing Member makes a Substituted Capital Contribution on behalf of a Non-Contributing Member in accordance with Section 3.3(a), such Non-Contributing Member shall have until one hundred eighty (180) days after the date on which an Additional Capital Contribution that it failed to make in accordance with Section 3.3(a) (the "Missed Contribution") was due in order to cure its failure to make such Missed Contribution by depositing into an account designated by the Members an amount equal to the amount of the Missed Contribution together with interest thereon at a rate of ten percent (10%) per annum from the date that the Contributing Member made the Substituted Capital Contribution until such amount has been so deposited in full into such account, at which point such amount shall promptly be distributed, in cash, to the Contributing Member that made a Substituted Capital Contribution on account of the Missed Contribution (and such distribution shall not otherwise be treated as a distribution for purposes of this Agreement). If the Non-Contributing Member makes such deposits as aforesaid, any dilution to Percentages and adjustments of Capital Contributions and Capital Accounts (and the distributions affected thereby) caused by its failure to make the Missed Contribution shall be unwound, and the payment and distribution of interest described above shall not be reflected in the Members' Capital Contributions or Capital Accounts.

(d)    Each Member acknowledges and agrees that the other Members would not be entering into this Agreement were it not for (i) all Members agreeing to make the Additional

# 5411549v1                                          8

Capital Contributions provided for in Section 3.3, and (ii) the remedy provisions set forth above in Section 3.3. Each Member acknowledges and agrees that in the event any Member fails to make its Additional Capital Contributions pursuant to this Agreement, the other Members will suffer substantial damages and the remedy provisions set forth above are fair, just and equitable in all respects.

(e)    In the case of a failure to make any Additional Capital Contributions required by this Agreement, (x) the remedy provisions set forth in Section 3.3 shall be the exclusive remedy against the noncontributory member fails to contribute on a timely basis all or any portion of any Additional Capital Contribution that it is required to make in accordance with Section 3.3, and (y) the remedy provisions set forth in Section 3.3 shall be the exclusive remedy against the Non-Contributing Member in the event that a Member fails to contribute on a timely basis all or any portion of any Additional Capital Contribution in accordance with Section 3.3.

**3.4    Interest.**    No Member shall receive interest on Capital Contributions or otherwise with respect to such Member's Capital Account.

**3.5    Return of Capital.**  No Member shall have the right to withdraw any part of their Capital Account or any Capital Contributions except as expressly provided in this Agreement. No Member shall be entitled to a return of any Capital Contributions in other than cash unless otherwise agreed to by all Members.

**3.6    Member Loans.**  With the approval of both of the Members, the Company may borrow funds from a Member or a Member Affiliate upon such terms and conditions as the Members approve.  If the Company elects to borrow funds from a Member or a Member Affiliate, the Administrative Manager shall provide a written notice of the proposed terms of such borrowing (including the applicable rate of interest, which may be different than the Member Loan Interest Rate) to all Members, and each Member (or its designated Affiliate(s)) shall be entitled to elect to loan funds on such terms and conditions on a pro rata basis relative to its respective Percentage Interest.  Unless otherwise designated in a loan agreement or similar document, payment of principal and interest on such Member Loans and the priority thereof in relation to all other Member Loans will be (i) solely the obligation of the Company and not of the Members, and (ii) in accordance with Section 5.1 and Section 5.2.

**3.7    Contribution Agreement.**   The Member agree that the Contribution Agreement shall be, and is, incorporated in this Agreement.

**3.8    Mortgage Lender and Preferred Equity Funding.**   The (i) Closing of the Mortgage Loan, and (ii) the funding of the Preferred Equity to the Company is a condition precedent to the effectuation of this Agreement. However, if this Article 3.8 condition precedent is not achieved by December 20, 2019 this Agreement and all related obligations and rights shall terminate.

**ARTICLE 4**
**PROFITS AND LOSSES**

**4.1    Allocations.**

(a)        Allocations of Profits or Losses.  Except as otherwise provided in this Agreement, Profits or Losses of the Company (and items thereof) for each Fiscal Year (or portion thereof) shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 4.1(b), the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the distributions that would be made to such Member pursuant to Section 5.2 (without regard to amounts payable pursuant to Sections 5.2(a), which for purposes of this Section 4.1 and Section 11.2(c) shall be considered liability payments) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 5.2, to the Members immediately after making such allocations, minus (ii) such Member's share of Company minimum gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) and Member Nonrecourse Debt Minimum Gain (determined according to Treasury Regulations Section 1.704-2(i)(3)), computed immediately prior to the hypothetical sale of assets.

(b)        Order of Allocations.  Prior to the making of any allocation under Section 4.1(a), the following allocations shall be made in the following order:

(i)        Any nonrecourse deduction (within the meaning of Regulation Section 1.704-2(b)(1)) for a Fiscal Year of the Company shall be allocated to the Members in accordance with their respective Percentage Interests.  If there is a net decrease in the Company's minimum gain (as defined in Regulations Section 1.704-2(d)) during a Fiscal Year of the Company, then items of income and gain for such Fiscal Year (and, if necessary, for subsequent periods) shall be allocated to the Members in the manner and to the extent required by Regulations Section 1.704-2(f).  This clause is intended to constitute a "minimum gain chargeback" as provided by Regulations Section 1.704-2(f), and this clause shall be construed accordingly.

(ii)        Any partner nonrecourse deduction (within the meaning of Regulations Section 1.704-2(i)(2)) shall be allocated in the manner specified in Regulations Section 1.704-2(i)(1), and, subject to the exceptions set forth in Regulations Section 1.704-2(i)(4), if there is a net decrease in partner nonrecourse debt minimum gain (within the meaning of Regulations Sections 1.704-2(i)(2) and 1.704-2(i)(3)) during a Fiscal Year attributable to a partner nonrecourse debt (within the meaning of Regulations Section 1.704-2(b)(4)), then each Member with a share of partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, for subsequent periods) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain for such period attributable to such partner nonrecourse debt (which share of such net decrease shall be determined under Regulations Sections 1.704-2(i)(4) and 1.704-2(g)(2)). This clause is intended to constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by Regulations Section 1.704-2(i)(4), and this clause shall be construed accordingly.

(iii)        In the event that a Member unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or

(6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain) shall be specially allocated to such Member in the manner required by Regulations Section 1.704-1(b)(2)(ii)(d) to eliminate, to the extent required by such regulation, the deficit in the Capital Account of such Member (as determined after (x) increasing such Capital Account by any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (y) decreasing such Capital Account by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)) as quickly as possible. This clause is intended to constitute a "qualified income offset" as provided by Regulations Section 1.704-1(b)(2)(ii)(d), and this clause shall be construed accordingly.

