# **EXHIBIT 26**

**BRAUNSTEIN TURKISH LLP**
ATTORNEYS AT LAW

7600 Jericho Turnpike, Suite 402, Woodbury, NY 11797

Tel: 516-802-0700 • Fax: 516-802-0701
www.BraunsteinTurkish.com

September 9, 2024

*Via UPS Overnight Mail,*
*Certificate Mail, Return Receipt Requested and*
*Electronic Mail*

1932 McGraw Avenue LLC
1932 McGraw Avenue
Bronx, New York 10462
Attn: David DeLucia
Email: david@unitedbenefitfund.com

David Delucia
243 Manhattan Avenue
Yonkers, New York 11010
Email: david@unitedbenefitfund.com

RandyLynn Rastello-McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465
Email: rmcmanus@upsidenewyork.com

Eliezer Torres
1932 McGraw Avenue
Bronx, New York 10462

James McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465
jmcmanus@upsidenewyork.com

## NOTIFICATION OF DISPOSITION OF COLLATERAL
## UNDER ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE

Dear Sirs/Madams:

Braunstein Turkish LLP is counsel to Fairbridge Credit LLC, a Delaware limited liability company (together with its successors and/or assigns, "**Lender**").

Reference is hereby made to that certain (i) Consolidated, Amended and Restated Note in the principal amount of Seven Hundred Six Thousand and 00/100 Dollars ($706,000.00), dated as of October 28, 2021, made by 1932 McGraw Avenue LLC, a New York limited liability company ("**Borrower**") in favor of RealFi Real Estate Investment Trust LLC, a Delaware limited liability company ("**Original Lender**") (the "**Land Note**"); (ii) Building Loan Note in the maximum principal amount of One Million Three Hundred Ninety Four Thousand and 00/100 Dollars ($1,394,000.00), dated as of October 28, 2021, made by Borrower in favor of Original Lender (the "**Building Note**" and together with the Land Note, collectively, the "**Note**"); and (iii) that certain Ownership Interests Pledge and Security Agreement, dated as of October 28, 2021, made between David DeLucia, RandyLynn Rastello-McManus, and Eliezer Torres (individually and collectively, "**Guarantor**" or "**Pledgor**") and Lender (a copy of which is attached hereto as Exhibit 1, collectively the "**Pledge Agreement**"). All capitalized terms shall have the meanings set forth in the Pledge Agreement unless otherwise stated herein.

Pursuant to the Pledge Agreement, Pledgor pledged to Lender, and Lender has a perfected first lien security interest in, the "Collateral" (which is defined in the Pledge Agreement),

-1-

consisting of, among other things, one hundred percent (100%) of the limited liability company membership interests in Borrower which are represented by the following Share Certificates (copies of said certificates are attached hereto as Exhibit 2 and are collectively hereinafter referred to as, the "**Certificates**"): (i) Certificate Number 1, dated as of October 28, 2021, made by Borrower in favor of David DeLucia; (ii) Certificate Number 2, dated as of October 28, 2021, made by Borrower in favor of RandyLynn Rastello-McManus; and (iii) Certificate Number 3, dated as of October 28, 2021, made by Borrower in favor of Eliezer Torres.

All of the Loan Documents were subsequently assigned by Original Lender to Lender on or about September 28, 2022 and, as of the date hereof, Lender remains the owner and holder of the Loan Documents.

On or about May 31, 2023, Borrower, Guarantor and Lender entered into those certain Mortgage Extension and Modification Agreements, dated as of May 31, 2023 (but effective as of April 28, 2023) (collectively, the "**Extension Agreements**") whereby the maturity date of the Loan was extended to September 1, 2023 pursuant to the terms as set forth in the Extension Agreements.

On or about October 18, 2023, Borrower, Guarantor and Lender entered into that certain Forbearance Agreement, dated as of October 18, 2023 (but effective as of September 1, 2023) (the "**Forbearance Agreement**") whereby Lender agreed to forbear from exercising its remedies under the Loan Documents pursuant to the terms set forth in the Forbearance Agreement.

On or about February 5, 2024, Lender sent to Borrower and Guarantor a notice of default for the Loan (a copy of such notice is attached hereto as Exhibit 3, the "**Initial Notice**") for failure to make on or before December 1, 2023 (the expiration date for the "Forbearance Period" defined in the Forbearance Agreement), the payment of the entire aggregate, outstanding principal amount due under the Loan, together with unpaid interest thereon and all fees, charges and other amounts to which Lender is entitled to under the Note, the Pledge Agreement and the other Loan Documents (collectively, the "**Debt**").

On or about June 5, 2024, our firm on behalf of Lender sent to Borrower and Guarantor a second notice of default for the Loan reaffirming the foregoing Event of Default, demanding payment of the Debt and setting forth the amount of the Debt due and owing as of such date (a copy of such notice is attached hereto as Exhibit 3, the "**Second Notice**" and together with the Initial Notice, collectively, the "**Notices**"). As of the date hereof, the Debt (which continues to accrue interest, cost, fees and other charges in accordance with the terms of the Loan Documents) still remains due and owing.

<u>**Notification of Disposition of Collateral**</u>

Notice is hereby given that Lender will, in accordance with Section 12(a) of the Pledge Agreement, sell the Collateral to the highest qualified bidder at a public sale in accordance with the provisions of the Uniform Commercial Code as in effect in the State of New York. The sale will take place beginning on October 25, 2024 at 10:00 a.m. (Eastern Time) at the offices of Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, *which you may attend*, and simultaneously by remote auction via Zoom, as follows:

Meeting link:        https://bit.ly/1932McGraw

-2-

4876-5291-0817, v. 1.1

| | |
|---|---|
| Meeting ID: | 892 2460 0893 |
| Meeting passcode: | 131167 |
| Call-in number: | +1 646 931 3860 (US) |

The sale will be conducted by Mannion Auctions, LLC, Matthew D. Mannion, licensed auctioneer (DCA #1434494). A copy of the two (2) forms of sale ad, which will be published four (4) times in the New York Post and once in the Bronx Times Reporter, are attached as Exhibit 4 hereto.

Borrower and Pledgor are entitled, *at no charge*, to an accounting of the unpaid Obligations secured by the Collateral that Lender intends to sell. Borrower or Pledgor may request an accounting by calling Pat Maruggi at (833) 869-3443.

Borrower and Pledgor and other obligated parties may be liable for any Obligations which shall remain after such sale to the extent permitted by applicable law and the Loan Documents.

## Reservation of Rights

Nothing contained herein shall be construed as a modification or any of the Loan Documents or as a waiver of any delinquency, breach, default or Event of Default under the Loan Documents, at law or in equity, or as a waiver, modification or limitation of any of rights or remedies of Lender, all of which are hereby expressly reserved. Any actions, omissions or forbearance by Lender in the exercise of any such rights and remedies shall not constitute a waiver of such rights or any other rights and shall not be deemed to establish a course of conduct nor justify an expectation by Borrower or Pledgor that Lender will take any further action or continue to not take any action and will not preclude Lender from exercising any and all remedies available at any time thereafter. Lender may exercise each right and remedy available to it from time to time and as often and in such order as it may determine in its sole discretion, and the exercise or beginning of the exercise of any such right or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it.

There may be other defaults or Events of Default which are not identified in this letter which may currently exist under a Loan Document. Lender is expressly not waiving any such defaults or Events of Default whether or not they are identified herein.

Any conversations, correspondences, proposals or discussions of proposals with Lender shall not prejudice Lender's rights nor be legally binding on Lender unless definitive documents are executed and delivered by Lender.

## Governing Law

THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.

-3-

4876-5291-0817, v. 1.1

-4-

Very truly yours,

Braunstein Turkish LLP

*Vincent Georgetti*

4876-5291-0817, v. 1.1

cc:    Pat Longobucco, Esq.
44 Church Street
White Plains, NY 10601

Fairbridge Credit LLC
Attn: Steve Wissak
Email: swissak@fairbridgellc.com

Attn: Steve Wissak
Email: swissak@fairbridgellc.com

Attn: Pat Maruggi
Email: pmaruggi@fairbridgellc.com

Braunstein Turkish LLP
Attn: William J. Turkish, Esq.
Email: wt@braunsteinturkish.com

Attn: Jonathan Mottahedeh
Email: jm@braunsteinturkish.com

-5-

4876-5291-0817, v. 1.1

## EXHIBIT 1

## PLEDGE AGREEMENT

[To Follow]

4876-5291-0817, v. 1.1

## OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT

This **OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT** (this "**Agreement**") is made as October 28, 2021 by and between **DAVID DELUCIA**, an individual having an address at 243 Manhattan Avenue, Yonkers, New York 11010, **RANDYLYNN RASTELLO-MCMANUS**, an individual having an address at 214 Outlook Avenue, Sunrise Marina Estates, New York 10465 and **ELIEZER TORRES**, an individual having an address at 1932 McGraw Avenue, Bronx, New York 10462 (collectively, the "**Pledgor**") to **REALFI REAL ESTATE INVESTMENT TRUST LLC**, a Delaware limited liability company, having its principal place of business at 707 Westchester Avenue, Suite 305A, White Plains, New York 10604 (together with its successors and/or assigns, as their interests may appear, the "**Lender**").