(iv)    To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(v)    If any amount is allocated pursuant to clause (i), (ii), (iii) or (iv) of this Section 4.1(b), then, notwithstanding anything to the contrary in this Agreement (but subject to the provisions of clauses (i), (ii), (iii) and (iv) of this Section 4.1(b) and Section 4.1(c)), income, gain, deduction and loss, or items thereof, thereafter shall be allocated in such manner and to such extent as may be necessary so that, after such allocation, the respective balances of the Capital Accounts as nearly as possible shall equal the balances that would have been obtained if the amount allocated pursuant to such clause (i), (ii), (iii) or (iv) and the amount allocated pursuant to this clause (v) instead had been allocated under the provisions of this Agreement without giving effect to the provisions of such clause (i), (ii), (iii) or (iv) or this clause (v).

(c)    Other Allocation Provisions.

(i)    For federal income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits or Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the Book Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Code Sections 704(b) and (c) of the Code (in the manner determined by the Tax Matters Partner and approved by members) so as to take account of the difference between Book Value and adjusted basis of such asset; provided, further, that if Company capital is reallocated pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3), then the Company shall make corrective allocations of income and gain, or loss and deduction, as applicable, in

accordance with Treasury Regulations Section 1.704-1(b)(4)(x). The allocations pursuant to this Section 4.1(c)(i) are for federal and state income tax purposes only and shall not be taken into account in computing the Members' respective shares of Profits or Losses or their respective Capital Accounts.

(ii)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Tax Matters Partner using any permissible method under Code section 706 and the Treasury Regulations thereunder as determined by the Tax Matters Partner.

(iii)    For each Fiscal Year (or portion thereof), any excess nonrecourse liabilities (within the meaning of Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to the Members in accordance with their respective Percentage Interests. To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Company shall endeavor to not treat distributions as having been made from the proceeds of a nonrecourse liability (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) or a partner nonrecourse debt (within the meaning of Treasury Regulations Section 1.704-2(b)(4)).

(iv)    If the Company issues or has outstanding at any time (as determined by the Tax Matters Partner) a "noncompensatory option" as defined in Treasury Regulations Section 1.721-2(f), the Company shall comply with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(s) and 1.704-1(b)(4)(x).

(d)    Modification of Allocations. Subject always to Section 11.2(a), the allocations and distributions set forth in this Agreement are intended to comply with the requirements of Sections 704(b) and 704(c) of the Code and the Regulations and shall be interpreted and applied in a manner consistent therewith. If, in the reasonable opinion of the Tax Matters Partner, the allocations of income, gain, deduction and loss set forth herein shall not (i) comply with the cited Code provisions and the Regulations or (ii) comply with any other provision of the Code or the Regulations, then, notwithstanding anything to the contrary contained herein, such allocations shall, upon notice in writing to the other Members, be modified to satisfy such provisions of the Code and the Regulations, provided that any such modification shall not materially alter the amounts distributable to the Members, including in particular the terms of Section 11.2(a).

## ARTICLE 5
## DISTRIBUTIONS

**5.1    Distributions and Other Payments of Cash Flow.** Cash Flow shall be distributed or otherwise paid based on the following priority:

a)    First, distributed to retire any/all encumbered liens on the subject Property;

b)    Then, distribute outstanding principal and interest on any Member Loans in proportion to the amount of the then-outstanding balance of each Member Loan, until all Member Loans are repaid in full;

c) Finally, distributed pari passu to the Members according to the respective Members capital account.

The Company shall, to the extent there is available Cash Flow, make distributions and payments pursuant to this Section 5.1 not less frequently than semi-annually (monthly or quarterly, to the extent permitted by Mortgage Lender).

**5.2    Distributions and Other Payments of Capital Proceeds.** Capital Proceeds shall be distributed or otherwise paid based on the following priority:

a) First, distributed to retire any/all encumbered liens on the subject Property;

b) Then, distribute outstanding principal and interest on any Member Loans in proportion to the amount of the then-outstanding balance of each Member Loan, until all Member Loans are repaid in full;

c) Finally, distributed pari passu to the Members according to the respective Members Capital Account.

## ARTICLE 6
## MANAGEMENT

**6.1    Management of the Company by Administrative Manager.** It is understood that Members do not stand in a fiduciary relationship to any other Member in any matters pertaining to the Company. Each Member shall act in good faith and shall deal fairly with each other Member. Management of the business of the Company shall be wholly vested in the Administrative Manager, who may exercise all such powers of the Company and do all such lawful acts and things as are not by law or this Agreement directed or required to be exercised or done only by the Members.

(a)    **Designation and Authority of the Administrative Manager; Development Plan; Annual Operating Budget.**

(i)    The Members have designated and do hereby designate Thomas Lee as the Administrative Manager of the Company. Except as otherwise provided in this Agreement for matters requiring Member unanimous Approval, the daily management of the Company shall be the obligation and responsibility of and rest exclusively with the Administrative Manager, who shall have all the rights and powers as are necessary or advisable to the management of the business and affairs of the Company. The Administrative Manager shall be responsible for the day-to-day operation and management of the Company which operation and management shall be in accordance with, and limited by, the Development Plan, the Approved Development Budget and the then-current Annual Operating Budget.

(ii)    James McManus  shall lead the Company efforts to pursue the Mortgage Loan and the Preferred Equity.  The Members and Administrative Manager agree to cooperate fully to actively, timely, and in good faith pursue the Mortgage Loan

# 5411549v1                                                                13

and Preferred Equity, including to consider modifying this Agreement to comply with Mortgage Loan or Preferred Equity requests (provided, however, that in the event any modification materially alters the economic terms of any Member, such Member shall not be forced to accept such proposed modification).

(iii)     The Members and Administrative Manager acknowledge that, on the Effective Date, the Annual Operating Budget to be provided by the Administrative Manager is incomplete. The Members agree to actively and in good faith negotiate, prepare, and approve an Annual Operating Budget within five (5) months of the Effective Date. The initial Annual Operating Budget shall cover the period from the Effective Date through December 31, 2022. The Annual Operating Budget for each subsequent Fiscal Year shall be submitted for Member approval forty-five (45) days prior to the first day of the upcoming Fiscal Year by the Administrative Manager. Members, along with the Administrative Manager, shall review the Annual Operating Budget for comments and/or edits. The approval of the Annual Operating Budget shall require unanimous Member approval. In the event an Annual Operating Budget is not approved for the upcoming Fiscal Year, the Administrative Manager may continue to operate the Company consistent with the prior year's Annual Operating Budget and all amounts shall be increased by the Consumer Price Index published by US Department of Labor, Bureau of Labor Statistics, CPI-U, U.S. City Average, All Items (not seasonally adjusted), 2017 Base Period annual. The terms of each Annual Operating Budget shall be subject to review and modification throughout the year, provided that any material modification shall require unanimous Member approval.