WHEREAS, pursuant to the terms of the Consolidated, Amended and Restated Note (the "**Land Note**") and the Building Loan Note (the "**Building Note**"; and together with the Land Note, hereinafter collectively, the "**Note**"), the Consolidated, Amended and Restated Mortgage and Security Agreement (the "**Land Mortgage**") and the Building Mortgage and Security Agreement (the "**Building Mortgage**"; together with the Land Mortgage, hereinafter collectively, the "**Mortgage**") and any and all other security documents and guarantees executed in connection therewith (collectively herein, the "**Loan Documents**"), each dated of even date herewith, between **1932 MCGRAW AVENUE LLC**, a New York limited liability company (the "**Issuer**"), and Lender, Lender has agreed to make (i) that certain land loan to the Issuer in the principal amount of Seven Hundred Six Thousand and 00/100 Dollars ($706,000.00)((the "**Land Loan**") and (ii) that certain building loan to the Issuer in the principal amount of up to One Million Three Hundred Ninety Four Thousand and 00/100 Dollars ($1,394,000.00)((the "**Building Loan**"; together with the Land Loan, hereinafter collectively, the "**Loan**") as evidenced and secured by all of the obligations under and in connection with the Loan Documents (the "**Obligations**"); and

WHEREAS, the Pledgors are the sole members of the Issuer; and

WHEREAS, in order to induce Lender to make the Loan, it is a condition precedent under the Loan Documents that Pledgor shall have (a) granted to Lender the security interests, and undertaken the obligations, set forth in this Agreement, and (b) executed and delivered to Lender this Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Pledge of Collateral. Pledgor hereby irrevocably and unconditionally pledges and assigns to Lender, and irrevocably and unconditionally grants to Lender a security interest in, all of Pledgor's right, title, and interest in and to the following (the "**Collateral**"):

   (a)     the Pledged Interests (hereinafter defined) together with all rights to Distributions (hereinafter defined) or other payments arising therefrom or relating thereto, and all options, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributable in respect of or in exchange for any or all of the Pledged Interests;

(b)    to the extent not covered by subparagraph (a), all rights to receive all income, gain, profit, loss, or other items allocated, allocable, distributed, or distributable to Pledgor under the Organizational Documents (hereinafter defined) of the Issuer, and all general intangibles, accounts, investment property, payment intangibles, supporting obligations, other contract rights or rights to the payment of money, and all proceeds, as each of the foregoing terms is defined in the UCC (hereinafter defined), arising out of, or in connection with, the membership interest in Issuer;

(c)    all of Pledgor's ownership interest in any capital accounts in the Issuer;

(d)    all of Pledgor's voting, consent, management, management removal and replacement, and approval rights, and/or rights to control or direct the affairs of the Issuer, inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Limited Liability Company Agreement of the Issuer dated as of February 19, 2021, and any amendments thereto, including without limitation, the First Amendment to Limited Liability Company Agreement dated as of the date hereof, as the same may be amended or amended and restated from time to time (collectively, the "**Operating Agreement**");

(e)    any additional ownership interests of, and any ownership interests exchangeable for or convertible into and warrants, options, and other rights to purchase or otherwise acquire shares of ownership interests of, the Issuer, or entity which is the successor of the Issuer, from time to time acquired by Pledgor in any manner (all of which interests shall be deemed to be part of the Pledged Interests), and any certificates or other instruments representing such additional interests, warrants, options, and other rights, and all Distributions and other property or proceeds from time to time received, receivable, or otherwise distributed or distributable in respect of or in exchange for any or all of such additional shares, warrants, options, or other rights. Pledgor agrees that Lender may from time to time attach as Schedule A hereto an updated list of the Collateral at the time pledged to Lender hereunder (although the failure to so update Schedule A shall not limit the pledge of such additional interests to Lender); and

(f)    to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing Collateral. For purposes of this Agreement, the term "proceeds" includes whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to Pledgor from time to time with respect to any of the Collateral.

2.    Certain Definitions. Capitalized terms used herein without definition shall have the respective meanings provided therefor in the Loan Documents. Terms (whether or not capitalized) used herein and not defined in the Loan Documents or otherwise defined herein that are defined in the Uniform Commercial Code as in effect in the State of New York or other applicable jurisdiction (the "**UCC**") have such defined meanings herein, unless the

-2-

context otherwise indicates or requires. In addition, the following terms used herein shall have the following meanings:

(a)     "Article 8 Matter" means any action, decision, determination or election by the Issuer or its members that the membership interest in the Issuer be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

(b)     "Business Day" means a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

(c)     "Contractual Obligation" means, as to any Person, any contract, agreement, or undertaking, regardless of how characterized, oral or written, to which such Person is a party, or by which such Person or such Person's property is bound, or to which such Person or such Person's property is subject.

(d)     "Distributions" means any distribution of property (including cash) (regardless of whether from cash flow, capital transactions, or otherwise) on account of a Pledged Interest, or any other distribution or payment on or in respect of any membership interest or the redemption or repurchase thereof.

(e)     "Governmental Authority" means any national, state, or local government, any political subdivision thereof, or any other governmental, quasi-governmental, judicial, public, or statutory instrumentality, authority, body, agency, bureau, or entity or any arbitrator with authority to bind a Person at law, and any agency, authority, department, commission, board, bureau, or instrumentality of any of them.

(f)     "Legal Requirements" means all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any Governmental Authority having or claiming jurisdiction with respect thereto, including, but not limited to, all orders and directives of any Governmental Authority having or claiming jurisdiction with respect thereto.

(g)     "Lien" means any lien, encumbrance, security interest, mortgage, restriction, charge or encumbrance of any kind.

(h)     "Loan Collateral" means the "Collateral" as defined in the Mortgage and includes the Collateral hereunder.

(i)     "Organizational Documents" means for any corporation, partnership, trust, limited liability company, limited liability partnership, unincorporated association, business or other legal entity, the agreements pursuant to which such entity has been established or organized, its affairs are to be governed, and its business is to be conducted, as such documents may be amended from time to time.

(j)    "Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(k)    "Pledged Interests" means the ownership interests or membership interest now or hereafter listed on Schedule A hereto or which would be listed on an updated Schedule A at any time of reference, together with all related rights of the holder thereof pursuant to the Organizational Documents of the Issuer.

3.    Security for the Secured Obligations. This Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), of the following (the "Secured Obligations"):

(a)    the Obligations, including all obligations and liabilities of every nature of the Issuer now or hereafter existing under or arising out of or in connection with the Loan Documents and all renewals or extensions thereof, whether for principal, interest, fees, expenses, indemnities, or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created, or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer, or otherwise, and all obligations of every nature of the Pledgor now or hereafter existing under this Agreement; and

(b)    the obligations of Pledgor hereunder.

4.    Delivery of Collateral.

(a)    If at any time the Pledged Interests are evidenced by one or more certificates, Pledgor shall deliver to Lender any original certificate evidencing the Pledged Interests (the "Certificate"), in suitable form for transfer by delivery or, as applicable, accompanied by any necessary endorsement or duly executed instruments of transfer or assignment, in blank, all in form and substance satisfactory to Lender.

(b)    Lender shall have the right, at any time after the occurrence of an Event of Default, in its discretion and without notice to Pledgor, to transfer to or to register (if not already so registered) in the name of Lender or any of its nominees any or all of the Collateral. In addition, Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

5.    Representations and Warranties. Pledgor hereby represents and warrants as follows:

- 4 -

(a)     Organization; Address of Pledgor. Pledgor is the type of entity, organized in the jurisdiction, and has the address set forth with respect to Pledgor in the introductory paragraph to this Agreement.

(b)     No Conflict. The execution, delivery, and performance by Pledgor of this Agreement will not (i) violate any provision of any Legal Requirement applicable to Pledgor, or any order, judgment, or decree of any Governmental Authority binding on Pledgor, (ii) result in a breach of, or constitute with due notice or lapse of time or both, a default under any Contractual Obligation of Pledgor, (iii) result in or require the creation or imposition of any Lien upon any of Pledgor's properties or assets, except pursuant to this Agreement, (iv) require the approval or consent of any Person under any Contractual Obligation of Pledgor, except for the approvals or consents described on Schedule B hereto, which approvals or consents have been obtained, and true and complete copies of which have been furnished to Lender, or (v) conflict with any provision of Pledgor's Organizational Documents.