(iv)     The services to be rendered by the Administrative Manager to the Company are not exclusive, and during the term of this Agreement, the Administrative Manager, or any Affiliate, subject to its respective obligations under this Agreement, may render services identical or similar to those required of it hereunder to other owners of real property and may itself engage in the acquisition and development of any other real property regardless of location for its own account or benefit without any accountability or liability whatsoever therefore to the Company or to any Member or Administrative Manager.

(v)     The Administrative Manager shall keep the Members apprised of the Project status. In that connection, the Members shall have ongoing access to information (including documents, reports and similar information) of the Administrative Manager regarding the Project.

(vi)     The Administrative Manager shall not be paid a fee for provision of its services to the Company pursuant to its position as Administrative Manager or otherwise except as specifically provided for in this Agreement.

**6.2     Vacancies.** Any vacancy occurring in a Administrative Manager position may be filled by the unanimous affirmative vote of the Members.

**6.3     Officers.** The Members may appoint a President, Vice-Presidents, a Treasurer and Secretary, as well as such other officers as the Members shall deem appropriate, such officers to have those duties and responsibilities as may be authorized from time to time by the

# 5411549v1                                           14

Members. The Members may remove any officer at any time with or without cause. Each officer shall hold office until such officer's successor shall have been duly appointed and shall have qualified, unless such officer sooner dies, resigns or is removed by the Member. The appointment of an officer does not itself create contract rights.

6.4    **Time Devoted to Business.** The Administrative Manager shall devote whatever time, effort, and skill it deems appropriate for the operation of the Company. The Administrative Manager is not obligated to devote all of its time or business efforts to the affairs of the Company. Administrative member shall be compensated for direct costs associated with his management of the business including any and all necessary staff and shall provide monthly billings with support and said payment/reimbursmnets shall be done no later than the 15th day of the month following any such request for re-imbursements.

6.5    **Exculpation.** Any act or omission of the Administrative Manager, the effect of which may cause or result in loss or damage to the Company or the Members, if done in good faith to promote the best interests of the Company, shall not subject the Administrative Manager, to any liability to the Members.

6.6    **Power to Bind.** Except to the extent otherwise expressly delegated by this Article 6, the only persons having the power to bind the Company shall be the Administrative Manager pursuant to the provisions of this Agreement.

6.7    **Limitation Powers of Administrative Manager.** Without limiting the generality of the foregoing, each of the following matters (each, a "Major Decision") requires the prior written approval of all Members:

(i)    Causing the Company to enter into or consummating any transaction or arrangement between the Company and any Affiliate of a Member;

(ii)    Entering into any agreement or taking any action that would subject a Member or any of its Affiliates (other than the Company) to personal recourse or personal liability other than as specifically contemplated herein;

(iii)    Acquiring any material real property, whether improved or unimproved or any interest therein, except the Property and the Project;

(iv)    Except as otherwise provided in **Article 11**, dissolving, liquidating and/or winding-up the affairs of the Company;

(v)    Causing the Company to engage in any business or activity other than those referred to in Section 2.3;

(vi)    Causing the Company to have any employees;

(vii)    Any merger or consolidation with or into any Person or establishment of joint ventures, partnerships or other non-wholly owned Subsidiaries;

(viii)    Appointment of a new Administrative Manager that is not an Affiliate of the Administrative Manager;

# 5411549v1                                            15

(ix)    Forming any new subsidiary of the Company ("Subsidiary"), except as required by lenders to the Company in connection with any financing;

(x)    Except as provided in Section 9.7 hereof, selling of the Property and the Project;

(xi)    Engagement of the property management company to manage the operation of the Project;

(xii)    The approval, amendment or modification of the Development Plan, other than as reflected in change orders in the ordinary course (including change orders as permitted under financing documents to which the Company is a party) that do not materially change the Project, it being agreed that material changes would include changes to the square footage of the Project, number of floors or units in the Project, the quality of materials or methods used in the construction of the Project or the grade of finishes for the Project;

(xiii)    The (A) filing of a petition for relief under the United States Bankruptcy Code, as amended, with respect to the Company and/or any Subsidiary, (B) making of an assignment for the benefit of creditors of the Company and/or any Subsidiary, (C) the application for the appointment of a custodian, receiver or trustee for the Company and/or any Subsidiary or any of the Company's and/or any Subsidiary's property, (D) consenting to any other bankruptcy or similar proceeding, or consenting to the filing of such proceeding with respect to the Company and/or any Subsidiary, or (E) admission in writing of the Company's and/or any Subsidiary's inability to pay its debts generally as they become due;

(xiv)    The approval of any marketing plan; and

(xv)    Any agreement or contract to do any of the foregoing;

**6.10    Limited Liability.** The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Administrative Manager the officers of the Company and, unless the loss or damage shall be due to a violation of willful Criminal Statutes, the Members shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a manager or member of the Company, as the case may be. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for any debts, liabilities or obligations of the Company.

**6.11    Indemnification.** The Company (including any receiver or trustee of the Company) shall, to the fullest extent provided or allowed by law, indemnify, save harmless and pay all judgments and claims against a Administrative Manager and its officers and members, the officers of the Company, the Members and each of any Member's agents, partners, affiliates, heirs, legal or personal representatives, successors and assigns (each an "**Indemnified Party**") from, against and in respect of any and all liability, loss, damage and expense incurred or sustained by the Indemnified Party in connection with the business of the Company or by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including, without limitation, costs and attorneys' fees before and at trial and at all appellate levels, whether or not

suit is instituted (which attorneys' fees may be paid as incurred), and any amounts expended in the settlement of any claims of liability, loss or damage, *provided* that the act or omission of the Indemnified Party does not constitute a violation of Willful Criminal Statutes by such Indemnified Party. The provisions of this Section shall be in addition to and not in limitation of any other rights of indemnification and reimbursement or limitations of liability to which an Indemnified Party may be entitled under the Act, common law or otherwise.

## ARTICLE 7
## COMPENSATION

**7.1    Fees.**    All fees earning pursuant to the development, construction and management of the Project shall be shared equally between the Members.

**7.2    Reimbursement of Members.**  The Company shall reimburse the Members and the Administrative Manager for all reasonable, direct out-of-pocket expenses incurred by them in connection with the operation of the Company that are approved by the Members.