(c)     Binding Obligation. The execution, delivery and performance of this Agreement and the transactions contemplated hereby is within the authority of Pledgor, has been duly authorized by all necessary proceedings, and is the legally valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws or equitable principles generally.

(d)     Description of Collateral. The Pledged Interests are being certificated pursuant to this Agreement and are fully paid and non-assessable. The Pledged Interests constitute all of the issued and outstanding ownership interests of the Issuer owned beneficially or of record by Pledgor. Neither Pledgor nor any other Person holds, or has any right to the issuance of, any options or other rights to purchase, and is not party to any other agreement with respect to and does not hold or have the right to any property that is now or hereafter convertible into, or that requires the issuance or sale of, any ownership interests of the Issuer. No Person other than Pledgor owns any ownership interests of any type in the Issuer. Other than the Certificate delivered to Lender pursuant to this Agreement, there currently exist no certificates, instruments or writings representing the Pledged Interests. However, to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Lender.

(e)     Ownership of Collateral. (i) Pledgor is the legal and beneficial owner of, and has good and marketable title to, the Collateral, and is the record owner of the Pledged Interests, free and clear of, and subject to no, pledges, Liens, security interests, charges, options, restrictions or other encumbrances, except the pledge and security interest created by this Agreement; (ii) Pledgor has the legal capacity to execute, deliver and perform Pledgor's obligations under this Agreement and to pledge and grant a security interest in all of the Collateral of which it is the legal or beneficial owner pursuant to this Agreement; (iii) except for authorizations and consents which have already been obtained, no authorization, consent of or notice to any party that has not been obtained is required in connection with the execution,

- 5 -

delivery, performance, validity or enforcement of this Agreement, including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer by Lender pursuant to the terms hereof; and (iv) Lender's filing of UCC-1 financing statements with the Secretary of State of the State of New York results in the perfection of Lender's security interest in the Pledged Interests, and such portion of the other Collateral in which a security interest may be perfected by filing such UCC-1 form or financing statement.

(f)   Governmental Authorizations. No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required for either (i) the pledge by Pledgor of the Collateral pursuant to this Agreement and the grant by Pledgor of the security interest granted hereby, (ii) the execution, delivery, or performance of this Agreement by Pledgor, or (iii) the exercise by Lender of the voting or other rights in respect of the Collateral provided for in this Agreement (except as may be required in connection with a disposition of Collateral by laws affecting the offering and sale of securities generally).

(g)   Article 8. Pledgor acknowledges and agrees that the terms of the Pledged Interests and the Organizational Documents of the Issuer do and will provide that the Pledged Interests shall constitute a "security" within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof), as in effect from time to time in the State of New York, and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Pledgor acknowledges and agrees that the Pledged Interests, and any and all Certificates which have been delivered to Lender on the date hereof, constitute and each will constitute a "certificated security" (as defined in the UCC). Pledgor therefor covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, the Operating Agreement as in effect on the date hereof. However, the Pledged Interests are not and will not be investment company securities within the meaning of Section 8-103 of the UCC. The Pledged Interests (i) will not become "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (ii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC).

(h)   Creation, Perfection and Priority of Security Interest. This Agreement constitutes an authenticated record, and Lender is authorized at any time and from time to time to file any and all UCC financing statements and take such other actions determined by Lender to be necessary or desirable to perfect its security interest in the Collateral.

(i)   No Other Financing Statements. Other than the UCC financing statements filed by Lender describing the Collateral, there is no financing statement (or similar statement or registration under the laws of any jurisdiction) now on file or registered

- 6 -

in any public office covering any interest of Pledgor or any other Person in the Collateral.

(j)     <u>Other Information</u>. All information heretofore, herein or hereafter supplied to Lender by Pledgor with respect to the Collateral in writing is accurate and complete in all material respects.

6.     <u>Assurances and Covenants of Pledgor</u>.

(a)     <u>Transfers and Other Liens</u>. Pledgor shall not:

(i)     sell, assign (by operation of law or otherwise), pledge, or hypothecate or otherwise dispose of, or grant any option with respect to, any of the Collateral, except to Lender pursuant to this Agreement; or

(ii)     create or suffer to exist any Lien upon or with respect to any of the Collateral, except for the Lien created hereunder.

(b)     <u>Covenants of Pledgor</u>. Pledgor covenants and agrees, with respect to itself and the Pledged Interests, that so long as any Secured Obligation is outstanding:

(i)     Pledgor shall not vote for, or agree or consent to, the sale, transfer, pledge or encumbrance of the Pledged Interests while the Loan is outstanding.

(ii)     Pledgor shall not vote for, or agree or consent to, the discontinuance of the business or the dissolution or liquidation of the Issuer.

(iii)     Pledgor shall not vote for, or agree or consent to, any material modifications to the Organizational Documents of the Issuer.

(iv)     Pledgor shall provide Lender with copies of any modifications made to the Organizational Documents of the Issuer within thirty (30) days after the date such modifications are made.

(v)     Pledgor shall not enter into any agreements which restrict, limit or otherwise impair the transferability of the Pledged Interests.

(vi)     Pledgor shall be the sole member of the Issuer and the sole holder of membership interest in the Issuer and shall not resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Issuer or any change in the management of the Issuer.

(c)     <u>Additional Collateral</u>. Pledgor shall pledge hereunder, immediately upon Pledgor's acquisition (directly or indirectly) thereof, any and all additional ownership interests of Pledgor in the Issuer.

(d)     <u>Pledge Amendments</u>. Pledgor shall, upon obtaining any additional ownership interests or other securities required to be pledged hereunder promptly (and in any event within five (5) Business Days) deliver to Lender such documents as Lender

- 7 -

may require to confirm the pledge hereunder of such additional collateral; provided that the failure of Pledgor to execute any such additional documents with respect to any additional Pledged Interests pledged pursuant to this Agreement shall not impair the security interest of Lender therein or otherwise adversely affect the rights and remedies of Lender hereunder with respect thereto.

(e)     Taxes and Assessments.    Pledgor shall pay promptly when due all taxes, assessments, and governmental charges or levies imposed upon, and all claims against, the Collateral, except to the extent the validity thereof is being contested in good faith and by appropriate proceedings and in which reserves or other appropriate provisions have been made or provided therefor; provided that Pledgor shall in any event pay such taxes, assessments, charges, levies, or claims not later than five (5) days prior to the date of any proposed sale under any judgment, writ, or warrant of attachment entered or filed against Pledgor or any of the Collateral as a result of the failure to make such payment.

(f)     Further Assurances. Pledgor shall from time to time, at the expense of Pledgor, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary and that Lender may request, in order to give full effect to this Agreement and to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral, provided that such further instruments, documents and action are consistent with this Agreement.

(g)     Warranty of Title to Collateral. Pledgor covenants that Pledgor will defend its rights and title in the Collateral against the claims and demands of all Persons whomsoever. Pledgor further covenants that Pledgor will have title to and right to pledge and grant a security interest in the Collateral hereafter pledged or in which a security interest is granted to Lender hereunder and will likewise defend its rights therein.

(h)     Good Standing. Pledgor will at all times be duly formed and is, and will at all times be, validly existing, in good standing and qualified to do business in each jurisdiction where required. Pledgor will at all times have all requisite power to own its property and conduct its business as now conducted and as presently contemplated.

7.     Voting Rights. Dividends. Etc.

(a)     So long as no uncured Event of Default shall have occurred:

(i)     Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement and the Loan Documents; provided, however, that any and all such rights shall remain subject to the provisions of Section 7(b) hereof;

(ii)    Subject to the terms and conditions of this Agreement and the Loan Documents, Pledgor shall be entitled to receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all Distributions, paid in respect of the Collateral; provided, however, if any such property is distributed in the form of shares of membership interest in the Issuer, such membership interest shall be pledged, and any certificates representing such membership interest delivered, to Lender (collectively, "**Collateral Payments and Distributions**").

(b)    After the occurrence of an uncured Event of Default:

(i)    all rights of Pledgor to exercise the voting, management, and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 7(a)(i) shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to exercise such voting, management, and other consensual rights;

(ii)    all rights of Pledgor to receive the Collateral Payments and Distributions which Pledgor would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to receive and hold as Collateral such Collateral Payments and Distributions; and

(iii)    all Collateral Payments and Distributions which are received by Pledgor contrary to the provisions of paragraph (ii) of this Section 7(b) shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor, and shall forthwith be paid over to Lender as Collateral in the same form as so received (with any necessary endorsements).