## ARTICLE 8
## MEETINGS OF MEMBERS

**8.1    Meetings of Members.**  A meeting of the Members may be called at any time by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Westchester County, New York designated by the Member calling the meeting. Not less than ten (10) nor more than thirty (30) days before each meeting, the Member calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice that is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.

**8.2    Voting.**  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of both of the Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact. Except as otherwise provided in this Agreement, the affirmative vote of both Members shall be required to approve any matter coming before the Members; provided, however, any such matter must also be approved by the Members to the extent provided herein.

**8.3    Informal Action by Members.**  Any action required or permitted to be taken by the Members under any provisions of law, the Articles or this Agreement may be taken without a meeting if all of the (unless the vote of a lesser proportion or number is otherwise required by the Act, by the Articles, or by this Agreement) sign a written consent thereto and such written consents are delivered to the Company.  Action taken under this section is effective upon delivery of such written consent, unless the consent specifies a different effective date, in which case it is effective on the date so specified.

**8.4    Impasse Resolution.**  The Members shall negotiate in good faith to resolve any disputes in connection with the business of the Company (the "Decision"). The Member proposing the Major Decision (the "Proposing Member") shall provide the other Member (the

"Receiving Member") with all such additional information as the Receiving Member may reasonably request in order to evaluate such proposed action, to the extent such information is available to, or can be obtained by, the Proposing Member. If the Receiving Member has responded with an objection to the implementation of such Decision, the Proposing Member may either (i) elect to withdraw the Decision or (ii) refer the proposed Decision to senior executives of each of the Members. If the senior executives of the Receiving Member do not meet with the senior executives of the Proposing Member within seven (7) days after the matter is referred to such senior executives, the Proposing Member may immediately declare, by written notice to the Receiving Member, an impasse (an "Impasse") which shall be resolved as provided for in Section 13.9. If such senior executives do meet within such seven (7) day period, such senior executives shall have a period of thirty (30) days after referral of the dispute to them to resolve such dispute through negotiations, and if such senior executives are unable to resolve such dispute through negotiations within such thirty (30) day period, the Proposing Member may declare upon fifteen (15) days' prior written notice to the Receiving Member, an Impasse which shall be resolved as provided for in Article 12; provided however that a Member may not declare an Impasse if its senior executives did not make a good faith effort to attend a meeting during the seven (7) day period referred to above or to actively participate in related discussions during the thirty (30) day period referred to above.

## ARTICLE 9
## RESTRICTION ON TRANSFER OF MEMBERSHIP RIGHTS

**9.1    Transfer Prohibited.**

(a)    No Member shall at any time during the existence of this Agreement, directly or indirectly, sell, assign, transfer, mortgage, encumber, pledge, or otherwise deal with or dispose of all or any part of the interest of the Member in the Company now owned or hereafter acquired by such Member ("Conveyance"), without first obtaining the written consent of the non-transferring Member. Any purported Conveyance in violation of the foregoing shall be null and void and of no further force and effect. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company. For purposes of this Agreement, a Conveyance of a Company Interest shall be deemed to have occurred with respect to a Member upon a Change of Control.

(b)    Notwithstanding the foregoing provisions of this Section 9.1, in the case of a Member which is a partnership or limited liability company, such Member's partners or members may transfer all or any part of their interest in such entity for purposes of estate planning as long as: (i) no Change of Control occurs, (ii) ten (10) day advanced written notice is provided to the non-transferring Member, and (iii) Article 9.1(c) is not violated.

(c)    Notwithstanding any provision in Article 9, an otherwise approved Conveyance shall only be effective provided it fully complies with the requirements of the Mortgage Lender and Mortgage Loan. Any Conveyance in contradiction or violation of the Mortgage Loan shall be null and void and of no further force and effect.

**9.2    Effect of Transfer.** In the event of any permitted Conveyance by a Member of all or any part of such Member's interest in the Company pursuant to the terms of this Agreement, the transferee shall receive and hold the transferred interest in the Company subject

to the terms and conditions of this Agreement and subject to the obligations of the transferor Member under this Agreement, and the transferee shall execute and deliver to the Company a joinder in this Agreement and acknowledgment of such responsibilities and other documents reasonably required by the Company as a condition precedent to the transfer pursuant to the terms of this Agreement.

**9.3** **Substitution of Transferee as a Member.** No assignee, transferee, designee or legal representative of a Member shall become a substitute Member without the written consent of the non-transferring Member. In the event that the required Member consent is not granted, the assignee, transferee, designee or legal representative of the Member has no right to participate in the management of the business and affairs of the Company and is entitled only to receive to the extent transferred, the allocations and distributions to which the transferor would be entitled. As conditions to the admission of any transferee as a substitute Member: (a) the assignee, transferee, designee or legal representative of the Member shall execute and deliver such instruments, in form and substance satisfactory to the Members as the Members shall deem necessary or desirable to cause the assignee, transferee, designee or legal representative of the Member to become a substitute Member, and (b) such assignee, transferee, designee or legal representative shall pay all reasonable expenses in connection with its, his or her admission as a substitute Member, including but not limited to, a tax opinion of the proposed transaction, and the cost of preparation and filing of any amendment of this Agreement or the Articles that is deemed by the Company and the Members to be necessary or desirable in connection therewith.

**9.4** **Section 754 Election.** Upon the request of any Member transferring all or any part of the Member's Percentage Interest pursuant to this Agreement, or upon the request of the transferee, the Company shall file an election pursuant to Section 754 of the Code to adjust the basis of Company property in the manner provided in Section 743 of the Code. The incremental cost of making such an election shall be borne by the requesting party, provided that if the requesting party is the transferor and such transferor is not a Member immediately after such transfer, or subsequently ceases to be a Member, such cost shall be borne by the transferee.

**9.5** **Evidence of Membership Interest**. Percentage Interests may be evidenced, at the request of the Members and in the sole discretion of the Members, by membership certificates. If certificates are issued, all such membership certificates of the Company now owned or that may hereafter be acquired shall be endorsed on the back thereof as follows:

UNDER THE OPERATING AGREEMENT OF THE COMPANY, RESTRICTIONS HAVE BEEN PLACED UPON THE TRANSFER OF THE PERCENTAGE INTERESTS REPRESENTED BY THIS MEMBERSHIP CERTIFICATE. IN ADDITION, THE OPERATING AGREEMENT OF THE COMPANY HAS LIMITED RIGHTS OF ASSIGNEES OR TRANSFEREES OF PERCENTAGE INTERESTS UNLESS SUCH PERSONS HAVE AGREED TO BE BOUND BY THE TERMS OF THE OPERATING AGREEMENT OF THE COMPANY. THE COMPANY WILL FURNISH A COPY OF THE OPERATING AGREEMENT OF THE COMPANY TO THE RECORD HOLDER OF THIS MEMBERSHIP CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE.