(c)    In order to permit Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant to Section 7(b)(i) and to receive all Collateral Payments and Distributions which it may be entitled to receive under Section 7(a)(ii) or Section 7(b)(ii), (i) Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to Lender all such proxies, dividend payment orders, and other instruments as Lender may from time to time request, and (ii) without limiting the effect of the immediately preceding clause (i), Pledgor hereby grants to Lender an irrevocable proxy to vote the Pledged Interests and to exercise all other rights, powers, privileges, and remedies to which a holder of the Pledged Interests would be entitled (including, without limitation, giving or withholding written consents of members, calling special meetings of members, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Interests on the record books of the Issuer) by any other Person (including the Issuer or any officer or agent thereof), provided, however, Lender shall not exercise any rights granted under such proxy except upon the occurrence of an Event of Default.

(d)    Notwithstanding any of the foregoing, Pledgor agrees that this Agreement shall not in any way be deemed to obligate Lender to assume any of Pledgor's obligations,

- 9 -

duties, expenses, or liabilities unless Lender otherwise expressly agrees to assume any or all of said obligations, duties, expenses, or liabilities in writing.

8.    Lender Appointed Attorney-in-Fact.  Pledgor hereby irrevocably appoints Lender as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, exercisable after the occurrence of an Event of Default, from time to time in Lender's discretion to take any action and to execute any instrument that Lender may in good faith deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)    to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to receive, endorse, and collect any instruments made payable to Pledgor representing any dividend or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same; and

(c)    to file any claims or take any action or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

9.    Standard of Care.  The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and except as specifically set forth herein shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral, it being understood that Lender shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relating to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, (b) taking any necessary steps (other than steps taken in accordance with the standard of care set forth above to maintain possession of the Collateral) to preserve rights against any parties with respect to any Collateral, (c) taking any necessary steps to collect or realize upon the Secured Obligations or any guaranty therefor, or any part thereof, or any of the Collateral, or (d) initiating any action to protect the Collateral against the possibility of a decline in market value.  In no event shall the standard of care imposed upon Lender hereunder exceed the minimum applicable standard of care imposed under Section 9-207 of the UCC.

10.    Waiver of Defenses; Secured Obligations Not Affected.

(a)    Pledgor hereby waives and agrees not to assert or take advantage of any defense based on: (i) except for a breach of the standard of care set forth in Section 9, any lack of diligence by Lender in collection, protection or realization upon any Loan Collateral; (ii) the failure to make or give notice of presentment and demand for payment, or failure to make or give protest and notice of dishonor or of default to Pledgor or to any other party with respect to the Secured Obligations; (iii) any exculpation of liability of any party contained in the Loan Documents; (iv) the

- 10 -

failure of Lender to perfect any security or to extend or renew the perfection of any security; (v) any valuation, stay, moratorium law or other similar law now or hereafter in effect or any right to require the marshalling of assets of Pledgor; (vi) any fraudulent, illegal or improper act by the Issuer or Pledgor; (vii) all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any agreement, express or implied, or now or hereafter accorded by applicable law to any party; (viii) the right to a trial by jury in any manner related to this Agreement; and (ix) to the fullest extent permitted by law, any other legal, equitable or suretyship defenses whatsoever to which Pledgor might otherwise be entitled, it being the intention that the obligations of Pledgor hereunder shall be absolute, unconditional and irrevocable.

(b)     All rights and remedies of Lender hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of, shall remain in full force and effect without regard to, and shall not be impaired by, any of the following, whether or not Pledgor shall have notice or knowledge thereof:

(i)     any lack of validity or enforceability of this Agreement or the Loan Documents or any other agreement or instrument relating to any of the foregoing;

(ii)     Pledgor has or had no legal existence or legal capacity or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from Pledgor by operation of law or for any other reason;

(iii)     the acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Pledgor, or for any other reason;

(iv)     any exercise or nonexercise, or any waiver, by Lender of any right, remedy, power or privilege under or in respect of any of the Obligations or any security therefor (including this Agreement);

(v)     any change in the time, manner, or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment, waiver, or modification of or any consent to any departure from the Loan Documents or any provision thereof;

(vi)     any exchange, release, or nonperfection of any interest in any Collateral, or any release or amendment or waiver of or consent to any departure from any guaranty, for all or any of the Obligations, or the taking of additional security for, or any other assurances of payment of, any of the Obligations; or

(vii)     any other circumstances (other than payment in full of the Secured Obligations) that might otherwise constitute a defense available to, or a discharge of, Issuer.

11.     <u>Events of Default</u>. An "<u>Event of Default</u>" shall exist if any of the following occurs and provided Pledgor has been provided with the written notice of Default required by the Loan Documents:

    (a)     The occurrence of an "*Event of Default*", as such term is defined in the Note and the other Loan Documents;

    (b)     if any representation or warranty of Pledgor made herein, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

    (c)     Intentionally Omitted;

    (d)     Intentionally Omitted; or

    (e)     Any transfer made by Pledgor in violation of the provisions of this Agreement or any breach or violation by Pledgor of the provisions of Sections 4(a) or 6 (b)(iii).

12.     <u>Remedies</u>.

    (a)     If any uncured Event of Default shall have occurred, then Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement, and Lender may also in its sole discretion, without notice except as specified below, sell the Collateral or any part thereof in one or more parts at public or private sale, at any recognized exchange or broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable. Lender may be the purchaser of any or all of the Collateral at any such sale, and Lender shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Lender at such sale. Notwithstanding anything herein to the contrary, Pledgor shall have a right of redemption prior to a UCC sale of the Collateral in accordance herewith. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor, and Pledgor hereby waives all rights of redemption which such Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted which might otherwise have been applicable subsequent to a UCC sale of the Collateral in accordance herewith. In addition, Pledgor hereby waives all rights of stay, and/or appraisal which Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without

further notice, be made at the time and place to which it was so adjourned. Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree.

(b)    Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as from time to time amended (the "Securities Act"), and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

(c)    If Lender determines to exercise its right to sell any or all of the Collateral, then, upon Lender's written request, Pledgor shall, and Pledgor shall cause the Issuer to, furnish to Lender such information as Lender may request of Pledgor concerning Pledgor and the Collateral.

(d)    Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)    Lender conducts the foreclosure sale in the State of New York,

(ii)    The foreclosure sale is conducted in accordance with the laws of the State of New York,

(iii)    Not less than five (5) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale,

(iv)    The foreclosure sale is conducted by an auctioneer licensed in the State of New York on any Business Day between the hours of 9 a.m. and 5 p.m.,

- 13 -

(v)     The notice of the date, time and location of the foreclosure sale is published in a widely circulated newspaper in New York once a week for four (4) consecutive weeks prior to the date of the foreclosure sale, and

(vi)     Lender sends notification of the foreclosure sale to all secured parties against Pledgor identified as a result of a search of the UCC financings statements in the filing offices located in the State of New York conducted not earlier than thirty (30) days before such notification date.

Notwithstanding Pledgor's agreement that any foreclosure sale conducted in accordance with the foregoing provisions shall be considered a commercially reasonable sale, the foregoing description of potential foreclosure sale procedures and the agreement of Pledgor that such procedures are commercially reasonable shall create no implication that a foreclosure sale conducted using different procedures is commercially unreasonable. As used herein the term "foreclosure sale" shall be deemed to include a public auction as such term is used in the UCC.

13.     Application of Proceeds. Except as expressly provided elsewhere in this Agreement, all proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and/or then, or at any time thereafter, applied in full or in part by Lender against, the Secured Obligations in the following order of priority:

FIRST: To the payment of all costs and expenses of such sale, collection, or other realization, including compensation to Lender and its agents, the fees and expenses and disbursements of Lender's counsel, and all other expenses, liabilities, and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder and all advances made by Lender hereunder for the account of the Pledgor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder, all in accordance with Section 14;

SECOND: To the payment in full of the Secured Obligations, in the manner provided for in the Loan Documents; and

THIRD: To the payment to or upon the order of Pledgor, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

14.     Indemnity and Expenses.

(a)     Pledgor agrees to indemnify Lender from and against any and all claims, losses, and liabilities in any way relating to, growing out of, or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses, or liabilities result from Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.

- 14 -

(b)     Pledgor shall pay to Lender upon demand the amount of any and all costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Lender hereunder, or (iii) the failure by Pledgor to perform or observe any of the provisions hereof.