The membership certificates shall be endorsed on the front thereof as follows:

"SEE RESTRICTIONS ON TRANSFER HEREOF ON REVERSE SIDE."

**9.6      Withdrawal**. Except as otherwise provided in the Act, no Member shall have the right to withdraw or otherwise dissociate from the Company without the unanimous written consent of all the Members. If a Member withdraws from the Company prior to dissolution under Section 11.1, such withdrawal is a "Wrongful Dissociation" pursuant to Connecticut Statutes Section, and the Member shall become a "Former Member." Each Former Member shall cease to be a Member of the Company, shall no longer be entitled to distributions from the Company, shall cease to be a Member within the meaning of the Act, and shall have no right to participate in any vote or consent of the Members, nor have any rights to interfere in the management or administration of the Company's business or affairs, acquire any information or account of the Company's transactions, or inspect the Company's books and records. A Former Member who wrongfully dissociates under this Section 9.6 is liable to the Company and the other Members for damages caused by the wrongful dissociation. Such liability is in addition to each debt, obligation, or other liability of the Member to the Company or the other Members.

**9.7      Sale of the Project.**

(a)      At any time from and after the Project achieving a stabilized occupancy of 90% ("Stabilization"), either Member may, without the consent of any other Member, cause a sale of the Project (the "Sale of the Company Property").

(b)      Prior to consummating a proposed Sale of Company Property, the Member that desires to cause such sale (the "Selling Member"), shall provide the other Member (the "Non-Selling Member") written notice (a "Proposed Sale Notice") which shall set forth the gross purchase price, the allocation of closing costs, including any projected broker fees and transfer taxes (which shall be deemed to be in accordance with local custom for sales of similar properties in the Litchfield County, New Milford, Connecticut and any other material economic terms of a hypothetical Sale of Company Property (the foregoing terms, the "Property Sale Terms"), and shall include any term sheets, indications of interest, valuations, appraisals, investment banking studies, opinions, broker analysis and the like (if any) received by the Selling Member with respect to such proposed Sale of Company Property or in connection with any marketing process initiated by such Selling Member.

(c)      At any time within the thirty (30) day period immediately following the date the Non-Selling Member receives the Proposed Sale Notice, the Non-Selling Member shall have the right (the "Non-Selling Member Option"), exercisable in its sole discretion by delivery of written notice (the "Sale Election Notice") to the Selling Member, to:

(i)      approve the sale as set forth in the Proposed Sale Notice and authorize the Selling Member to proceed with the Sale of Company Property to any Person, subject to the requirements of Section 9.7(c);

(ii)      elect to purchase the Company Property for the purchase price (the "Company Property Purchase Price") and on such other terms set forth in the Property Sale Notice; or

(iii)    elect to purchase the Selling Member's Percentage Interest for a purchase price (the "Selling Member Percentage Interest Price") equal to the amount which the Selling Member would have received under this Agreement if the Company Property were sold pursuant to the Property Sale Terms and the Company had been dissolved and wound up following such sale and the net proceeds of such sale and other assets of the Company had been distributed to the Members in accordance with the provisions of this Agreement applicable to liquidation and dissolution.

(d)    If the Non-Selling Member does not deliver the Sale Election Notice to the Selling Member within the thirty (30) day period set forth in Section 9.7(c), or the Non-Selling Member affirmatively waives the Non-Selling Member Option, then in either such event, the Non-Selling Member Option shall be deemed waived by the Non-Selling Member and the Selling Member may proceed to complete the Sale of Company Property to any Person; provided, however, that if:

(i)    the actual purchase price and other terms of such sale are not as favorable, in all material respects, to the transferor as the terms contained in the Property Sale Terms, or

(ii)    a closing of such sale does not occur within one (1) year after the earlier to occur of:

(A)    the expiration of the thirty (30) day period set forth in Section 9.7(b), and

(B)    the delivery by the Non-Selling Member of an affirmative waiver of the Non-Selling Member Option, then the Selling Member may not thereafter consummate the Sale of Company Property without again complying with the applicable procedures set forth in this Section 9.7.

(e)    For the purposes of the foregoing, such Sale of Company Property shall be deemed "not as favorable, in all material respects" if the gross purchase price shall be less than ninety-five percent (95%) of the purchase price set forth in the Proposed Sale Notice or if the other material economic terms of such Sale of Company Property, when taken in the aggregate, are less favorable to the Company than those set forth in the Property Sale Terms.

(f)    If the Non-Selling Member timely elects to purchase the Company Property or the Selling Member's Percentage Interest pursuant to Section 9.7(b), then in order for such Sale Election Notice to be effective, the Non-Selling Member shall, contemporaneously with the delivery of such Sale Election Notice, deposit with a reputable title insurance company or escrow agent located in the State of Illinois selected by the Non-Selling Member a deposit (the "Sale Deposit") equal to five percent (5%) of the Selling Member Percentage Interest Price. To the extent the Non-Selling Member delivers the Sale Election Notice and pays the Sale Deposit in accordance with the terms hereof, then:

(i)    if the closing of the purchase of the Company Property or the Selling Member's Percentage Interest, as applicable, pursuant thereto fails to occur due to any default, breach or failure on the part of the Non-Selling Member, then the Selling

Member may retain the Sale Deposit as liquidated damages with respect thereto, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and shall have all rights and remedies at law or in equity including (without limitation) the right to specific performance, and

(ii)     if the closing of the purchase of the Company Property or the Selling Member's Percentage Interest, as applicable, pursuant thereto fails to occur due to any default, breach or failure on the part of Selling Member, then the Non-Selling Member shall receive a refund of the Sale Deposit and shall have all rights and remedies at law or in equity. Notwithstanding anything to the contrary contained herein, a default by the Non-Selling Member in closing a transaction pursuant to a Sale Election Notice (absent any default by the Selling Member with respect thereto) shall be deemed a waiver by the Non-Selling Member of the Non-Selling Member Option as to any and all subsequent transactions pursuant to Section 9.7(b) by the Selling Member thereafter and Section 9.7(c) shall be deemed null and void and of no further force and effect with respect thereto.