15.     Continuing Security Interest. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the payment in full of all Secured Obligations and the Issuer has no further obligations under the Loan Documents, (b) be binding upon Pledgor and Pledgor's legal representatives, successors and assigns, and (c) inure, together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors, transferees and assigns. Upon the payment in full of all Secured Obligations and the cancellation or termination of the Loan Documents, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Pledgor. Upon any such termination Lender will, at Pledgor's expense, execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination, and Pledgor shall be entitled to the return, upon Pledgor's request and at Pledgor's expense, against receipt and without recourse to Lender, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

16.     Amendments, Etc. No amendment, modification, termination, or waiver of any provision of this Agreement, and no consent to any departure by Pledgor from the terms and conditions hereof, shall in any event be effective as to Pledgor unless the same shall be in writing and signed by Lender and, in the case of any such amendment or modification, by Pledgor. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

17.     Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of Lender in the exercise of any power, right, or privilege hereunder shall impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right, or privilege preclude any other or further exercise thereof or of any other power, right, or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

18.     Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19.     Headings. Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

20.     Counterparts. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute

- 15 -

but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

21. Marshalling. Lender shall not be required to marshal any present or future security for (including, but not limited to, this Agreement and the Collateral), or other assurances of payment of, the Secured Obligations or any of them, or to resort to such security or other assurances of payment in any particular order. All of Lender's rights hereunder and in respect of such security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent lawfully permissible, Pledgor hereby agrees that Pledgor will not invoke any law, doctrine, or principle relating to the marshalling of collateral that might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that Pledgor lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

22. Notices, Etc. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission followed by telephonic confirmation or similar writing) and shall be given to such party as follows: (i) to Lender, to the address set forth in the Loan Documents, with a copy to: Mavrides Moyal Packman Sadkin LLP, 276 Fifth Avenue, Suite 404, New York, New York 10001, Attn: David Koshers, Esq., and (ii) to Pledgor, to the address set forth in the Loan Documents, with a copy to: Pat Longobucco, Esq., 44 Church Street, White Plains, New York 10601.

Any such addressee may change its address for such notices to any other address in the United States as such addressee shall have specified by written notice given as set forth above.

Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when such facsimile is transmitted to the facsimile number specified in this Section and the appropriate facsimile confirmation is received, (ii) if given by mail, on the earlier of actual receipt or three (3) Business Days after such communication is deposited in the mail with first class certified or registered mail, postage prepaid, addressed as aforesaid, (iii) if given by a nationally recognized overnight carrier, one (1) Business Day after such communication is deposited with such carrier with delivery charges prepaid, or (iv) if given by any other means, when delivered at the address specified in this Section.

23. Delay Not Waiver. No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right. No waiver by Lender in any instance shall constitute a waiver in any other instance.

24. Irrevocable Proxy. With respect to Article 8 Matters and all other matters, including without limitation, the rights, remedies and powers granted by this Agreement, and to the extent applicable, Pledgor hereby irrevocably grants and appoints Lender, from the date of

this Agreement until the payment in full of the Secured Obligations and the termination of all obligations of the Issuer under the Loan Documents, exercisable whether or not there has been an Event of Default hereunder or under the Loan Documents, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead, to vote the Pledged Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters. The proxy granted and appointed in this Section 24 shall include the right to sign Pledgor's name (as the holder of a membership interest in the Issuer) to any consent, certificate or other document relating to an Article 8 Matter and the related Pledged Interests that applicable law may permit or require and to cause the Pledged Interests to be voted in accordance with the preceding sentence. Pledgor hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter. Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.

THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

25.    Miscellaneous.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Lender to enforce any provision shall not preclude Lender from enforcing any such provision thereafter.

(b)    Pledgor hereby authorizes Lender to file one or more financing statements describing all or part of the Collateral, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law. Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Pledgor is an organization, the type of organization and any organizational identification number issued to Pledgor. Pledgor agrees to furnish any such information to Lender promptly upon request.

(c)    This Agreement shall be governed by and construed according to the internal laws of the State of New York, without regard to the conflict of law provisions thereof other than Sections 5-1401 and 5-1402 of the New York General Obligations Law. Pledgor and Lender hereby irrevocably (i) submit to the non-exclusive jurisdiction of any United States Federal or State court sitting in New York County, New York, in any action or proceeding arising out of or relating to this Agreement, and (ii) waive to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. Service of process by Lender in connection with such action or proceeding shall be binding on Pledgor if sent to Pledgor by registered or certified mail at its address specified above.

26.    WAIVER OF JURY TRIAL. TO THE EXTENT ALLOWED BY APPLICABLE LAW, PLEDGOR AND LENDER EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING ON OR ARISING OUT OF THIS AGREEMENT.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGOR:**

DAVID DELUCIA

RANDYLYNN RASTELLO-MCMANUS

ELIEZER TORRES

**LENDER:**

**REALFI REAL ESTATE INVESTMENT TRUST LLC**
a Delaware limited liability company

By: _____
Name: Anthony C. Balbo
Title: Authorized Signatory

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGOR:**

DAVID DELUCIA

RANDYLYNN RASTELLO-MCMANUS

ELIEZER TORRES

**LENDER:**

**REALFI REAL ESTATE INVESTMENT TRUST LLC**
a Delaware limited liability company

By: _____
Name:
Title:

## SCHEDULE A

### [Pledged Interests]

| PLEDGOR | ISSUER | INTERESTS PLEDGED |
|---|---|---|
| David DeLucia<br>243 Manhattan Avenue<br>Yonkers, New York 10707 | 1932 McGraw Avenue LLC, a New York limited liability company | Thirty percent (30.00%) membership interests |
| Randylynn Rastello-McManus<br>214 Outlook Avenue<br>Sunrise Marina Estates, New York 10465 | 1932 McGraw Avenue LLC, a New York limited liability company | Thirty percent (30.00%) percent membership interests |
| Eliezer Torres<br>1932 McGraw Avenue<br>Bronx, New York 10462 | 1932 McGraw Avenue LLC, a New York limited liability company | Forty percent (40.00%) membership interests |

**SCHEDULE B**

[Consent]

## JOINDER AND CONSENT OF THE ISSUER

The undersigned hereby (a) joins in the above Agreement for the sole purpose of consenting to the terms thereof; (b) agrees to cooperate fully and in good faith with the Lender and Pledgor in carrying out this Agreement (including, without limitation, by admitting Lender or its transferee (including from a secured party's sale) as a substituted member); (c) waives any transfer or other restrictions existing pursuant to Contractual Obligations, Organizational Documents, or otherwise (other than under any applicable securities laws), which otherwise might apply to the granting of the pledges and security interests hereunder, or to the exercise by the Lender of the rights and remedies provided in this Agreement or applicable law, at law or in equity, so as to, among other things, permit (x) Pledgor to enter into and perform Pledgor's obligations under this Agreement, and (y) the Lender's exercise of the Lender's rights and remedies hereunder and under applicable law, at law or in equity; (d) represents and warrants that the (i) Issuer has elected to have its membership interest deemed to be "securities" for the purposes of Articles 8 and 9 of the UCC, and any and all Certificates being delivered to Lender pursuant to the Agreement are each a "certificated security" (as defined by the UCC), (ii) Lender is duly noted in the Issuer's books and records as the sole pledgee of the Collateral, and (iii) Issuer will not recognize any transferee or pledgee of the Collateral other than Lender or pursuant to the exercise of Lender's rights and remedies under this Agreement; and (e) agrees to comply with any "instructions" (as defined in Section 8-102(a)(12) of the UCC) originated by the Lender in conformity with this Agreement without further consent of the Pledgor, including, without limitation, instructions regarding the transfer, redemption or other disposition of the Collateral or the proceeds thereof, including any Distributions with respect thereto (this clause (e) shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the above Agreement).

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the undersigned has caused this Joinder and Consent to be executed as an instrument under seal of the date first above written.

ISSUER:

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____
Name: David DeLucia
Title:   Authorized Signatory

-7-

## EXHIBIT 2

## SHARE CERTIFICATES

[To Follow]

-7-

## SHARE CERTIFICATE
### THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. THE TRANSFER OF THIS CERTIFICATE AND THE MEMBERSHIP INTEREST REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE OPERATING AGREEMENT OF THE COMPANY, AS THE SAME MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME.