(g)     If the Non-Selling Member delivers a Sale Election Notice and pays the Sale Deposit in accordance with the terms hereof, the Company, the Selling Member and the Non-Selling Member shall close the purchase of the Company Property or the Selling Member's Percentage Interest, as applicable, on the terms set forth in this Section 9.7(g). The closing of any purchase by the Non-Selling Member under this Section 9.7 will be held at the Company's principal office and shall take place on the closing date set forth in the Sale Election Notice (such date to be not less than fifteen (15) and not more than sixty (60) days after the date such Sale Election Notice is delivered to the Selling Member). Any purchase of the Company Property or the Selling Member's Percentage Interest in the Company pursuant to this Section 9.7(e) shall be on the terms set forth in the Sale Election Notice, for the Company Property Purchase Price or the Selling Member Percentage Interest Price, as applicable, for all cash, with no representations or warranties by the Selling Member; provided, however, the Selling Member shall warrant and represent that:

(i)     it is the sole owner of the Selling Member's Percentage Interest in the Company and holds the same free and clear of any liens or other encumbrances (other than such liens and encumbrances which are not prohibited by the terms of this Agreement and which will be terminated, released or otherwise removed on or prior to the closing date), and

(ii)     such purchase has been authorized by all requisite action on the part of the Selling Member and any applicable Affiliates and it has the right and power to sell, exchange, transfer, assign or otherwise dispose of the Company Property or the Selling Member's Percentage Interest, as applicable, and

(iii)     all consents required for a sale of the Company Property or the Selling Member's Percentage Interest, as applicable, have been obtained.

On the closing date, the Sale Deposit shall be credited against the Company Property Purchase Price or the Selling Member Percentage Interest Price, as applicable, and the Non-Selling Member shall pay the balance of the Company Property Purchase Price for the Company

Property, or the Selling Member Percentage Interest Price for the Selling Member's Percentage Interest, as applicable. All transfer, stamp and recording taxes imposed on the transfer, and all other closing costs shall be allocated as set forth in the Proposed Sale Notice.

(h)    In connection with the closing of any Sale of the Company Property with respect to which the Non-Selling Member waives or is deemed to have waived any particular Non-Selling Member Option, then the Non-Selling Member, within fifteen (15) days after receipt of a written request by the Selling Member, shall deliver to the Selling Member and the prospective purchaser of the Company Property identified by the Selling Member a statement, duly executed on behalf of the Non-Selling Member, stating that such Non-Selling Member Option has been waived by the Non-Selling Member.

## ARTICLE 10
## AMENDMENT

An amendment to this Agreement shall become effective only at such time as it has been unanimously approved in writing by both Members.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

**11.1    Events of Dissolution.** The Company shall continue until dissolved by:

11.1.1  the written approval of both of the Members;

11.1.2  any event which makes it unlawful for the business of the Company to be carried on by the Company; or

11.1.3  any other event causing a dissolution of a limited liability company under the Act.

**11.2    Winding Up, Liquidation and Distribution of Assets.**

(a)    Upon dissolution of the Company, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Members shall immediately proceed to wind up the affairs of the Company.

If the Company is dissolved and its affairs are to be wound up, the Members shall first sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the Members may determine to distribute any assets to the Members in kind), and then distribute the assets in the following order:

(i)    first, to payment, or the making of reasonable provision for payment, of all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation and all Member Loans, if any) including the establishment of such adequate reserves for the payment and discharge of all debts, liabilities and obligations of the Company, including contingent, conditional or unmatured liabilities, in such amount and for such term as the Members may reasonably determine; and

(ii)     second, any remaining proceeds of liquidation, and any assets that are to be distributed in kind, shall be distributed to the Members as promptly as practicable, but in any event within the time required by Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2), to the Members in accordance with their positive Capital Account balances (as adjusted pursuant to Section 11.2(c) below) or, if the Capital Accounts have been paid to zero, the percentages set forth in Section 5.2(f).

The distribution of the assets in accordance with the above may be made either in cash or in kind, as determined by the Members, with any assets distributed in kind being valued for this purpose at fair market value.

(b)     If any assets of the Company are to be distributed in kind the fair market value of such assets as of the date of dissolution shall be determined by the Members or if the Members cannot agree after the receipt of appraisals from such number of recognized unaffiliated appraisal companies regularly employed in the geographic areas in which each such appraisal is to be performed that the Members determine are reasonably necessary.

(c)     In the final Fiscal Year of the Company, before making the distributions provided for in Section 11.2(a), Profits and Losses shall be credited or charged to Capital Accounts of the Members (which Capital Accounts shall be first adjusted to take into account all distributions other than liquidating distributions made during the Fiscal Year) in the manner provided in Article 4.  The allocations and distributions provided for in this Agreement are intended to result in the Capital Account of each Member immediately prior to the distribution of the Company's assets pursuant to Section 11.2(a) being equal to the amount distributable to such Member pursuant to Section 5.2.  The Members are authorized to make appropriate adjustments in the allocation of Profits and Losses as necessary to cause the amount of each Member's Capital Account immediately prior to the distribution of the Company's assets pursuant to Section 11.2(a) to equal the amount distributable to such Member pursuant to Section 5.2.

**11.3     Articles of Dissolution.**  Upon the completion of the distribution of Company assets, the Company shall be terminated and the Members shall cause the Company to execute articles of dissolution and take such other actions as may be necessary to dissolve the Company.

**11.4     No Action.**  The Members agree that during the continuance of the Company as herein provided, no action or proceeding in court will be instituted by any Member to terminate the Company or to partition any Company property regardless of any rule or law permitting such dissolution or partition.

**11.5     Deficit Capital Accounts.**  Notwithstanding anything to the contrary in this Agreement, no Member shall be obligated to make any Capital Contributions in order to restore a deficit balance in its Capital Account, and a negative balance of a Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

**ARTICLE 12**
**BOOKS AND RECORDS; TAXATION**

**12.1**    **Information Relating to Company.** Each Member or the Member's authorized representative shall have access to and may inspect and copy all books, records and materials regarding the Company or its activities during normal business hours upon prior written notice to the Administrative Manager. The exercise of the rights contained in this Section shall be at the requesting Member's expense.

**12.2**    **Books; Accounting Period.** The Administrative Manager shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business, or at such other place as the Members from time to time may select. The books shall be kept on such method of accounting as the Members shall select. The Company's accounting period shall be the calendar year.

**12.3**    **Partnership Representative.**

(a)    The Administrative Manager (or its designee) is hereby designated as the "partnership representative" of the Company (the "Partnership Representative") within the meaning of Section 6223 of the Code and partnership audit procedures and provisions of state, local or non-U.S. law. The Partnership Representative may appoint another Person to be designated as the Partnership Representative. The Company shall comply with any requirements necessary to effect such designations. The Partnership Representative may exercise any authority granted to it under the Code. The Partnership Representative shall be reimbursed by the Company for any expenses incurred by the Partnership Representative, or on the Partnership Representative's behalf, in its capacity as the Partnership Representative, as well as released from all liability for, and fully indemnified for, any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by the Partnership Representative in performing such services.