Certificate Number 1                                    30.00% Membership Interests

        **1932 MCGRAW AVENUE LLC,** a New York limited liability company (the "**Company**"), hereby certifies that **DAVID DELUCIA,** an individual (together with any assignee of this Certificate, the "**Holder**") is the registered owner of thirty percent (30.00%) of the Membership Interests in the Company (the "**Interests**"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of that Limited Liability Company Agreement of the Issuer, dated as of February 19, 2021, as amended by that certain First Amendment to Limited Liability Company Agreement dated as of October 28, 2021, and as the same may be further amended or amended and restated from time to time (collectively, the "**Operating Agreement**"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

        This Share Certificate shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

Dated: As of October 28, 2021

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____

Name: David DeLucia

Title:  Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a thirty percent (30.00%) membership interest in **1932 MCGRAW AVENUE LLC**, a New York limited liablity company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____, and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____, _____

David DeLucia

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "**Applicant**") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "**Transfer**") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
(Transferee)

Dated: _____, _____        Address:

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____
Name:  David DeLucia
Title:  Authorized Signatory

## SHARE CERTIFICATE

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. THE TRANSFER OF THIS CERTIFICATE AND THE MEMBERSHIP INTEREST REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE OPERATING AGREEMENT OF THE COMPANY, AS THE SAME MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME.**

Certificate Number 2                                          30.00% Membership Interests

        **1932 MCGRAW AVENUE LLC**, a New York limited liability company (the "**Company**"), hereby certifies that **RANDYLYNN RASTELLO-MCMANUS**, an individual (together with any assignee of this Certificate, the "**Holder**") is the registered owner of thirty percent (30.00%) of the Membership Interests in the Company (the "**Interests**"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of that Limited Liability Company Agreement of the Issuer, dated as of February 19, 2021, as amended by that certain First Amendment to Limited Liability Company Agreement dated as of October 28, 2021, and as the same may be further amended or amended and restated from time to time (collectively, the "**Operating Agreement**"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

        This Share Certificate shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

Dated: As of October 28, 2021

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____

Name: David DeLucia

Title:   Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto
_____, a thirty percent (30.00%) membership interest in **1932 MCGRAW AVENUE LLC**, a New York limited liablity company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____, and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____, _____

Randlynn Rastello-McManus

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "**Applicant**") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "**Transfer**") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____

(Transferee)

Dated: _____, _____                    Address:

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____
Name: David DeLucia
Title:   Authorized Signatory

## SHARE CERTIFICATE
## THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. THE TRANSFER OF THIS CERTIFICATE AND THE MEMBERSHIP INTEREST REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE OPERATING AGREEMENT OF THE COMPANY, AS THE SAME MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME.

Certificate Number 3                                         40.00% Membership Interests

**1932 MCGRAW AVENUE LLC**, a New York limited liability company (the "**Company**"), hereby certifies that **ELIEZER TORRES**, an individual (together with any assignee of this Certificate, the "**Holder**") is the registered owner of forty percent (40.00%) of the Membership Interests in the Company (the "**Interests**"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of that Limited Liability Company Agreement of the Issuer, dated as of February 19, 2021, as amended by that certain First Amendment to Limited Liability Company Agreement dated as of October 28, 2021, and as the same may be further amended or amended and restated from time to time (collectively, the "**Operating Agreement**"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

This Share Certificate shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

Dated: As of October 28, 2021

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

1932 MCGRAW AVENUE LLC
a New York limited liability company

By: _____
Name: David DeLucia
Title:   Authorized Signatory

## (REVERSE SIDE OF CERTIFICATE)
## ASSIGNMENT OF INTERESTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a forty percent (40.00%) membership interest in **1932 MCGRAW AVENUE LLC**, a New York limited liablity company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____, and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____, _____

Eliezer Torres

## APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "**Applicant**") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "**Transfer**") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
(Transferee)

Dated: _____, _____          Address:

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**1932 MCGRAW AVENUE LLC**
a New York limited liability company

By: _____
Name: David DeLucia
Title:  Authorized Signatory

-8-

## EXHIBIT 3

## NOTICES

[To Follow]

4876-5291-0817, v. 1.1

## NOTICE OF DEFAULT AND RESERVATION OF RIGHTS

February 5, 2024

**Via Overnight Courier**

1932 MCGRAW AVENUE LLC
1932 McGraw Avenue
Bronx, New York 10462

David Delucia
243 Manhattan Avenue
Yonkers, New York 11010

David Delucia
243 Manhattan Avenue
Tuckahoe, New York 10707

James McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465

RandyLynn Rastello-McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465

Re:    Those certain loans made by RealFi Real Estate Investment Trust LLC being now known as Fairbridge Real Estate Investment Trust LLC ("Original Lender") to 1932 MCGRAW AVENUE LLC, a New York limited liability company ("Borrower"), as follows: (i) in the principal sum of SEVEN HUNDRED SIX THOUSAND AND XX/100 DOLLARS ($706,000.00) dated as of October 28, 2021 (the "Land Loan"); (ii) in the principal sum of ONE MILLION THREE HUNDRED NINETY FOUR THOUSAND AND XX/100 DOLLARS ($1,394,000.00) dated as of October 28, 2021 (the "Building Loan"); (iii) in the principal sum of TWO HUNDRED THOUSAND AND XX/100 DOLLARS ($200,000.00) dated as of October 28, 2021 (the "Subordinate Loan"); and (iv) in the principal sum of FIVE HUNDRED THOUSAND AND XX/100 DOLLARS ($500,000.00) dated as of June 3, 2022 (the "Air Rights Loan") (each a "Loan", and collectively the "Loan"), as the Loan is now owned and held by Fairbridge Credit LLC, a Delaware limited liability company, having an address at 330 Post Road, Suite 230, Darien, Connecticut 06820 ("Lender") by assignment from Original Lender.

Ladies and Gentlemen:

Reference is made to the following documents evidencing and securing the Loan:

i.    Consolidated, Amended and Restated Note, dated as of October 28, 2021, by Borrower for the benefit of Original Lender in the principal sum of $706,000.00 (as assigned to Lender) (the "Land Loan Note");

ii.   Consolidated, Amended and Restated Mortgage and Security Agreement, dated as of October 28, 2021, by Borrower to Original Lender in the principal sum of $706,000.00 (as assigned to Lender) (the "Land Loan Mortgage");

iii.  Conditional Guaranty, dated as of October 28, 2021, by David Delucia, an individual, James McManus, an individual, and RandyLynn Rastello-McManus, an individual (each a "Guarantor" and collectively the "Guarantor") in favor of Original Lender, in connection with the Land Loan and the Building Loan (as assigned to Lender) (the "Conditional Guaranty");

iv.   Building Loan Agreement, dated as of October 28, 2021, by and between Borrower and Original Lender (as assigned to Lender) (the "Building Loan Agreement");

v.    Building Loan Note, dated as of October 28, 2021, by Borrower or the benefit of Original Lender in the principal sum of up to $1,394,000.00 (as assigned to Lender) (the "Building Loan Note");

vi.   Building Mortgage and Security Agreement, dated as of October 28, 2021, from Borrower to Original Lender in the principal sum of $1,394,000.00 (as assigned to Lender) (the "Building Loan Mortgage");

vii.  Guaranty of Completion, dated as of October 28, 2021, by Guarantor in favor of Original Lender (as assigned to Lender) (the "Guaranty of Completion");

viii. Subordinate Promissory Note, dated as of October 28, 2021, by Borrower for the benefit of Original Lender in the principal sum of $200,000.00 (as assigned to Lender) (the "Subordinate Note");

ix.   Subordinate Mortgage and Security Agreement, dated as of October 28, 2021, from Borrower to Original Lender in the principal sum of $200,000.00 (as assigned to Lender) (the "Subordinate Mortgage");

x.    Conditional Guaranty, dated as of October 28, 2021, by Guarantor in favor of Original Lender in connection with the Subordinate Loan (as assigned to Lender) (the "Conditional Guaranty-Subordinate Loan");

xi.   Secured Promissory Note, dated as of June 3, 2022, by Borrower for the benefit of Original Lender in the principal sum of $500,000.00 (as assigned to Lender) (the "Air Rights Note", and together with the Land Loan Note, the Building Loan Note, and the Subordinate Note, the "Note");

xii.  Mortgage and Security Agreement, dated as of June 3, 2022, from Borrower to Original Lender in the principal sum of $500,000.00 (as assigned to Lender) (the "Air Rights Mortgage", and together with the Land Loan Mortgage, the Building Loan Mortgage, and the Subordinate Mortgage, the "Mortgage");

xiii. Conditional Guaranty, dated as of June 3, 2022, by Guarantor in favor of Original Lender in connection with the Air Rights Loan (as assigned to Lender) (the "Conditional Guaranty-Air Rights Loan", and together with the Conditional Guaranty, the Guaranty of Completion, and the Conditional Guaranty-Subordinate Loan, the "Guaranty");

xiv.  Forbearance Agreement, made as of October 18, 2023, effective as of September 1, 2023, by and among Lender, Borrower, and Guarantor (the "Forbearance Agreement"); and

xv.   The Loan Agreement, Note, Mortgage, Guaranty, Forbearance Agreement, and all of documents executed and delivered by Borrower to Original Lender and/or Lender in connection with the Loan are hereinafter collectively referred to as the "Loan Documents", as such Loan Documents are now owned and held by Lender.

You are hereby notified that Events of Defaults and Defaults have occurred and are continuing under the Loan Documents, including, without limitation, resulting from Borrower's failure to make any payment of principal or interest on the Note when due including Borrower's failure to pay the outstanding Loan principal, and any amounts due thereon, on December 1, 2023, the date on which the Forbearance Period

ended under the Forbearance Agreement. As a result, default interest has been accruing since the date of the foregoing Event of Default.