(b)    Notwithstanding any other provision in this Agreement, to the extent permissible under the Code and Regulations, the Administrative Manager will have the discretion to cause the Company to elect application of Section 6221(b) of the Code or any successor provision or the applicable corresponding provisions of state, local or non-U.S. law.

(c)    To the extent (a) permissible under the Code and Regulations, and (b) the Administrative Manager has not caused the Company to elect application of Section 6221(b) of the Code or any successor provision or the applicable corresponding provisions of state, local or non-U.S. law pursuant to Section 12.3C above, the Administrative Manager shall be authorized to cause the Company either to (1) pay any "imputed underpayment" of taxes (together with interest and penalties) determined in accordance with Section 6225 of the Code or the applicable corresponding provisions of state, local or non-U.S. law that may from time to time be required to be made under Section 6232 of the Code or the applicable corresponding provisions of state, local or non-U.S. law, or (2) elect application of Section 6226(a) of the Code or any successor provision or the applicable corresponding provisions of state, local or non-U.S. law. Each Member hereby agrees, upon request by the Company, the Administrative Manager or the Partnership Representative, to timely provide any information and comply with any requirements (including the filing of any tax returns and the payment of any taxes) that the Partnership Representative determines is or are necessary or advisable to reduce the amount of any tax (including an "imputed underpayment" of taxes within the meaning of Section 6225 of the Code or similar provisions of state, local or non-U.S. law), interest, penalties or similar amounts the

cost of which is (or would otherwise be) borne by the Company (directly or indirectly) or to make any election permitted by the Code. In the event an election is made under Section 6226(a) of the Code or any successor provision or the applicable corresponding provisions of state, local or non-U.S. law, each Member, who was a partner in the Company for federal income tax purposes for the "reviewed year" (within the meaning of Section 6225(d)(1) of the Code or the applicable corresponding provisions of state, local or non-U.S. law, shall take any adjustment to income, gain, loss, deduction, or credit (as determined in the notice of final partnership adjustment) into account as provided for in Section 6226(b) of the Code or the applicable corresponding provisions of state, local or non-U.S. law.

(d)    The Administrative Manager may, to the extent permissible under the Code and Regulations, cause the Company to allocate the amount of any such "imputed underpayment" of taxes paid by the Company among the Members (including, as applicable, former Members) in a manner the Administrative Manager considers equitable, taking into account, among other factors, the magnitude of the "imputed underpayment," the nature of the tax items that are the subject of the adjustment giving rise to such "imputed underpayment," the classification of the Members for U.S. federal income tax purposes as corporations, individuals, exempt organizations, or other types of taxpayers, and the persons who received (and the proportions in which they received) the benefits of the activities that gave rise to the imputation of underpayment. Notwithstanding anything to the contrary contained herein, the Administrative Manager shall be authorized to unilaterally amend the Agreement in its sole discretion and without the consent of the Members in order to achieve a practical and, to the extent possible, equitable result in allocating the expense of, reducing the amount of or otherwise handling any "imputed underpayment" (within the meaning of Section 6225 of the Code or similar provisions of state, local or non-U.S. law), or any associated interest, penalties, additions to tax, additional amounts, costs or expenses, for which the Company may be liable.

(e)    Each Member (including any former Member) may be required, in the sole discretion of the Administrative Manager, to return amounts distributed to such Member or former Member (or any of its predecessors in interest) for the purpose of meeting such Member's share of any taxes, interest, penalties, or similar amounts the cost of which is borne by the Company (directly or indirectly) that relate to any period during which such Member or former Member (or any of its predecessors in interest) held an interest in the Company.

(f)    Each Member's share (as reasonably determined by the Administrative Manager) of any tax (including an "imputed underpayment" of taxes within the meaning of Section 6225 of the Code or similar provisions of state, local or non-U.S. law), interest, penalties or similar amounts paid or accrued by the Company shall be treated as a distribution to such Member for all purposes of this Agreement.

(g)    Except to the extent the Administrative Manager expressly agrees otherwise with the Member, no Member shall file a notice with the Internal Revenue Service under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's U.S. federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's U.S. federal income tax return.

(h)    Pursuant to Section 6224(b) of the Code, each Member waives any right granted by the Code to participate in any administrative proceeding of the Company for any taxable year

in which such Member is a partner in the Company for U.S. federal income tax purposes. Each Member further waives any right granted in connection with the tax laws of any state or local jurisdiction to participate in any administrative proceeding of the Company for any taxable year in which such Member is a partner in the Company for purposes of the tax laws of such state or local jurisdiction. Upon request by the Administrative Manager, each Member shall provide all additional information or documentation, execute all forms or other documents, and take all other action required by law to effect such a waiver. This Agreement may be filed with the Internal Revenue Service or any state or local taxing authority upon the commencement of any administrative proceeding of the Company.

**12.4    Election to be Taxed as Association.** The Company shall be treated as a partnership for federal and state income tax purposes. No Member shall cause the Company to elect to be treated as a corporation for federal or state income tax purposes, unless such election is approved in writing by all of the Members.

**12.5    Reporting Requirements.** The Administrative Manager shall close the books of account promptly after the end of each calendar year, and shall prepare and send to each Member a statement of such Member's allocable share of income and expense for federal income tax reporting purposes.

**12.6    Accounting Decisions; Tax Elections.** All decisions as to accounting matters and tax elections, except as specifically provided to the contrary in this Agreement, shall be made by the Administrative Manager. The Administrative Manager may rely upon the advice of the Company's accountants and professional advisors in making such decisions.

## ARTICLE 13
## GENERAL PROVISIONS

**13.1    Entire Agreement.** This Agreement (a) contains the entire agreement among the parties, (b) may not be amended nor may any rights hereunder be waived except by an instrument in writing signed by the party sought to be charged with such amendment or waiver, (c) shall be construed in accordance with, and governed by, the laws of New York, and (d) shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, administrators, devisees, legatees, heirs, successors and permitted assigns, but nothing herein shall permit any assignment or other transfer not otherwise permitted under this Agreement.

**13.2    Notice.** Whenever notice is required, written notice stating the place, day and hour of the meeting shall be delivered at least two (2) days prior thereto to each person entitled to receive such notice, either personally with receipt, by first-class registered or certified United States mail, return receipt requested, by facsimile or by other form of electronic communication, or by reputable overnight delivery service (such as UPS or FedEx) to such person's address set forth on Exhibit "A" or such other address as any of the parties hereto may specify in the same manner. All notices shall be deemed to be delivered upon receipt (and refusal of receipt shall be deemed to constitute receipt).