Notwithstanding anything to the contrary contained in this letter, Lender (a) reserves all of its rights under the Loan Documents, applicable law and otherwise, (b) is not otherwise by this letter (or due to the passage of time) providing a waiver of any Specified Event of Default, or any event, condition or circumstance that, with the giving of notice, the passage of time, or both, would be an Event of Default (a "Default") under the Loan Documents or any other right or remedy under the Loan Documents, applicable law or otherwise, and (c) may exercise any or all of its rights and remedies (whether arising by contract, operation of law or otherwise) against Borrower, any or any other Person who has provided a guaranty of or security for the Loan, including without limitation, Lender's rights and remedies pursuant to the Loan Documents including but not limited to accruing interest at the Default Rate (as defined in the Loan Documents) or accelerating the Loan. No forbearance, delay or inaction by Lender in the exercise of its rights and remedies, and no continuing performance by Lender or any Borrower under the Loan Documents (including, without limitation, any payments received and accepted by Lender): (a) shall constitute: (i) a modification or an alteration of the terms, conditions, or covenants of the Loan Documents or any related documents, instruments and agreements, all of which remain in full force and effect; or (ii) a waiver, release, or limitation upon Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved; or (b) release any Borrower in any way from any Borrower's duties, obligations, covenants, or agreements under the Loan Documents or from any consequences of a Specified Event of Default or a Default under the Loan Documents.

Please be reminded that for any agreement, amendment, waiver, consent, modification or other action to be binding on Lender, it must arise only from the handwritten execution of a formal written instrument signed by Lender and not by any other action or communication, verbal, written or otherwise (including this letter). This letter is not intended, nor shall it, establish any course of dealing between the Lender and the Borrower that is inconsistent with the express terms of the Loan Agreement or the provisions of any other Loan Documents. All provisions of the Loan Documents shall remain in full force and effect and be unaffected by this letter.

**Lender:**

**FAIRBRIDGE CREDIT LLC**

By: _____

Anthony C. Balbo
Authorized Signatory

cc:

**Via Overnight Courier:**
Pat Longobucco, Esq.
44 Church Street
White Plains, New York 10601

Page 3 of 3

**BRAUNSTEIN TURKISH LLP**
ATTORNEYS AT LAW

7600 Jericho Turnpike, Suite 402, Woodbury, NY 11797

Tel: 516-802-0700 • Fax: 516-802-0701
www.BraunsteinTurkish.com

June 5, 2024

**VIA UPS**

1932 MCGRAW AVENUE LLC
1932 McGraw Avenue
Bronx, New York 10462

1932 MCGRAW AVENUE LLC
214 Outlook Avenue
Bronx, New York 10465

David DeLucia
243 Manhattan Avenue
Yonkers, New York 11010

David DeLucia
243 Manhattan Avenue
Tuckahoe, New York 10707

James McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465

James McManus
214 Outlook Avenue
Bronx, New York 10465

RandyLynn Rastello-McManus
214 Outlook Avenue
Sunrise Marina Estates, New York 10465

RandyLynn Rastello-McManus
214 Outlook Avenue
Bronx, New York 10465

## SECOND NOTICE OF DEFAULT

Re:     Those certain loans made by RealFi Real Estate Investment Trust LLC being now known as Fairbridge Real Estate Investment Trust LLC ("Original Lender") to 1932 MCGRAW AVENUE LLC, a New York limited liability company ("Borrower"), as follows: (i) in the principal sum of SEVEN HUNDRED SIX THOUSAND AND XX/100 DOLLARS ($706,000.00) dated as of October 28, 2021 (the "Land Loan"); (ii) in the principal sum of ONE MILLION THREE HUNDRED NINETY FOUR THOUSAND AND XX/100 DOLLARS ($1,394,000.00) dated as of October 28, 2021 (the "Building Loan"); (iii) in the principal sum of TWO HUNDRED THOUSAND AND XX/100 DOLLARS ($200,000.00) dated as of October 28, 2021 (the "Subordinate Loan"); and (iv) in the principal sum of FIVE HUNDRED THOUSAND AND XX/100 DOLLARS ($500,000.00) dated as of June 3, 2022 (the "Air Rights Loan") (each a "Loan", and collectively the "Loan"), as the Loan is now owned and held by Fairbridge Credit LLC, a Delaware limited liability company, having an address at 330 Post Road, Suite 230, Darien, Connecticut 06820 ("Lender") by assignment from Original Lender.

Dear Sir/Madam:

We are counsel for the Lender, the owner and holder of the Loan Documents, as more fully to include, but not limited to:

1932 MCGRAW AVENUE LLC
David DeLucia
James McManus
RandyLynn Rastello-McManus
June 5, 2024
Page 2

i.    Consolidated, Amended and Restated Note, dated as of October 28, 2021, by Borrower for the benefit of Original Lender in the principal sum of $706,000.00 (as assigned to Lender) (the "Land Loan Note");

ii.    Consolidated, Amended and Restated Mortgage and Security Agreement, dated as of October 28, 2021, by Borrower to Original Lender in the principal sum of $706,000.00 (as assigned to Lender) (the "Land Loan Mortgage");

iii.    Conditional Guaranty, dated as of October 28, 2021, by David Delucia, an individual, James McManus, an individual, and RandyLynn Rastello-McManus, an individual (each a "Guarantor" and collectively the "Guarantor") in favor of Original Lender, in connection with the Land Loan and the Building Loan (as assigned to Lender) (the "Conditional Guaranty");

iv.    Building Loan Agreement, dated as of October 28, 2021, by and between Borrower and Original Lender (as assigned to Lender) (the "Building Loan Agreement");

v.    Building Loan Note, dated as of October 28, 2021, by Borrower or the benefit of Original Lender in the principal sum of up to $1,394,000.00 (as assigned to Lender) (the "Building Loan Note");

vi.    Building Mortgage and Security Agreement, dated as of October 28, 2021, from Borrower to Original Lender in the principal sum of $1,394,000.00 (as assigned to Lender) (the "Building Loan Mortgage");

vii.    Guaranty of Completion, dated as of October 28, 2021, by Guarantor in favor of Original Lender (as assigned to Lender) (the "Guaranty of Completion");

viii.    Subordinate Promissory Note, dated as of October 28, 2021, by Borrower for the benefit of Original Lender in the principal sum of $200,000.00 (as assigned to Lender) (the "Subordinate Note");

ix.    Subordinate Mortgage and Security Agreement, dated as of October 28, 2021, from Borrower to Original Lender in the principal sum of $200,000.00 (as assigned to Lender) (the "Subordinate Mortgage");

x.    Conditional Guaranty, dated as of October 28, 2021, by Guarantor in favor of Original Lender in connection with the Subordinate Loan (as assigned to Lender) (the "Conditional Guaranty-Subordinate Loan");

xi.    Secured Promissory Note, dated as of June 3, 2022, by Borrower for the benefit of Original Lender in the principal sum of $500,000.00 (as assigned to Lender) (the "Air Rights Note", and together with the Land Loan Note, the Building Loan Note, and the Subordinate Note, the "Note");

xii.    Mortgage and Security Agreement, dated as of June 3, 2022, from Borrower to Original Lender in the principal sum of $500,000.00 (as assigned to Lender) (the "Air Rights Mortgage", and together with the Land Loan Mortgage, the Building Loan Mortgage, and the Subordinate Mortgage, the "Mortgage");

xiii.    Conditional Guaranty, dated as of June 3, 2022, by Guarantor in favor of Original Lender in connection with the Air Rights Loan (as assigned to Lender) (the "Conditional Guaranty-Air Rights Loan", and together with the Conditional Guaranty, the Guaranty of Completion, and the Conditional Guaranty-Subordinate Loan, the "Guaranty");

1932 MCGRAW AVENUE LLC
David DeLucia
James McManus
RandyLynn Rastello-McManus
June 5, 2024
Page 3

    xiv.    Forbearance Agreement, made as of October 18, 2023, effective as of September 1, 2023, by and among Lender, Borrower, and Guarantor (the "Forbearance Agreement"); and

    xv.    The Loan Agreement, Note, Mortgage, Guaranty, Forbearance Agreement, and all of documents executed and delivered by Borrower to Original Lender and/or Lender in connection with the Loan are hereinafter collectively referred to as the "Loan Documents", as such Loan Documents are now owned and held by Lender.