**13.3    Construction Principles.** Words in any gender shall be deemed to include the other gender. The singular shall be deemed to include the plural and vice versa. The headings

and underlined Section titles are for guidance only and shall have no significance in the interpretation of this agreement.

**13.4    Counterparts.** This agreement may be executed in counterparts, each of which shall be deemed an original for all purposes when signed by any of the parties hereto.

**13.5    Severability.** If any provision or part of any provision of this Agreement shall be invalid or unenforceable in any respect, such provision or part of any provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Agreement.

**13.6    Binding Effect.** This Agreement binds all Members and their respective distributees, successors, and assigns and any other person claiming a right or benefit under or covered by this Agreement.

**13.7    Attorney Fees and Other Litigation Expenses.** If the Company resorts to litigation to remedy a breach of this Agreement by a Member or former Member and the Company prevails in the litigation, in addition to any other remedies available to the Company under this Agreement or by law the Company may collect its reasonable attorney fees and other costs and expenses of litigation.

**13.8    Waiver of Appraisal Rights.** The Members understand that the Act provides specific instances that trigger appraisal rights under Connecticut statutes. Such appraisal rights allow a Member to force a judicial proceeding to determine the fair price of such Member's interest in the Company. THE MEMBERS HEREBY WAIVE AND RELINQUISH THE STATUTORY APPRAISAL RIGHTS.

**13.9    Dispute Resolution.**

(a)    If an Impasse occurs that cannot be resolved as provided in Section 8.4 and if available, neither Member elects to exercises the purchase and sale rights set forth in Section 9.7, then such Impasse, regardless of the magnitude thereof or the amount in controversy or whether such Impasse, but would otherwise be considered justiciable or ripe for resolution by a court or arbitral tribunal, shall be submitted to, and finally determined by, arbitration in accordance with the following provisions of this Section 13.9(a):

(i)    Any such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), except as the AAA conflicts with the provisions of this Section 13.9, in which event the provisions of this Section 13.9 shall control.

(ii)    The arbitration panel shall consist of one arbitrator if the parties mutually agree on such arbitrator and otherwise shall consist of three arbitrators who are independent of the parties and their Affiliates (in either case, the "Arbitrators") appointed pursuant to the AAA procedure for selecting arbitrators.

(iii)    Should an Arbitrator refuse or be unable to proceed with arbitration proceedings as called for by this Section 13.9, the Arbitrator shall be replaced by the

procedure set forth in (ii) above. If an Arbitrator is replaced after the arbitration hearing has commenced, then a rehearing shall take place in accordance with the provisions of this Section 13.9 and the procedures of the AAA.

(iv)    The arbitration shall be conducted in New York or in such other location as the parties may designate by unanimous written consent; provided, however, that the Arbitrator(s) may from time to time convene, carry on hearings, inspect property or documents, and take evidence at any location that the Arbitrator(s) deems appropriate.

(v)    The Arbitrator(s) may in their discretion order a pre-hearing exchange of information including production of documents, exchange of summaries of testimony or exchange of statements of position, and shall schedule promptly limited discovery (to the extent necessary and appropriate) and other procedural steps and otherwise assume case management initiative and control to effect an efficient and expeditious resolution of the Dispute.

(vi)    At any oral hearing of evidence in connection with an arbitration pursuant to this Section 13.9, each party and its legal counsel shall have the right to examine its witnesses and to cross-examine the witnesses of any other party. No testimony of any witness shall be presented in written form unless the opposing party or parties shall have the opportunity to cross-examine such witness, except as the parties otherwise agree in writing.

(vii)    Within fifteen (15) days after the closing of the arbitration hearing, the Arbitrator(s) shall prepare and distribute to the parties a writing setting forth the Arbitrator(s) findings of facts and conclusions of law relating to the Dispute, including the reasons for the giving or denial of any award.

(viii)    Except as necessary in court proceedings to enforce this arbitration provision or an award rendered hereunder, or to obtain interim relief, no party hereto nor an Arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of all parties.

(ix)    The parties consent to the jurisdiction of any Federal or State court in Chicago, Illinois with respect to such arbitration and further consent that any notice of arbitration upon the other party hereto by the party instituting such arbitration shall be deemed sufficient if made in accordance with this Agreement, and that such notice shall have the same effect as if personal service of notice had been made. A judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction.

(x)    If deemed appropriate by the Arbitrator(s), the non-prevailing party shall pay any administrative fee, any compensation of the Arbitrators and any expenses of any witnesses or proof produced at the direct request of the Arbitrator(s); provided, however, that if requested by the Arbitrator(s), the Administrative Manager shall cause the Company to bear all of such fees and expenses if deemed appropriate by the Arbitrator(s) to ensure the payment of all such fees and expenses, and the non-prevailing party shall reimburse the Company for all such fees and expenses paid by the Company.

# 5411549v1                                29

(xi)    If deemed appropriate by the Arbitrator(s), the prevailing party shall be reimbursed by the non-prevailing party for all of its fees and expenses (including fees and expenses of counsel and accountants, and travel, lodging and meal expenses) incurred in connection with such Dispute and/or arbitration.

(xii)    The provisions of the Federal Arbitration Act, 9 U.S.C. Sections 1 through 14, except as modified hereby, shall govern the interpretation and enforcement of this Section 13.9.

(b)    Notwithstanding the Dispute resolution procedures contained in Section 13.9, any party hereto may apply to any court having jurisdiction (i) to enforce this agreement to arbitrate, (ii) to seek provisional injunctive relief so as to enforce any agreements in this Agreement until the arbitration award is rendered or the Dispute is otherwise resolved, (iii) to avoid the expiration of any applicable limitation period, (iv) to preserve a superior position with respect to other creditors or (v) to challenge or vacate any final judgment, award or decision of the Arbitrator(s) that does not comport with the express provisions of this Agreement.

[SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the Members acknowledge that the matters and facts set forth in this Agreement are true and that they have signed this Agreement to be effective as of the Effective Date.

COMPANY: 47 Poplar Owners LLC

MEMBERS:

_____

Thomas Lee

_____

James McManus

## EXHIBIT A

### NAME, ADDRESS, CAPITAL CONTRIBUTION
### AND PERCENTAGE INTERESTS OF THE MEMBERS

| Member Name And Address | | Initial Capital Contributions | Initial Cash Payment | Capital Contributions | Contributed Capital Percentages |
|---|---|---|---|---|---|
| Thomas Lee | | n/a | n/a | $XX | 50% |
| James McManus | | n/a | n/a | $XX | 50% |
| | | | | | 100% |

# 5411549v1                                    32

## EXHIBIT B

## LEGAL DESCRIPTION OF PROPERTY

# EXHIBIT C

## APPROVED DEVELOPMENT PLAN

34