This letter shall serve as formal notification of Borrower's continuing default in payment of its obligations under the Loan Documents. As of June 1, 2024, the total indebtedness due Lender is calculated as follows:

| Air Rights loan: | |
|---|---|
| Principal | $500,000.00 |
| Default Interest Owed (9/1/23 - 6/1/24) | $91,666.67 |
| Interest Reserve Balance at 9/1/23 | ($143.32) |
| Late Fees | $5,066.67 |
| **Payoff Balance** | **$596,590.02** |

| Building, Senior & Subordinate loan: | |
|---|---|
| Building Loan Principal | $625,034.37 |
| Senior Loan Principal | $706,000.00 |
| Subordinate Loan Principal | $200,000.00 |
| Senior & Building Loan Note Interest Owed (8/1/23 - 8/31/23) | $14,900.19 |
| Senior & Building Loan Default Interest Owed (9/1/23 - 6/1/24) | $244,022.97 |
| Senior & Building Loan Late Fees | $21,782.81 |
| Senior & Building Interest Reserve Balance at 9/1/23 | ($12,699.62) |
| Subordinate Note Interest Owed (8/1/23 - 8/31/23) | $2,238.89 |
| Subordinate Default Interest Owed (9/1/23 - 6/1/24) | $36,666.67 |
| Subordinate Interest Reserve Balance at 9/1/23 | ($444.16) |
| Subordinate Loan Late Fees | $3,419.47 |
| Re-appraisal Fee | $4,500.00 |
| **Payoff Balance** | **$1,845,421.59** |

**TOTAL BALANCE DUE:**   **$2,442,011.61**

1932 MCGRAW AVENUE LLC
David DeLucia
James McManus
RandyLynn Rastello-McManus
June 5, 2024
Page 4

In addition to the foregoing, the Borrower has failed, pursuant to the terms of the Loan Documents, to pay, on or before December 1, 2023 (the extended "Maturity Date"), the outstanding principal sum of the Notes together with unpaid interest thereon and all fees, charges and other amounts to which Lender is entitled under the Loan Documents nor has the Borrower made any attempts to cure the defaults subsequent to the initial Notice of Default dated February 5, 2024.

Pursuant to the Loan Documents, this notice is being sent by overnight mail and shall be deemed to have been given on the earlier of (a) the first day after such notice is deposited with the overnight carrier or (b) the date such notice is actually received. If Lender does not receive payment of all amounts due under the Loan and Note as detailed above by no later than June 15, 2024, Lender will take all such actions it deems appropriate to protect its interests in the Loan and to collect the debt thereunder, including, without limitation, seeking foreclosure and/or reconveyance of its security under the Loan Documents without further notice or demand except as required by state law and the Loan Documents. In the event any such actions are taken, Lender will also seek to recover its additional costs and expenses, including attorneys' fees and court costs, incurred in any collection efforts.

Neither this notice, any discussions by Lender with Borrower or its representatives, nor any subsequent acceptance by Lender of any partial payment constitutes (a) a waiver by Lender of any other default by Borrower under the Loan Documents, whether or not referred to herein or any prior notice of default; (b) an election of remedies with respect to any such default by Lender, which reserves all rights and remedies under law and the Loan Documents, (c) a waiver, modification, relinquishment or forbearance by Lender of any right or remedy under the Loan Documents or under law, all of which are reserved by Lender; (d) a reinstatement of the Loan, or (e) a modification of the Loan Documents.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender unless and until Lender and Borrower have reached agreement on all issues, and such entire agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender, Borrower and any guarantor of the Loan. Oral agreements, emails, memoranda of meetings, summary of proposed terms, etc., shall have no effect whatsoever and shall not be binding on Lender.

Very truly yours,

William J. Turkish

WJT/jc

cc: Fairbridge Credit LLC

2332.0306/fairbridgecreditllc/1932mcgrawavenuellc/letters/secondnoticeofdefault 06.05.24

# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| | | |
|---|---|---|
| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o  Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o  Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o  Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o  Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o  Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o  Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

UPS Access Point™
THE UPS STORE
338 JERICHO TPKE
SYOSSET NY 11791-4507

UPS Access Point™
CVS STORE # 1958
55 COLD SPRING RD
SYOSSET NY 11791-3108

UPS Access Point™
CVS STORE # 1216
1026 OLD COUNTRY RD
PLAINVIEW NY 11803-4917

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.**  Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.**  Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o   Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o   Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



# View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialogue box that appears. Note: If your browser does not support this function, select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a scheduled Pickup**
   - o Your driver will pickup your shipment(s) as usual.

   **Customers without a scheduled Pickup**
   - o Schedule a Pickup on ups.com to have a UPS driver pickup all of your packages.
   - o Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. To find the location nearest you, please visit the 'Locations' Quick link at ups.com.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | CVS STORE # 1958 | CVS STORE # 1216 |
| 338 JERICHO TPKE | 55 COLD SPRING RD | 1026 OLD COUNTRY RD |
| SYOSSET NY 11791-4507 | SYOSSET NY 11791-3108 | PLAINVIEW NY 11803-4917 |

FOLD HERE



-9-

## EXHIBIT 4

## FORMS OF SALE AD

[To Follow]

-9-

## UNIFORM COMMERCIAL CODE PUBLIC SALE NOTICE

Please take notice that MANNION AUCTIONS, LLC, Matthew D. Mannion, licensed auctioneer (DCA #1434494), on behalf of FAIRBRIDGE CREDIT LLC, a Delaware limited liability company ("**Secured Party**"), offers for sale at public auction on October 25, 2024 at 10:00 a.m. (Eastern Time) at the offices of Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, and simultaneously by remote auction via Zoom (Meeting link: https://bit.ly/1932McGraw; Meeting ID: 892 2460 0893; Meeting passcode: 131167; Call-in number: +1 646 931 3860 (US)), in connection with a Uniform Commercial Code sale of the limited liability company membership interests (the "**Interests**") in 1932 MCGRAW AVENUE LLC, a New York limited liability company ("**Borrower**"), which entity is the fee owner of real property located at 1932 McGraw Avenue, Bronx, New York 10462. The Interests represent one hundred percent (100%) of the ownership interest in Borrower and are owned by: David DeLucia, as to thirty percent (30%) of the Interests; RandyLynn Rastello-McManus, as to thirty percent (30%) of the Interests; and Eliezer Torres, as to forty percent (40%) of the Interests.

The Secured Party's loan (the "**Loan**") to Borrower is secured by a first priority lien on the Interests. The Secured Party is offering the Interests for sale in connection with the foreclosure on the pledge of such Interests.

The Interests are being offered as a single lot, "AS-IS, WHERE-IS", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

The Secured Party reserves the right to credit bid, set a minimum reserve price, reject any or all bids (including without limitation, any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made), and terminate or adjourn the sale to another time, without further notice. The Secured Party further reserves the right to restrict prospective bidders to those who will represent that they are purchasing the Interests for their own account for investment and not with a view to the distribution or resale of such Interests, to verify that each certificate for the Interests to be sold have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and may not be disposed of in violation of the provisions of the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as the Secured Party deems advisable in order to comply with the Securities Act or any other applicable law.

All interested parties shall be required to provide a minimum deposit of $100,000 with Secured Party's counsel at least 5 days prior to the auction, and all bids (other than credit bids of the Secured Party) must be in U.S. Dollars, and the successful bidder must be prepared to deliver immediately available good funds by wire or bank check to the Secured Party, within twenty-four (24) hours after the sale and otherwise comply with the bidding requirements.

Further information concerning the Interests, the requirements for obtaining information and bidding on the interests and the terms of sale can be obtained by contacting the Secured Party's counsel, Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, Attn: Vincent L. Georgetti, Esq., Tel: (516) 802-0700 x312, E-mail: vg@braunsteinturkish.com.

4894-6485-0145, v. 2

## UNIFORM COMMERCIAL CODE PUBLIC SALE NOTICE

Please take notice that MANNION AUCTIONS, LLC, Matthew D. Mannion, licensed auctioneer (DCA #1434494), on behalf of FAIRBRIDGE CREDIT LLC, a Delaware limited liability company ("**Secured Party**"), offers for sale at public auction on October 25, 2024 at 10:00 a.m. (Eastern Time) at the offices of Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, and simultaneously by remote auction via Zoom (Meeting link: https://bit.ly/1932McGraw; Meeting ID: 892 2460 0893; Meeting passcode: 131167; Call-in number: +1 646 931 3860 (US)), in connection with a Uniform Commercial Code sale of the limited liability company membership interests (the "**Interests**") in 1932 MCGRAW AVENUE LLC, a New York limited liability company ("**Borrower**"), which entity is the fee owner of real property located at 1932 McGraw Avenue, Bronx, New York 10462. The Interests represent one hundred percent (100%) of the ownership interest in Borrower.

The Interests are being offered as a single lot, "AS-IS, WHERE-IS", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

All interested parties shall be required to provide a minimum deposit of $100,000 with Secured Party's counsel at least 5 days prior to the auction, and all bids (other than credit bids of the Secured Party) must be in U.S. Dollars, and the successful bidder must be prepared to deliver immediately available good funds by wire or bank check to the Secured Party, within twenty-four (24) hours after the sale and otherwise comply with the bidding requirements.

Interested parties who would like additional information concerning the sale of the Interests should contact the Secured Party's counsel, Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, Attn: Vincent L. Georgetti, Esq., Tel: (516) 802-0700 x312, E-mail: vg@braunsteinturkish.com.