**EXHIBIT 27**

## AMENDED AND RESTATED
## CONSTRUCTION LOAN AGREEMENT

Dated: as of March 13, 2025
(but effective as of February 21, 2025)

Between

**47 POPLAR OWNERS LLC**,
as Borrower

and

**FAIRBRIDGE CREDIT LLC,**
as Lender

4938-8333-2636, v. 5

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS; PRINCIPLES OF CONSTRUCTION**......................................2
Section 1.01  **Definitions**....................................................................................2
Section 1.02  **Principles of Construction.**.......................................................17

**ARTICLE 2 GENERAL TERMS**..................................................................................17
Section 2.01  **Loan Commitment; Disbursement to Borrower**........................17
Section 2.02  **Interest Rate**...........................................................................19
Section 2.03  **Loan Payments**.......................................................................20
Section 2.04  **Prepayments**..........................................................................21
Section 2.05  **Loan Fees**...............................................................................21
Section 2.06  **Extension of the Maturity Date**.............................................22
Section 2.07  **Intentionally Omitted**............................................................22
Section 2.08  **Closing.**..................................................................................22
Section 2.09  **Initial Advance.**......................................................................25
Section 2.10  **Advances.**...............................................................................27
Section 2.11  **Conditions of Final Construction Advance**............................31
Section 2.12  **No Reliance**............................................................................31
Section 2.13  **Method of Disbursement of Loan Proceeds.**...........................31

**ARTICLE 3 CONSTRUCTION PROVISIONS**............................................................34
Section 3.01  **Approval of Project Documents.**............................................34
Section 3.02  **Final Project Documents**.......................................................35
Section 3.03  **The Project Improvements.**....................................................36
Section 3.04  **Commencement of Construction**...........................................37
Section 3.05  **Project Budget**.......................................................................37
Section 3.06  **Correction of Defects**............................................................37
Section 3.07  **Change Orders**......................................................................37
Section 3.08  **Use of Cost Savings and Contingency**...................................38
Section 3.09  **Cost Overruns**.......................................................................38
Section 3.10  **Review of Plans and Specifications**......................................38
Section 3.11  **Final Completion of the Improvements**.................................38
Section 3.12  **Final Completion**..................................................................38
Section 3.13  **Close Out Items**.....................................................................39
Section 3.14  **Stored Materials.**...................................................................39

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES**.............................................39
Section 4.01  **Legal Status and Authority**...................................................39
Section 4.02  **Validity of Documents**..........................................................39
Section 4.03  **Litigation**..............................................................................40
Section 4.04  **Agreements**...........................................................................40
Section 4.05  **Financial Condition**..............................................................40
Section 4.06  **Disclosure**.............................................................................41

i

Section 4.07   No Plan Assets ........................................................................................41
Section 4.08   Not a Foreign Person ...............................................................................41
Section 4.09   Business Purposes ....................................................................................41
Section 4.10   Borrower's Principal Place of Business ..................................................41
Section 4.11   Status of Property ....................................................................................41
Section 4.12   Financial Information ..............................................................................43
Section 4.13   Condemnation ..........................................................................................43
Section 4.14   Separate Lots ............................................................................................43
Section 4.15   Insurance ..................................................................................................43
Section 4.16   Use of Property ........................................................................................44
Section 4.17   Leases and Rent Roll ...............................................................................44
Section 4.18   Filing and Recording Taxes ....................................................................44
Section 4.19   Management Agreement ..........................................................................44
Section 4.20   Illegal Activity/Forfeiture .......................................................................44
Section 4.21   Taxes .........................................................................................................44
Section 4.22   Permitted Encumbrances ........................................................................44
Section 4.23   Third Party Representations ...................................................................44
Section 4.24   Federal Reserve Regulations ..................................................................45
Section 4.25   Investment Company Act .........................................................................45
Section 4.26   Fraudulent Conveyance ...........................................................................45
Section 4.27   Embargoed Person ...................................................................................45
Section 4.28   Anti-Money Laundering and Economic Sanctions ...............................46
Section 4.29   Bank Holding Company ..........................................................................46
Section 4.30   Intentionally Omitted ..............................................................................46
Section 4.31   No Change in Facts or Circumstances; Disclosure ...............................47
Section 4.32   Intentionally Omitted ..............................................................................47
Section 4.33   Construction Manager's Agreement .......................................................47
Section 4.34   Major Contracts .......................................................................................47
Section 4.35   Architect's Contract .................................................................................47
Section 4.36   Plans and Specifications .........................................................................47
Section 4.37   Budget .......................................................................................................47
Section 4.38   Feasibility .................................................................................................48
Section 4.39   Major Contracts .......................................................................................48
Section 4.40   Construction Approvals ...........................................................................48

ARTICLE 5 BORROWER COVENANTS ...............................................................................48

Section 5.01   Existence ...................................................................................................48
Section 5.02   Legal Requirements .................................................................................48
Section 5.03   Maintenance and Use of Property ..........................................................49
Section 5.04   Waste .........................................................................................................49
Section 5.05   Taxes and Other Charges ........................................................................49
Section 5.06   Litigation ..................................................................................................50
Section 5.07   Access to Property ....................................................................................50
Section 5.08   Notice of Default ......................................................................................50
Section 5.09   Cooperate in Legal Proceedings .............................................................50
Section 5.10   Performance by Borrower .......................................................................50
Section 5.11   Awards .......................................................................................................51

ii

Section 5.12    Books and Records; Reporting.................................................................51
Section 5.13    Estoppel Certificates...........................................................................52
Section 5.14    Leases and Rents.................................................................................52
Section 5.15    Management Agreement .....................................................................53
Section 5.16    Payment for Labor and Materials......................................................54
Section 5.17    Performance of Other Agreements ...................................................54
Section 5.18    Debt Cancellation...............................................................................54
Section 5.19    ERISA ................................................................................................55
Section 5.20    No Joint Assessment ..........................................................................55
Section 5.21    Alterations ..........................................................................................55
Section 5.22    Intentionally Omitted .........................................................................55
Section 5.23    Insurance ............................................................................................55
Section 5.24    Distributions.......................................................................................55
Section 5.25    Financial Covenants ...........................................................................56
Section 5.26    Intentionally Omitted .........................................................................56
Section 5.27    Intentionally Omitted..........................................................................56
Section 5.28    Listing of Property..............................................................................56
Section 5.29    Construction Contracts .......................................................................56
Section 5.30    Completion of Construction................................................................56
Section 5.31    Construction Consultant......................................................................57
Section 5.32    Laborers, Subcontractors and Materialmen........................................58
Section 5.33    Ownership of Personalty .....................................................................58
Section 5.34    Purchase of Material Under Conditional Sale Contract.....................58
Section 5.35    Construction Management ..................................................................58
Section 5.36    Minimum Invested Equity ..................................................................59
Section 5.37    Protection of the Property...................................................................59
Section 5.38    Signage ...............................................................................................59

ARTICLE 6 ENTITY COVENANTS.........................................................................59

Section 6.01    Single Purpose Entity/Separateness ...................................................59
Section 6.02    Change of Name, Identity or Structure ..............................................61
Section 6.03    Business and Operations .....................................................................61

ARTICLE 7 NO SALE OR ENCUMBRANCE...........................................................62

Section 7.01    Transfer Definitions............................................................................62
Section 7.02    No Sale/Encumbrance ........................................................................62
Section 7.03    Assumptions .......................................................................................63
Section 7.04    Lender's Rights...................................................................................63
Section 7.05    Economic Sanctions, Anti-Money Laundering and Transfers ...........63

ARTICLE 8 INSURANCE; CASUALTY; CONDEMNATION; RESTORATION............63

Section 8.01    Insurance ............................................................................................63
Section 8.02    Casualty ..............................................................................................67
Section 8.03    Condemnation ....................................................................................67
Section 8.04    Restoration .........................................................................................68

iii

**ARTICLE 9 RESERVE FUNDS**................................................................................70

Section 9.01    **Tax and Insurance Funds** .............................................................70
Section 9.02    **Rebalancing Reserve Funds**..........................................................71
Section 9.03    **Interest Reserve Funds**.................................................................71
Section 9.04    **The Accounts Generally** ...............................................................72

**ARTICLE 10 EVENTS OF DEFAULT; REMEDIES**...............................................73

Section 10.01    **Event of Default** ..........................................................................73
Section 10.02    **Remedies**......................................................................................76

**ARTICLE 11 SECONDARY MARKET**....................................................................78

Section 11.01    **Transfer of Loan**..........................................................................79
Section 11.02    **Dissemination of Information**.......................................................79
Section 11.03    **Cooperation** ..................................................................................79

**ARTICLE 12 INDEMNIFICATIONS**.......................................................................79

Section 12.01    **General Indemnification** ..............................................................79
Section 12.02    **Mortgage and Intangible Tax Indemnification**............................80
Section 12.03    **ERISA Indemnification**................................................................80
Section 12.04    **Duty to Defend, Legal Fees and Other Fees and Expenses**...........80
Section 12.05    **Survival**.........................................................................................80
Section 12.06    **ADA and Environmental Indemnity**.............................................80

**ARTICLE 13 RECOURSE**........................................................................................80

Section 13.01    **Recourse**.......................................................................................80

**ARTICLE 14 NOTICES** ...........................................................................................81

Section 14.01    **Notices** ..........................................................................................81

**ARTICLE 15 FURTHER ASSURANCES**.................................................................82

Section 15.01    **Replacement Documents.** .............................................................82
Section 15.02    **Recording of Mortgage, Etc.**........................................................82
Section 15.03    **Further Acts, Etc.** .........................................................................82
Section 15.04    **Changes in Tax, Debt, Credit and Documentary Stamp Laws** .....82

**ARTICLE 16 WAIVERS** ...........................................................................................83

Section 16.01    **Remedies Cumulative; Waivers** ...................................................83
Section 16.02    **Modification, Waiver in Writing**..................................................83
Section 16.03    **Delay Not a Waiver**......................................................................84
Section 16.04    **Waiver of Trial by Jury** ...............................................................84
Section 16.05    **Waiver of Notice** ..........................................................................84
Section 16.06    **Remedies of Borrower**..................................................................84
Section 16.07    **Marshalling and Other Matters** ...................................................84
Section 16.08    **Statute of Limitations** ..................................................................85

iv

Section 16.09  **Waiver of Counterclaim** .................................................................................85
Section 16.10  **Sole Discretion of Lender** ...............................................................................85

**ARTICLE 17 MISCELLANEOUS** ...........................................................................................**85**

Section 17.01  **Survival** ..............................................................................................................85
Section 17.02  **Governing Law; Jurisdiction** ..........................................................................85
Section 17.03  **Headings** ............................................................................................................87
Section 17.04  **Severability** .......................................................................................................87
Section 17.05  **Preferences** ........................................................................................................87
Section 17.06  **Expenses** ............................................................................................................87
Section 17.07  **Cost of Enforcement** ........................................................................................88
Section 17.08  **Schedules Incorporated** ...................................................................................88
Section 17.09  **Offsets, Counterclaims and Defenses** .............................................................88
Section 17.10  **No Joint Venture or Partnership; No Third Party Beneficiaries.** ...................88
Section 17.11  **Publicity** .............................................................................................................90
Section 17.12  **Limitation of Liability** .....................................................................................90
Section 17.13  **Conflict; Construction of Documents; Reliance** ............................................90
Section 17.14  **Entire Agreement** .............................................................................................90
Section 17.15  **Liability** .............................................................................................................90
Section 17.16  **Duplicate Originals; Counterparts** .................................................................90
Section 17.17  **Brokers** ..............................................................................................................91
Section 17.18  **Retention of Servicer** .......................................................................................91
Section 17.19  **Set-Off** ...............................................................................................................91
Section 17.20  **Appraisal** ...........................................................................................................91

## SCHEDULES

Schedule "A"          Post Closing Undertakings

## EXHIBITS

Exhibit "A"          Form of Borrower's Requisition

4938-8333-2636, v. 5

## AMENDED AND RESTATED CONSTRUCTION LOAN AGREEMENT

**THIS AMENDED AND RESTATED CONSTRUCTION LOAN AGREEMENT** (this "**Agreement**") is dated as of March 13, 2025 (but made effective as of February 21, 2025), by **47 POPLAR OWNERS LLC,** a Connecticut limited liability company, having a principal place of business at 399 Knollwood Road Ext, White Plains, New York 10523 ("**Borrower**") and **FAIRBRIDGE CREDIT LLC,** a Delaware limited liability company, having an address at 330 Post Road, Suite 230, Darien, CT 06820 (together with its successors and/or assigns, "**Lender**").

## WITNESSETH:

A.    Borrower is the fee owner of the Property (defined below).

B.    RealFi Real Estate Investment Trust LLC, a Delaware limited liability company, ("**RealFi Real Estate Investment Trust**") n/k/a Fairbridge Real Estate Investment Trust LLC, a Delaware limited liability company (the "**Fairbridge Real Estate Investment Trust**") made available to Borrower a loan in the maximum principal amount of $650,000.00 (the "**2021 Loan**") pursuant to that certain Mortgage Note dated as of December 29, 2021 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**2021 Note**"), which 2021 Note was secured by a certain Open-End Mortgage Deed and Security Agreement, dated as of December 29, 2021, made by Borrower to and the benefit of RealFi Real Estate Investment Trust, encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**2021 Mortgage**").

C.    Thereafter, Fairbridge Real Estate Investment Trust made available to Borrower a loan in the maximum principal amount of $4,550,000.00 (the "**2022 Loan**", and together with the 2021 Loan, collectively, the "**Original Loan**") pursuant to that certain Construction Mortgage Note dated as of May 11, 2022 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**2022 Note**"), which 2022 Note was secured by a certain Construction Open-End Mortgage Deed and Security Agreement, dated as of May 11, 2022, made by Borrower to and the benefit of Fairbridge Real Estate Investment Trust, encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**2022 Mortgage**"), which 2022 Mortgage contained certain construction loan advance provisions regarding the 2022 Loan (the "**Construction Loan Provisions**").

D.    On or about September 12, 2022, the Original Loan was assigned by Fairbridge Real Estate Investment Trust LLC to Lender, pursuant to certain assignment documents between Fairbridge Real Estate Investment Trust and Lender.

E.    As of the date hereof, the Borrower requested, and Lender agreed subject to the terms set forth herein, to amend, restate, increase and extend the Original Loan into the Loan (defined below), made by Lender to Borrower subject and pursuant to this Agreement and evidenced by the Note (defined below).

F.    Borrower desires to obtain the Loan from Lender.

1

G.      Lender is willing to make the Loan to Borrower subject to and in accordance with the terms of this Agreement and the other Loan Documents (defined below).

H.      The Construction Loan Provisions set forth in the 2022 Mortgage are hereby amended and restated in their entirety so that the terms, conditions, covenants and provisions of the Construction Loan Provisions set forth in the 2022 Mortgage shall read and be as set forth in this Agreement.

**NOW, THEREFORE,** in consideration of Lender's making the Loan and the covenants, agreements, representations and warranties set forth in this Agreement, the parties covenant, agree, represent and warrant as follows:

**ARTICLE 1**
**DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

Section 1.01    **Definitions**. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iii) to the extent not covered by clauses (i) - (ii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean the Tax Account, the Insurance Account, the Rebalancing Reserve Account, the Interest Reserve Account and any other account established by this Agreement or the other Loan Documents.

"**ADA and Environmental Indemnity**" shall mean that certain Amended and Restated ADA and Environmental Indemnity Agreement, dated of even date herewith, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender.

"**Advance**" or "**Advances**" shall mean any disbursement of the proceeds of the Loan by Lender pursuant to the terms of this Agreement.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, (i) is in Control of, is Controlled by or is under common Control with such Person; (ii) is a director or officer of such Person or of an Affiliate of such Person or (iii) owns ten percent (10%) or more of the equity interests in such Person.

"**Affiliate Contracts**" shall mean any Contract between Borrower (or otherwise affecting the Property), on the one hand, and a Borrower Party, on the other hand, which shall be subject to prior written approval by Lender in its sole discretion.

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Member, Guarantor or any Affiliate of such Persons has, directly or indirectly, any legal, beneficial or economic interest.

"**AIA**" means the American Institutes of Architects.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

2

"**Approved Construction Schedule**" shall have the meaning as set forth in Section 3.02(d) hereof.

"**Approved Operating Budget**" shall mean that certain operating budget with respect to the Project, including the preliminary version approved by Lender as of the Closing Date as well as all subsequent updates thereto.

"**Approved Plans and Specifications**" shall have the meaning as set forth in Section 3.02(c) hereof.

"**Approved Project Budget**" shall have the meaning as set forth in Section 3.02(e) hereof.

"**Architect's Contract**" shall mean that certain AIA Standard Form Agreement between Owner and Architect to be entered into between Borrower and the Borrower's Architect in form and substance acceptable to Lender, as the same may be amended from time to time in compliance with the terms hereof.

"**Architect's Performance Letter**" shall have the meaning as set forth in Section 2.09(a)(xxiv) hereof.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated of even date herewith, executed and delivered by Borrower as security for the Loan and encumbering the Property.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more the of the following: (i) Borrower shall commence any case, proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) Borrower shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's assets; (iv) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property; (vi) Borrower makes an assignment for the benefit of creditors, or admits, in

3

4938-8333-2636, v. 5

writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Guarantor or its respective subsidiaries (if any); (viii) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person (other than Lender) under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person (other than Lender); (ix) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (viii) above; and (x) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Borrower, Guarantor or their Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Base Project Documents**" shall mean, collectively, (i) the Project Scope; (ii) the Project Budget; (iii) the Plans and Specifications and (iv) the Construction Schedule.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower Funds**" shall mean all amounts expended or to be expended by Borrower or any Borrower Party with respect to the Project and/or the Property that are not Advances, including, without limitation, the Required Equity Funds.

"**Borrower Operating Account**" shall mean the Borrower's operating account set forth in each Borrower's Requisition.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, Guarantor and Member.

"**Borrower's Architect**" shall mean the architect for the Project, selected by Borrower and acceptable to Lender.

"**Borrower's Requisition**" shall have the meaning set forth in Section 2.13(a)(i) hereof.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

"**Business Plan**" shall mean a compilation of the following items, in each case, subject to Lender's approval as provided for in this Agreement: (i) the Project Budget and (ii) the Construction Schedule which shall provide that the work on the Project shall be completed by no later than the Final Completion Date.

"**Carry Costs**" shall mean Taxes, Insurance Premiums, Other Charges, any Construction Consultant costs, fees or expenses and any other costs necessary or reasonably desirable to own and operate the Property as determined by Lender.

"**Casualty**" shall have the meaning set forth in Section 8.02.

"**Casualty Consultant**" shall have the meaning set forth in Section 8.04.

"**Closing Date**" shall mean February 21, 2025.

4

4938-8333-2636, v. 5

"**Change Order**" shall mean any change in, modification to or deviation from the Plans and Specifications or the Construction Schedule, whether designated as a change order, construction change directive or the like, and whether or not there is a change in the contract sum or contract time under any Contract.

"**Closing Costs**" shall mean, customary and reasonable third party out-of-pocket costs and expenses (including brokerage, legal, and marketing fees and rebates and/or reimbursements to the purchaser of such Unit) actually incurred by Borrower in connection with the sale of a given Unit; provided, however, that (i) such Closing Costs shall only be paid to third parties unaffiliated with any Borrower Party unless such costs and expenses are paid to such Person in an arms-length market transaction and are approved by Lender acting in its sole discretion, and (ii) Lender shall have received reasonable supporting documentation with respect to such Closing Costs.

"**CME Term SOFR**" means the forward-looking term rate Secured Overnight Financing Rate (SOFR) provided by CME Benchmark Administration Limited as administrator of the benchmark (or a successor administrator).

"**CME Term SOFR Fixing Day**" shall mean the day that is two (2) U.S. Government Securities Business Days preceding the Term SOFR Reset Date (or any amended publication day for CME Term SOFR, as specified by the CME Term SOFR administrator in the CME Term SOFR benchmark methodology).

"**Collateral**" shall have the meaning set forth in the Pledge Agreement.

"**Completion Guaranty**" shall mean that certain Completion Guaranty dated of even date herewith, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Construction Consultant**" shall mean such Person as Lender may designate and engage as a replacement to review the construction budget and any documents for the Project, inspect the Improvements and the Property as construction progresses, review Draw Requests and consult with and to provide advice to and to render reports to Lender, which Person may be, at Lender's option upon notice to Borrower, either an officer or employee of Lender or any other Person appointed by Lender in its sole discretion.

"**Construction Contract**" shall mean any agreement, contract, subcontract or purchase order entered into by Borrower, in which the Contractor thereunder agrees to provide labor, equipment, services and/or materials in connection with the construction and development of the Project Improvements. "Construction Contract" shall not include any Operating Contract.

"**Construction Costs**" shall have the meaning set forth in the defined term "Project Related Costs".

"**Construction Manager**" shall mean JCT Construction NY Inc.

5

"**Construction Manager's Agreement**" shall mean that certain agreement to be entered into between Borrower and the Construction Manager in form and substance acceptable to Lender, as the same may be amended from time to time in compliance with the terms hereof.

"**Construction Schedule**" shall mean the construction schedule to be presented to Lender, as may be revised from time to time in accordance with the terms of this Agreement and which shall be replaced and superseded by the Approved Construction Schedule upon Lender's approval thereof on or prior to the date of the Initial Advance, together with any subsequent changes thereto from time to time as approved in writing by Lender.

"**Contract**" shall mean any Operating Contract or Construction Contract.

"**Contractor**" shall mean any contractor, subcontractor or other Person (including any subsidiaries and Affiliates of the foregoing), supplying services, labor or materials in connection with the Project Improvements.

"**Control**" shall mean the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

"**Cost Savings**" shall mean either (i) the completion of 100% of the work relating to a Line Item in the Approved Project Budget without the expenditure of all amounts allocated to such Line Item in the Approved Project Budget (whether within a particular phase of construction or between phases of construction), or (ii) after completion of at least 51% of the work relating to any Line Item in the Approved Project Budget, demonstration by Borrower to Lender's satisfaction that a cost savings has been, or is reasonably likely to be, realized with respect to such uncompleted Line Item in the Approved Project Budget (whether within a particular phase of construction or between phases of construction).

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement or the other Loan Documents (including, without limitation, all costs and expenses payable to Lender thereunder and any Make Whole Fee).

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate; or (ii) twenty-four percent (24%) per annum.

"**Development**" shall mean Borrower's development project currently anticipated to consist of 32 residential apartment units, subject to changes in the development of the Base Project Documents as provided for herein.

6

4938-8333-2636, v. 5

"**Development Property**" shall mean the property owned by Borrower to be developed in connection with the Project.

"**Dollars**" and "**$**" shall mean lawful money of the United States of America.

"**Draw Request**" shall mean, with respect to each Advance (or Total Deemed Advance, as applicable), Borrower's request for such Advance, together with Borrower's Requisition and all other documents and information required by this Agreement to be furnished to Lender as a condition to such Advance or Total Deemed Advance.

"**Embargoed Person**" shall have the meaning set forth in Section 4.27 hereof.

"**Environmental Laws**" shall have the meaning set forth in the ADA and Environmental Indemnity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.06 hereof.

"**Extension Option**" shall have the meaning set forth in Section 2.06 hereof.

"**Extension Period**" shall have the meaning set forth in Section 2.06 hereof.

"**Extension Period Interest Rate**" shall mean a floating rate per annum equal to the greater of (i) Term SOFR plus eight hundred sixty basis points (8.60%) and (ii) thirteen percent (13.00%) per annum. Any change in Term SOFR shall be effective immediately, without notice to Borrower.

"**Final Advance**" shall mean the Advance whereby the Loan has been fully funded by Lender.

"**Exit Fee**" shall mean an exit fee equal to one percent (1.00%) of $8,800,000.00.

"**Event of Default**" shall have the meaning set forth in Section 10.01 hereof.

"**Final Advance**" shall mean the Advance whereby the Loan has been fully funded by Lender.

"**Final Completion**" shall mean that (i) Borrower shall have delivered to Lender a certificate signed by an authorized officer of Borrower that all punch list items have been completed in accordance with the Plans and Specifications, all applicable Legal Requirements, and this Agreement, (ii) all Construction Costs have been paid in full and unconditional final lien waivers in the Connecticut statutory form, or, if such form is not applicable, in a form acceptable to Lender, from all Contractors under Construction Contracts with Borrower (taking into account all Change Orders and aggregating all Contracts with Affiliates of the Contractor) for all work performed, and all equipment, labor or material supplied, (iii) no conditions to the issuance of a permanent certificate of occupancy for the entire Project exist other than those approved by Lender, (iv) the Improvements shall contain all Personal Property required for the use and operation of the Improvements for their intended use or which may be required by any Governmental Authority or by any law, regulation or rule of any Governmental Authority for the use or operation of the Improvements for their intended use, and (v) all utilities necessary to serve the Property have been connected and are in operation and Borrower shall have paid all outstanding connection charges related thereto.

4938-8333-2636, v. 5

"**Final Completion Date**" shall mean the date for Final Completion set forth in the Approved Construction Schedule subject to Force Majeure and further subject to adjustment through approved changes to the Approved Construction Schedule, provided that such date shall be no later than July 15, 2025 under any circumstance, including, but not limited to, Force Majeure.

"**Final Project Documents**" shall have the meaning as set forth in Section 3.02 hereof.

"**Final Project Scope**" shall have the meaning as set forth in Section 3.02(a) hereof.

"**First Monthly Payment Date**" shall mean April 1, 2025.

"**Flood Insurance Acts**" shall have the meaning set forth in Section 8.01 hereof.

"**Force Majeure**" shall mean (i) an act of God, war, strikes or similar labor troubles directly affecting the Project, fire, severe weather, including, without limitation, flood, hurricanes, earthquakes or other casualty directly and materially restricting the performance of the obligations under this Agreement, (ii) United States Secretary of Treasury certified domestic "act of terrorism" affecting construction activities in Litchfield County, Connecticut, or (iii) unavailability of materials, to the extent such unavailability is applicable to the construction industry in the State of Connecticut and there are no reasonable substitutes for such materials acceptable to Lender, and that increased cost shall not be deemed to cause materials to be unavailable so long as the same are still available at commercially reasonable rates; provided that, with respect to any of the circumstances described in the foregoing clauses (i) through (iii): (x) for the purposes of this Agreement, any period of Force Majeure shall apply to the performance of all obligations necessarily affected by such circumstance and shall continue as long as Borrower or such other affected Person is continuously and diligently using all reasonable efforts to minimize the effect and duration thereof, and in no event, for longer than ninety (90) days from the commencement of the Force Majeure period; (y) notwithstanding anything to the contrary set forth herein, Force Majeure shall not include the unavailability or insufficiency of funds; and (z) Borrower shall notify Lender of any Force Majeure promptly (and in no event later than five (5) Business Days) following the occurrence thereof and shall keep Lender reasonably and periodically informed of how Borrower is addressing such events.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantor**" shall mean, collectively, Thomas Lee, an individual, and James McManus, an individual.

"**Guaranty**" shall mean that certain Amended and Restated Guaranty, dated of even date herewith, executed by Guarantor in favor of Lender.

"**Hard Costs**" shall mean those Construction Costs which are for labor, materials, equipment and fixtures.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, any indebtedness or other similar obligation for which such Person is obligated (directly or indirectly, by contract, operation of law or

8

otherwise), including, without limitation, (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person by contract and/or as a guaranteed payment (including, without limitation, any such amounts required to be paid to partners and/or as a preferred or special dividend, including any mandatory redemption of shares or interests), (iv) all indebtedness incurred and/or guaranteed by such Person, directly or indirectly (including, without limitation, contractual obligations of such Person), (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Parties**" shall mean (i) Lender; (ii) any successor owner or holder of the Loan or participations in the Loan; (iii) any Servicer or prior Servicer of the Loan; (iv) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party; (v) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding; (vi) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing and (vii) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Initial Advance**" shall mean the first Advance of the Loan.

"**Initial Interest Rate**" shall mean a floating rate per annum equal to the greater of (i) Term SOFR plus seven hundred sixty basis points (7.60%) and (ii) twelve percent (12.00%) per annum. Any change in Term SOFR shall be effective immediately, without notice to Borrower.

"**Insurance Account**" shall mean the insurance escrow account, if any, maintained by Borrower with Lender in accordance with Section 9.01 hereof.

"**Insurance Payment Date**" shall mean, with respect to any applicable Policies, the date occurring thirty (30) days prior to the date the applicable Insurance Premiums associated therewith are due and payable.

"**Insurance Premiums**" shall have the meaning set forth in Section 8.01 hereof.

"**Insurance Proceeds**" shall mean any insurance proceeds paid by any insurance company in connection with a Policy or Policies in respect of all or any part of the Property.

"**Interest Accrual Period**" shall mean, (i) in connection with the calculation of interest to be paid on the Closing Date, if any, the period beginning on (and including) the Closing Date and ending on (and including) the last day of the calendar month in which the Closing Date occurs and (ii) in connection with the calculation of interest accrued with respect to any specified Monthly Payment Date, the period beginning on (and including) the first (1st) day of the prior calendar month and ending on (and including) the last day of such prior calendar month. No

9

Interest Accrual Period shall be shortened by reason of any payment of the Loan prior to the expiration of such Interest Accrual Period.

"**Interest Rate**" shall mean the Initial Interest Rate; provided that, if the Loan is extended pursuant to and in accordance with Section 2.06 hereof, the interest rate due under the Loan for the Extension Period shall be the Extension Period Interest Rate.

"**Interest Reserve Account**" shall have the meaning set forth in Section 9.03 hereof.

"**Interest Reserve Funds**" shall have the meaning set forth in Section 9.03 hereof.

"**Interest Shortfall**" shall have the meaning set forth in Section 9.03 hereof.

"**Interest Shortfall Notice**" shall have the meaning set forth in Section 9.03 hereof.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Investor**" shall have the meaning set forth in Section 11.02 hereof.

"**Land**" shall have the meaning set forth in the Mortgage.

"**Lease**" shall have the meaning set forth in the Mortgage.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting any Borrower Party or the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all Permits, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting any Borrower Party or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Lender Review Fees**" shall mean any reasonable fees and expenses incurred by Lender in connection with any travel, Project review and ongoing compliance costs and expenses incurred by Lender in connection with the Loan.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Guaranty, the Completion Guaranty, the ADA and Environmental Indemnity, and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs and reasonable attorneys' fees, in the case of each of the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

10

"**Major Contractor**" shall mean any Contractor hired by Borrower supplying labor or materials, or both, in connection with the Project Improvements which is, when aggregated with all other Contracts with any Affiliate of such Contractor hired by (or on behalf of) Borrower and taking into account all Change Orders under such Contract, for an aggregate contract price equal to or greater than $100,000, whether pursuant to one contract or agreement or multiple contracts or agreements; provided that, for each Major Contractor, Lender shall have received evidence in form and substance satisfactory to Lender of such Major Contractor's construction experience and financial capability and Lender shall have approved such Major Contractor.

"**Major Contracts**" shall mean (i) any contract with a Major Contractor, or Other Design Professional, including without limitation, the Architect's Contract, (ii) any other contract which is, when aggregated with all other contracts with any Affiliate of such Contractor or Other Design Professional hired by (or on behalf of) Borrower and taking into account all Change Orders under such contract for an aggregate contract price equal to or greater than $100,000, (iii) any contract relating to the environmental condition of the Property, (iv) any contract relating to the management of the Property, (v) any Operating Contract that requires annual payments in excess of $100,000 and is not terminable upon thirty (30) days' notice from Borrower without the payment of any fee or penalty whatsoever, and (vi) any contract with a Borrower Party.

"**Make Whole Amount**" shall mean four Hundred Fifty-Two Thousand Three Hundred Twenty and 00/100 Dollars ($452,320.00).

"**Make Whole Fee**" shall mean, upon prepayment or repayment of the Debt, if the aggregate sum of Debt Service paid to Lender from the Closing Date through the time of such prepayment or repayment is less than the Make Whole Amount, the amount that is equal to the Make Whole Amount minus the aggregate sum of Debt Service received by Lender as of the date of such prepayment or repayment.

"**Management Agreement**" shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean such entity, if any, selected as the manager of the Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean with respect to any Person, any action to consolidate or merge such Person with or into any Person, or sell all or substantially all of the assets of such Person, or to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or make any assignment for the benefit of creditors of such Person, or admit in writing such Person's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate such Person.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the Property; (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of any Borrower Party or the Property; (iii) the enforceability, validity, perfection or priority of the

11

lien of the Mortgage or the other Loan Documents or (iv) the ability of any Borrower Party to perform its obligations under the Mortgage or the other Loan Documents.

"**Maturity Date**" shall mean March 1, 2026, or the Extended Maturity Date, if applicable, pursuant to and in accordance with Section 2.06 hereof, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Maximum Loan Amount**" shall mean Nine Million Eight Hundred Thousand and 00/100 Dollars ($9,800,000.00).

"**McGraw Loan Allocation**" shall mean the One Million and 00/100 Dollars ($1,000,000.00) of the Maximum Loan Amount which is being allocated towards the potential shortfall on the loan made by Lender to Borrower's Affiliate, **1932 MCGRAW AVENUE LLC,** a New York limited liability company (the "**McGraw Loan**"), and secured by the real property and improvements located at 1932 McGraw Avenue, Bronx, New York 10462 (the "**McGraw Property**"). If upon the sale of the McGraw Property there is a shortfall owed under the McGraw Loan to Lender (a "**McGraw Shortfall Event**"), then Lender shall have the immediate right to Advance under the Maximum Loan Amount (without notice to, or consent of, the Borrower), the entire McGraw Loan Allocation or such lesser amount thereof (in Lender's sole discretion) (the "**McGraw Advance Amount**"), which amount shall not accrue any interest due hereunder; provided however, that, if the entire McGraw Loan Allocation is not drawn by Lender following a McGraw Shortfall Event, then, such remainder of the McGraw Loan Allocation shall be available for Advances hereunder by the Borrower for Project Related Costs, subject to all Advance requirements hereunder and, in such case, will accrue interest hereunder at the Interest Rate or the Default Rate, as applicable.

"**Member**" shall mean the Guarantor.

"**Minimum Advance Amount**" shall mean One Hundred Fifty Thousand Dollars ($150,000.00).

"**Minimum Invested Equity**" means the sum of the Required Equity Funds, once fully invested in accordance with the requirements hereof.

"**Monthly Debt Service Payment Amount**" shall mean a payment equal to the amount of interest which has accrued during the preceding Interest Accrual Period computed at the Interest Rate.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 9.01 hereof.

"**Monthly Payment Date**" shall mean the First Monthly Payment Date and the first (1st) day of every calendar month occurring thereafter during the term of the Loan.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 9.01 hereof.

"**Mortgage**" shall mean that certain first priority Amended and Restated Construction Open-End Mortgage Deed, Assignment of Leases and Rents, Security Agreement and Fixture

4938-8333-2636, v. 5

Filing, dated of even date herewith, executed and delivered by Borrower as security for the Loan and encumbering the Property.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 8.04 hereof.

"**New Manager**" shall mean any Person replacing or becoming the assignee of the then current Manager, in each case, in accordance with the applicable terms and conditions hereof.

"**Note**" shall mean that certain Amended and Restated Promissory Note, dated of even date herewith, in a principal amount equal to the Maximum Loan Amount, made by Borrower in favor of Lender.

"**Notice**" shall have the meaning set forth in Section 14.01 hereof.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its other obligations hereunder and under the other Loan Documents.

"**OFAC**" shall have the meaning set forth in Section 4.28 hereof.

"**Operating Contract**" shall mean any cleaning, maintenance, service, repair, supply, credit, personnel, staffing or other contract or agreement of any kind relating to the use, development, operation, maintenance, repair or restoration of the Property or otherwise binding on Borrower or any Affiliate of Borrower (on behalf of Borrower), whether written or oral. "Operating Contract" does not include (i) any Construction Contract, or (ii) Intentionally Omitted.

"**Origination Fee**" shall mean the non-refundable loan origination fee equal to one and one-quarter of one percent (1.25%) of $8,800,000.00.

"**Other Charges**" shall mean all maintenance charges, impositions other than Taxes, and any other charges, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Design Professionals**" shall mean any architect (other than Borrower's Architect), engineer, interior designer, landscape designer, expediter or other professionals engaged to work on the Project Improvements having compensation which is, when aggregated with all other compensation received by such professional (and any Affiliate of such professional) under any Contract relating to the Project Improvements in excess of $100,000.00.

"**Other Obligations**" shall mean (i) the performance of all obligations of Borrower contained herein; (ii) the performance of each obligation of Borrower contained in any other Loan Document; and (iii) the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of this Agreement, the Note or any other Loan Document.

"**Patriot Act**" shall have the meaning set forth in Section 4.28 hereof.

13

"**Permits**" shall mean all certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) necessary or desirable for the development, operation, use and occupancy of the Property, the construction of the Project and the conduct of the Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean collectively, (i) the lien and security interests created by this Agreement, the Mortgage and the other Loan Documents; (ii) all liens, encumbrances and other matters disclosed in the Title Insurance Policy; (iii) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent; (iv) existing Leases and new Leases entered into in accordance with this Agreement; and (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any other entity and, in each case, any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Pledge Agreement**" shall mean that certain first priority Amended and Restated Pledge and Security Agreement, dated of even date herewith, executed and delivered by the Member as security for the Loan and encumbering the Collateral.

"**Policies**" shall have the meaning specified in Section 8.01 hereof.

"**Prohibited Transfer**" shall have the meaning set forth in Section 7.02 hereof.

"**Project**" shall mean, collectively, Borrower's construction and development of its fee interest in the Property together with all Improvements currently located upon or to be constructed upon the Property in accordance with the terms of this Agreement, such Improvements to include, but not be limited to, approximately 32-unit residential apartment units on the Development Property subject to and in accordance with the Plans and Specifications.

"**Project Budget**" shall mean the Project Budget given to Lender as revised from time to time in accordance with the terms of this Agreement and which shall be replaced and superseded by the Approved Project Budget upon Lender's approval thereof on or prior to the date of the Initial Advance, together with any subsequent changes thereto from time to time as approved in writing by Lender.

"**Project Improvements**" shall mean the Improvements of the Property as the same will be developed, remediated and constructed in accordance with the Plans and Specifications and all Legal Requirements.

"**Project Related Costs**" shall mean all direct and indirect costs and expenses of (i) designing, inspecting, remediating, constructing, and developing the Project Improvements to Final Completion (collectively, the "**Construction Costs**"), (ii) closing the Loan, and (iii) operating the Property throughout the term of this Agreement, including, without limitation, Hard Costs, Soft Costs, contingency, and Carry Costs.

"**Project Report**" shall mean a report to be prepared by the Construction Consultant, based on its review of the Project Budget, the Plans and Specifications, the Construction

14

Schedule, all in final form, the Contracts, the Major Contracts, inspections of the Project, and such other documents and information required by the Construction Consultant.

"**Project Scope**" shall mean the Project Scope given to Lender as revised from time to time in accordance with the terms of this Agreement and which shall be replaced and superseded by the Final Project Scope upon Lender's approval thereof on or prior to the date of the Initial Advance, together with any subsequent changes thereto from time to time as approved in writing by Lender.

"**Property**" shall mean the Development Property or portion thereof which shall remain subject to the Mortgage in accordance with the terms of this Agreement.

"**Qualified Insurer**" shall have the meaning set forth in Section 8.01 hereof.

"**Rebalancing Reserve Account**" shall have the meaning set forth in Section 9.02 hereof.

"**Rebalancing Reserve Funds**" shall have the meaning set forth in Section 9.02 hereof.

"**Release**" shall have the meaning set forth in Section 2.07 hereof.

"**Rent Loss Proceeds**" shall have the meaning set forth in Section 8.01 hereof.

"**Rents**" shall have the meaning set forth in the Mortgage.

"**Required Equity Funds**" shall have the meaning set forth in Section 2.01(h) hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the Rebalancing Reserve Account, the Interest Reserve Account and any other escrow account established by this Agreement or the other Loan Documents.

"**Reserve Funds**" shall mean the Tax and Insurance Funds, the Rebalancing Reserve Funds, the Interest Reserve Funds and any other escrow funds established by this Agreement or the other Loan Documents.

"**Restoration**" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"**Restoration Retainage**" shall have the meaning set forth in Section 8.04 hereof.

"**Restricted Party**" shall have the meaning set forth in Section 7.01 hereof.

"**Retainage**" shall mean, the greater of (i) the actual retainage required under such Contract or (ii) retainage of ten percent (10%) of the applicable contract price.

"**Sale or Pledge**" shall have the meaning set forth in Section 7.01 hereof.

"**Sanctions**" shall have the meaning set forth in Section 4.28 hereof.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 11.01 hereof.

"**Servicer**" means the entity or entities appointed by Lender from time to time to serve as servicer and/or special servicer of the Loan. If at any time no entity is so appointed, the term "Servicer" shall be deemed to refer to Lender.

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

15

"**Shortfall**" shall have the meaning set forth in Section 2.01(f) hereof.

"**Soft Costs**" shall mean those Project Related Costs set forth in clauses (i), (ii) and (iii) of the definition of "Project Related Costs" which are not otherwise included in the definition of Hard Costs, including but not limited to, architect's, engineer's and contractor's fees, interest on the Loan, marketing costs and expenses, legal fees, recording taxes and title charges in respect of the Mortgage, Taxes and Other Charges, Insurance Premiums and such other non-construction costs as are part of the costs of the Project.

"**Successor Owner**" shall mean any Person acquiring title to the Property in connection with or subsequent to Lender exercising its remedies under the Loan Documents.

"**State**" shall mean the state in which the Property or any part thereof is located.

"**Stored Materials**" shall have the meaning set forth in Section 3.14 hereof.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Account**" shall mean the tax escrow account, if any, maintained by Borrower with Lender in accordance with Section 9.01 hereof.

"**Tax and Insurance Funds**" shall have the meaning set forth in Section 9.01 hereof.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Tax Payment Date**" shall mean, with respect to any applicable Taxes, the date occurring thirty (30) days prior to the date the same are due and payable.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Term SOFR**" means, CME Term SOFR for a period of 1-month, as published by, authorized distributors of CME Term SOFR at 6:00 a.m., New York City time (or any amended publication time of CME Term SOFR, as specified by the CME Term SOFR administrator in the CME Term SOFR benchmark methodology) on the CME Term SOFR Fixing Day. If that rate is subsequently corrected and provided by the administrator of CME Term SOFR to, and published by, authorized distributors of CME Term SOFR within the longer of one hour of the time when such rate is first published by authorized distributors of CME Term SOFR and the republication cut-off time for CME Term SOFR, if any, as specified by the CME Term SOFR administrator in the CME Term SOFR benchmark methodology then that rate will be subject to those corrections. If any time Term SOFR is less than zero (0), then Term SOFR shall be deemed to be zero (0). In the event that Term SOFR (i) is permanently or indefinitely unavailable or unascertainable, (ii) ceases to be published, (iii) is officially discontinued, (iv) the government authority having jurisdiction over the Lender set forth a specific date that Term SOFR may no longer be available for determining interest rates, (v) can no longer be lawfully relied upon in contracts, (vi) does not accurately and fairly reflect the cost of making or maintaining the type of loan under the Note or this Agreement or (vii) the Lender in its sole judgment believes that Term SOFR is no longer a widely recognized benchmark for the origination of loans and such circumstances are unlikely to be temporary, then all references to the Interest Rate herein will instead be to a replacement rate

16

determined by Lender in its sole judgment. If at any time such replacement rate is less than zero (0), then the replacement rate shall be deemed to be zero (0) plus any spread adjustment for purposes of calculating the loan. Lender will provide reasonable notice to Borrower of such replacement rate, which will be effective on the date of the earliest event set forth in clauses (i)-(vii) of this paragraph. If there is any ambiguity as to the date of occurrence of any such event, Lender's judgment will be dispositive.

"**Term SOFR Reset Date**" shall mean the first day of each month unless the first day is not a Business Day in which case it shall mean the first succeeding Business Day unless the first succeeding Business Day is in the next calendar month in which case it shall be the first preceding Business Day, provided however, there shall be no adjustment for a Term SOFR Reset Date that falls on a day which is not a Business Day.

"**Title Insurance Policy**" shall mean that certain ALTA mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Mortgage.

"**Total Deemed Advance**" shall mean, collectively, (i) all Advances, and (ii) all Borrower Funds.

"**Total Deemed Advance Available Amount**" shall mean, at any given time, the sum of (without duplication) (i) the undisbursed proceeds of the Loan (which, for the avoidance of doubt, shall not include any amounts deposited in any Account) which are available to be disbursed to Borrower in accordance with the terms of this Agreement and (ii) amounts on deposit in the Rebalancing Reserve Account.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State where the Property is located.

"**U.S. Government Securities Business Day**" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

Section 1.02    **Principles of Construction**. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

**ARTICLE 2**
**GENERAL TERMS**

Section 2.01    **Loan Commitment; Disbursement to Borrower**.

(a)    **Agreement to Lend and Borrow**. Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept Advances in respect of the Loan as more particularly set forth in this Agreement, including, without limitation, the Advance of the "McGraw Loan Allocation," as and when due in accordance with the terms set forth in the definition "McGraw Loan Allocation".

17

(b)      **No Reborrowings**. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

(c)      **The Note, Mortgage and Loan Documents**. The Loan shall be evidenced by the Note and secured by the Mortgage covering the fee simple interest of Borrower in the Property, the Improvements and other property, rights and interests of Borrower in the Property and the other Loan Documents and made subject to the terms and conditions of this Agreement, and advanced in accordance with the provisions of this Agreement.

(d)      **Use of Proceeds**. Borrower hereby agrees that Borrower shall use the proceeds of the Loan solely to refinance the Original Loan and to pay or reimburse itself for Project Related Costs actually incurred in connection with the construction of the Project Improvements to the extent such costs are set forth in the Project Budget and fund Accounts as approved by Lender.

(e)      **Loan Advances**. Subject to compliance by Borrower with the terms and conditions of this Agreement, Lender shall make Advances under this Agreement to Borrower for Project Related Costs, each as set forth in the Approved Project Budget, as the same may be revised in accordance with the express provisions of this Agreement. Lender shall not be required to make Advances under the Loan for costs incurred by Borrower with respect to Stored Materials on or off the Property. The Approved Project Budget shall meet the requirements of Article 3 hereof. Lender shall not withhold Advances for any category or Line Item exceeding the amount specified therefor in the Approved Project Budget so long as such excess amount is properly allocated to Contingency in the manner provided for herein.

(f)      **Insufficiency of Loan Proceeds**. At any time from and after the date of the Initial Advance, Lender shall have the right (but not the obligation) to deliver a notice to Borrower in writing (a "**Shortfall Notice**") stating that, as determined in Lender's sole discretion, (i) the cost of all Project Related Costs (excluding Carry Costs and Debt Service) necessary to achieve Final Completion that remain unpaid at the time in question exceeds (ii) the sum of (x) the Total Deemed Advance Available Amount and (y) the unallocated balance of the Rebalancing Reserve Account (the amount of any such deficiency under clauses (i) minus (ii) being herein referred to as the "**Shortfall**"). Upon any such Shortfall Notice being delivered by Lender, Borrower shall cause the Shortfall amount to be deposited in the Rebalancing Reserve Account within five (5) days following the delivery of such Shortfall Notice. Failure to make such deposit as set forth herein shall be an immediate Event of Default.

(g)      **Quality of Work**. No Advance or any portion thereof shall be made with respect to defective work or to any Contractor that has performed work that is defective and that has not been cured, as confirmed by the report of the Construction Consultant, but Lender may disburse all or part of any Advance before the portion thereof allocable to any such defective work shall become payable hereunder if Lender believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

(h)      **Required Equity Funds**. Prior to the date of the Initial Advance, Lender shall have received evidence reasonably acceptable to Lender that Borrower has invested non-borrowed cash in respect of Project Related Costs in an amount (the "**Initial Required Equity Funds**") equal to or greater than (i) the Approved Project Budget minus (ii) the Maximum Loan Amount. In addition, no later than June 1, 2025, Lender shall have received evidence reasonably

18

acceptable to Lender that, Borrower has invested additional, non-borrowed cash in respect of Project Related Costs in an amount (the "**Additional Required Equity Funds**" and together with the Initial Required Equity Funds, collectiely, the "**Required Equity Funds**") of at least Five Hundred Eight Thousand Three Hundred Seventy-Seven and 65/100 Dollars ($508,377.65). Lender, in its discretion, may permit the investment of the Additional Required Equity Funds to be contributed on a pari passu basis with the remainder of the Construction Costs to be funded by Lender pursuant to the Approved Project Budget.

(A)    The Required Equity Funds shall include all of Borrower's investment to date that is properly allocated to the Project. Borrower and Lender acknowledge that various paid and budgeted items necessary for the completion of the Project will also benefit future phases of Development of the Development Property. Borrower and Lender agree that the full amount of the cost of such items paid by Borrower and included in the Approved Project Budget will be treated as part of the Required Equity Funds notwithstanding the potential future benefit for subsequent development at the Development Property.

(B)    The Required Equity Funds shall exclude Guarantor and Borrower overhead and expenses, this Loan and other financing costs related to the Project. For the avoidance of doubt, no portion of any employee cost, facility cost, administrative cost or other overhead of Guarantor and Borrower shall be treated as Required Equity Funds.

(i)    **Fee Title**. On the Closing Date, Borrower shall own the fee interest in the Property, free and clear of all liens, claims, encumbrances other than Permitted Encumbrances.

Section 2.02    **Interest Rate**.

(a)    **Generally**. Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)    **Default Rate**. In the event that, and for so long as, any Event of Default set forth in Section 10.01 hereof (which Section includes any applicable notice and grace periods for any Default hereunder), shall have occurred and be continuing, (i) the then outstanding principal balance of the Loan and, to the extent permitted by applicable law, overdue interest in respect of the Loan shall each accrue interest at the Default Rate, calculated from the date the applicable Default occurred without regard to any grace or cure periods contained herein; (ii) without limitation of any rights or remedies contained herein and/or in any other Loan Document, any interest accrued at the Default Rate in excess of the interest component of the Monthly Debt Service Payment Amount shall, to the extent not already paid and/or due and payable hereunder, be due and payable on each Monthly Payment Date and (iii) all references herein and/or in any other Loan Document to the "Interest Rate" shall be deemed to refer to the Default Rate. If judgment is entered on the Note and this Agreement, interest shall continue to accrue post-judgment, until the date upon which the Debt is paid in full, at the greater of (x) the Default Rate or (y) the applicable statutory judgment rate.

(c)    **Interest Calculation**. Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which

19

4938-8333-2636, v. 5

the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance. The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Accrual Period immediately prior to such Monthly Payment Date. Borrower understands and acknowledges that such interest accrual requirement results in more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(d) **Usury Savings**. This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.03 **Loan Payments**.

(a) **Payment before Maturity**. Borrower shall make a payment to Lender of interest only on the Closing Date for the period from (and including) the Closing Date through (and including) the last day of the calendar month in which the Closing Date occurs; provided, however, if the Closing Date is the first (1st) day of a calendar month, no such separate payment of interest shall be due. Borrower shall make a payment to Lender of interest and, to the extent applicable, principal in the amount of the Monthly Debt Service Payment Amount on the First Monthly Payment Date and on each Monthly Payment Date occurring thereafter to and including the Maturity Date. Each payment shall be applied first to accrued and unpaid interest and the balance to principal. All of said Monthly Debt Service Payments, subject to the terms of Section 9.03 hereof, shall be made from the Interest Reserve Account.

(b) **Payment on Maturity**. Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

(c) **Late Payment Charge**. If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower within five (5) days of the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of ten percent (10.00%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of

20

the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents.

(d)    **Method and Place of Payment**.

(i)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 12:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately succeeding Business Day.

(iii)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Section 2.04    **Prepayments**.

(a)    Voluntary Prepayment. Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. On any Business Day during the term of the Loan, Borrower may, at its option and upon 10-days' prior written notice to Lender, prepay the Debt, in whole or in part, provided that Borrower shall pay to Lender, simultaneously with such prepayment (i) all accrued and unpaid interest on the amount of principal being prepaid through and including the date of prepayment; (ii) all other amounts then due and payable under this Agreement and the other Loan Documents, including, without limitation, all accrued but unpaid interest; (iii) the Make Whole Fee; and (iv) the Exit Fee.

(b)    Mandatory Net Proceeds Prepayment. On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for Restoration, Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds.

(c)    Prepayments After Default. If concurrently with or after an Event of Default has occurred and is continuing, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth herein and Borrower, such purchaser at foreclosure or other Person shall pay the outstanding principal balance, together with (i) all accrued and unpaid interest due in connection with this Agreement and the Note; (ii) the Make Whole Fee; (iii) the Exit Fee; and (iv) all other amounts payable under the Loan Documents. Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

Section 2.05    **Loan Fees**. Borrower has paid to Lender on or before the Closing Date the Origination Fee. Borrower and Lender recognize and agree that the Origination Fee (a) is not a

21

charge for the use of money, but rather a purchase of the right to secure a loan of money on the part of Borrower; and (ii) is a material inducement for Lender to make the Loan and for having Lender ready, willing and able to fund the Loan in accordance with the terms of the Note, this Agreement and the other Loan Documents. Borrower's payment of the Origination Fee to Lender is and shall be in addition to all other payments (including without limitation, principal and interest) now or hereafter payable to Lender pursuant to the terms and conditions of the Note, this Agreement and the other Loan Documents.

Section 2.06 **Extension of the Maturity Date**. Borrower shall have one (1) option to extend the term of the Loan beyond the initial Maturity Date for one (1) successive term (the "**Extension Option**") for a period of six (6) months (the "**Extension Period**") to September 1, 2026 if the Extension Option is exercised (the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions (in each case as determined by Lender):

(a)      no Default or Event of Default shall have occurred and be continuing at the time the Extension Option is exercised and on the date that the Extension Period is commenced;

(b)      Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than one-hundred twenty (120) days and no later than thirty (30) days prior to the applicable Maturity Date;

(c)      Borrower shall have paid to Lender an extension fee for the Extension Option in the amount equal to one percent (1.00%) of $8,800,000.00, on or before the date the Extension Period has commenced;

(d)      At Lender's election, Borrower shall have deposited into the Interest Reserve Account amounts sufficient to fund Debt Service payments hereunder, as determined by Lender, for such Extension Period;

(e)      Final Completion has occurred; and

(f)      Borrower shall have paid all costs and expenses incurred by Lender in connection with the Extension Option, including, but not limited to, underwriting, title and legal fees and costs.

All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the Extended Maturity Date in the event the Extension Option is exercised. If Borrower fails to timely exercise the Extension Option in accordance with the provisions of this Section 2.06, the Extension Option hereunder will be of no further force or effect.

Section 2.07 **Intentionally Omitted**.

Section 2.08 **Closing**.

(a)      **Conditions to Closing**. The obligation of Lender to close shall be subject to the following conditions precedent, all of which conditions precedent must be satisfied or waived by Lender on or prior to the Closing Date:

22

4938-8333-2636, v. 5

(i)     Loan Documents. Lender shall have received and approved fully executed originals of the Loan Documents.

(ii)    Performance. Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the Closing Date.

(iii)   Representations and Warranties. The representations and warranties made by Borrower Parties in the Loan Documents shall be true and correct in all material respects.

(iv)    UCC Searches. Lender shall have received Federal, state and local tax and judgment lien searches and searches of the appropriate Uniform Commercial Code filing offices showing no liens affecting the Property, Borrower or Member, other than the Permitted Encumbrances; provided, however, to the extent any of such searches are not received by closing Lender is not waiving this requirement which shall be required to be fulfilled after the Closing Date.

(v)     Insurance. Lender shall have received, at least three (3) Business Days prior to the Closing Date, certificates evidencing all insurance policies required under Section 8.01, in each case, showing that all such insurance is in effect, in form satisfactory to Lender, together with evidence of the payment of all premiums payable for the existing policy period.

(vi)    Formation, Authority and Good Standing Documents. Lender shall have received the following items, which must be reasonably satisfactory to Lender: (i) evidence of the due organization or incorporation and good standing of each Borrower Group Member (if a legal entity), as certified by the Secretary of State of such party's state of organization or incorporation, the Secretary of State of the State where the Property is located and any other jurisdiction where such party is required to qualify to do business and maintain its good standing therein; (ii) true, correct and complete copies of all organizational documents; and (iii) evidence of the due authorization of this transaction by each Borrower Party, including, without limitation, corporate, partnership or limited liability company resolutions specifically authorizing this transaction and incumbency certificates with original specimen signatures for the officers signing the Loan Documents.

(vii)   Opinions of each Borrower Parties' Counsel. Lender shall have received and reasonably approved legal opinions from each Borrower Party's counsel, whose identity must be reasonably satisfactory to Lender, addressing corporate, partnership and limited liability organization, authority and good standing, the enforceability of the Loan Documents, and such other typical and customary matters as Lender may reasonably request, in form and substance acceptable to Lender.

(viii)  Financial Statements. Lender shall have received and approved the most current consolidated financial statements available for Borrower and Guarantor and its Subsidiaries (which financial statements, in the case of Guarantor, shall include aggregated financial information with respect to the Borrower Parties), certified as required in and meeting the other requirements of Section 5.12, including evidence, reasonably satisfactory to Lender, confirming that Guarantor is in compliance with all financial covenants set forth in the Guaranty, Completion Guaranty and Springing Guaranty, as applicable.

(ix)    Evidence of Purchase of the Development Property. Lender shall have received reasonably satisfactory evidence that Borrower has invested the full amount of the acquisition cost of the Development Property.

(x)    Title Insurance Policy. Lender shall have received and reasonably approved the Title Insurance Policy, insuring that Lender has a valid and perfected first lien as of the Closing Date on the Property, with respect to the Mortgage, subject to the Permitted Encumbrances.

(xi)    Survey. Lender shall have received the Survey, which shall be prepared and be certified to the Title Company, Lender and their respective successors and assigns, in accordance with a survey certification acceptable to Lender.

(xii)    No Damage. The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Lender shall be satisfied, in the judgment of Lender, that sufficient insurance proceeds or other funds provided by Borrower will be available to effect the satisfactory restoration of the Improvements and to permit Final Completion prior to the Final Completion Date.

(xiii)    Intentionally Omitted.

(xiv)    Agreements. Lender shall have received copies of all development, redevelopment, reciprocal easement or other material agreements relating to the Property, each certified by Borrower as being true, correct and complete.

(xv)    Affiliate Contracts. Lender shall have received copies of all executed Affiliate Contracts, each certified by Borrower and approved by Lender.

(xvi)    Base Project Documents. Lender shall have received and shall have approved preliminary versions of the Base Project Documents.

(xvii)    Architect's Contract. Borrower shall have delivered to Lender, and Lender shall have approved, the Architect's Contract, which shall be fully executed by all parties thereto.

(xviii)    Approved Operating Budget. Lender shall have received and shall have approved a preliminary version of the Approved Operating Budget.

(xix)    Patriot Act. Lender shall have received all documents and information deemed necessary by Lender to comply with Section 326 of the USA Patriot Act and regulations promulgated pursuant to such law.

(xx)    Intentionally Omitted.

(xxi)    Notices All notices required by any Governmental Authority or by any applicable Legal Requirement to be filed prior to commencement of construction of the Project Improvements shall have been filed and Lender, Lender, or any requested designee thereof shall

24

have been listed on the Notice of Commencement as an additional party to receive copies of all notices.

(xxii)    Origination Fee. Lender shall have received the Origination Fee.

(xxiii)    Zoning. Lender shall have received evidence satisfactory to it confirming that the use and operation of the Development Property as presently improved are in compliance with all Legal Requirements, and the planned development, use and operation of the Development Property would be consistent with all Legal Requirements.

Section 2.09    **Initial Advance.**

(a)    **Conditions of Initial Advance**. The obligation of Lender to make the Initial Advance shall be subject to the following conditions precedent, all of which conditions precedent unless otherwise specifically set forth herein must be satisfied or waived by Lender prior to the making of the Initial Advance:

(i)    Prior Conditions Satisfied. All conditions precedent pursuant to Section 2.08(a) shall continue to be satisfied and/or waived, as applicable, as of the date of the Initial Advance, irrespective of whether or not such conditions are repeated in this Section 2.09(a).

(ii)    Final Project Documents. Lender shall have approved the Final Project Documents in accordance with the standard of discretion and procedures set forth in Section 3.02(e) of this Agreement, which show the Final Completion Date to be no later than September 30, 2025 (regardless of any applicable cure or grace periods or delays due to a Force Majeure event).

(iii)    Approved Operating Budget. Lender shall have received and shall have approved a final version of the Approved Operating Budget.

(iv)    Required Equity. Lender shall have received evidence satisfactory to Lender that there is no Shortfall and that Guarantor has satisfied the requirements set forth in Section 2.01(h) hereof with respect to the contribution of the Required Equity Funds, and that all such Required Equity Funds have been used (or will be used concurrently with the use of the proceeds of such Initial Advance) to pay for Project Related Costs in a manner satisfactory to Lender.

(v)    Performance; No Default. Borrower shall have performed and complied in all material respects with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Initial Advance, and on the date of such Advance there shall exist no Event of Default.

(vi)    Representations and Warranties. The representations and warranties made by Borrower in the Loan Documents or otherwise required to be made by or on behalf of Borrower through (and including) the date of such Initial Advance shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade on the date of such Initial Advance.

25

(vii)    Financial Statements. Lender shall have received and approved the most current financial statements available for Borrower and Guarantor, certified as required in and meeting the other requirements of Section 5.12, including evidence, satisfactory to Lender, confirming that Guarantor is in compliance with all financial covenants set forth in the Guaranty, Completion Guaranty and the Springing Guaranty, as applicable.

(viii)    Intentionally Omitted.

(ix)    Intentionally Omitted.

(x)    Compliance with Laws. Borrower shall represent and warrant to Lender and Lender that except as otherwise disclosed or identified herein (A) the Property is in compliance with all Legal Requirements (including all local, state and federal environmental laws), other than non-material violations that (1) will be cured during construction of the Project Improvements, (2) will not prevent issuance of any necessary Governmental Approvals in accordance with the Construction Schedule and the Plans and Specifications, or (3) will not otherwise materially and adversely affect Borrower's completion of the Project Improvements, and (B) that there are no conditions existing currently or that would reasonably be expected to exist during the term of the Loan that require or are likely to require investigation, removal or remediation pursuant to any of the aforesaid environmental laws (other than in the ordinary course of construction of the Project Improvements).

(xi)    Intentionally Omitted.

(xii)    Utilities. Lender shall have received evidence that all sewer, water, electrical, telephone and any other utility services are available at the Property in adequate supply.

(xiii)    Construction Consultant Report. Lender shall have received a report from the Construction Consultant with respect to the Project which shall have been approved by Lender.

(xiv)    Construction Manager's Agreement. Borrower shall have delivered to Lender, and Lender shall have approved, the Construction Manager's Agreement, which shall be fully executed by all parties thereto. The Construction Manager's Agreement shall (A) be in full force and effect and (B) Borrower and Construction Manager shall be in compliance with their respective obligations under the Construction Manager's Agreement and any subcontracts with Major Contractors.

(xv)    Endorsement to Title Insurance Policy. Lender shall have received a date-down endorsement to the Title Insurance Policy, which shall, among other things, insure that since the date of the Title Insurance Policy, there has been no change in the status of title to the Property.

(xvi)    No Damage. The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Lender shall be satisfied, in the judgment of Lender, that sufficient insurance proceeds or other funds provided by Borrower will be available to effect the satisfactory restoration of the Improvements and to permit Final Completion prior to the Final Completion Date.

(xvii)    Licenses and Permits. Borrower shall have delivered to Lender evidence that all Permits from any Governmental Authority necessary for the construction of the Project Improvements as contemplated by the Plans and Specifications have been obtained and are in full force and effect, including, without limitation, permits for cranes and hoists, scaffolds, sidewalk or road closures, and the final approval of the Plans and Specifications and for the commencement and undertaking of the work contemplated by this Agreement by the Town of New Milford, Connecticut and any other applicable Governmental Authorities for the Project Improvements, as applicable.

(xviii)    Intentionally Omitted.

(xix)    Agreements. Lender shall have received copies of all development, redevelopment, reciprocal easement or other material agreements relating to the Property, each certified by Borrower as being true, correct and complete.

(xx)    Trades. Fixed price or guaranteed maximum price contracts are completed or have been entered into for work constituting at least 80% of Hard Costs set forth in the Project Budget.

(xxi)    Contracts. All Contracts (including the Construction Manager's Agreement and guaranteed maximum price contracts or fixed price contracts in accordance with the Final Project Documents with respect to at least 80% of the remaining Project Related Costs to be incurred as set forth in the Approved Project Budget (the "**Contracting Threshold**")) shall be in full force and effect or the work and all payments thereunder shall be fully completed and copies thereof shall have been delivered to Lender. Borrower shall have delivered to Lender, and Lender shall have approved, a list, certified by Borrower, of all Contractors who have been or will be supplying labor or materials for the Property. The list of Contractors may be amended from time to time subject to the approval of Lender. If requested by Lender, Borrower shall have delivered a Performance Letter from any Major Contractors and Other Design Professionals as Lender shall designate, and Lender shall have received a certified copy or a fully executed duplicate original of each such Contract with a Major Contractor and/or Other Design Professional.

(xxii)    Accounts. All Accounts which are required to be opened prior to the Initial Advance hereunder shall have been opened.

(xxiii)    Zoning. Lender shall have received evidence satisfactory to Lender that the Zoning Work is complete and no further action is necessary to confirm that the use and operation of the Property as presently improved is in compliance with all Legal Requirements, and the planned development, use and operation of the Property would be consistent with all Legal Requirements.

(xxiv)    Architect's Performance Letter. Borrower shall have delivered to Lender a performance letter from Borrower's Architect (the "**Architect's Performance Letter**") in form and substance acceptable to Lender.

Section 2.10    **Advances**.

27

4938-8333-2636, v. 5

(a) **Conditions to all Advances.** The obligation of Lender to make any Advance, including the Initial Advance, shall be subject to the satisfaction of the following conditions precedent, all of which conditions precedent must be satisfied prior to Lender making any such Advance. To the extent that Borrower has not requested an Advance during the calendar month immediately preceding a Payment Date, on each such Payment Date, Borrower shall deliver to Lender evidence of Borrower's compliance with clauses (iv), (v), (vii), and (ix) of this Section 2.10 with respect to the use of any Borrower Funds during such preceding calendar month.

(i) Prior Conditions Satisfied. All conditions precedent (including, without limitation, any documents and/or other deliverables that Lender is or was permitted to require in connection with the Initial Advance) to any prior Advance (in the same manner in which they were satisfied for the Initial Advance or prior Advance, as applicable) shall continue to be satisfied and/or waived, as applicable, as of the date of such subsequent Advance, irrespective of whether or not such conditions are repeated in this Section 2.10.

(ii) Performance; No Default. Borrower shall have performed and complied in all material respects with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Advance, and on the date of such Advance there shall exist no Event of Default or Shortfall.

(iii) Representations and Warranties. The representations and warranties made by Borrower in the Loan Documents or otherwise required to be made by or on behalf of Borrower through (and including) the date of such Advance (including, for the avoidance of doubt, the representations of Borrower contained in Section 2.09(a)(x)) shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade on the date of such Advance.

(iv) Borrower Funds. Lender shall have received satisfactory evidence that Borrower shall have complied with the requirements set forth in Section 2.01(h) hereof, and Lender shall be satisfied that all Borrower Funds expended have been used in a manner consistent with this Agreement as if such Borrower Funds were Advances.

(v) Other Deliveries. The following items or documents shall have been delivered to Lender (to the extent not previously delivered to Lender for each Advance):

(A) *Anticipated Costs Report.* An anticipated cost report (A) executed by Borrower which sets forth the anticipated Hard Costs to complete construction of the applicable Project Improvements to Final Completion, after giving effect to costs incurred to date, the determination of costs relating to any anticipated Change Orders, and (B) executed by Borrower which sets forth all anticipated Project Related Costs to complete construction of the applicable Project Improvements to Final Completion, after giving effect to costs incurred to date and any anticipated Change Orders.

(B) *Endorsement to Title Insurance Policy.* A date-down endorsement to Lender's title insurance policy and confirmation that there are no real estate taxes or other assessments with respect to the Property other than real estate taxes and assessments not yet due and payable.

28

(C)    *Draw Request.* A Draw Request complying with the provisions of this Agreement which shall constitute Borrower's representation and warranty to Lender that: (a) any completed construction is substantially in accordance with the Plans and Specifications, (b) all costs for the payment of which Lender and any third party escrow agent mutually satisfactory to Borrower and Lender, pursuant to an escrow agreement mutually acceptable to both parties, shall have previously advanced funds have in fact been paid, (c) the use of all Borrower Funds constituting such Total Deemed Advance shall be in compliance with the requirements set forth in this Agreement with respect to the same (and with respect to Advances) and otherwise in compliance with all Legal Requirements applicable to the same (d) all the representations and warranties contained in Article 4 of this Agreement continue to be true and correct in all material respects, (e) no Event of Default shall have occurred and be continuing hereunder, (f) Borrower continues to be in compliance with all of the other terms, covenants and conditions contained in this Agreement in all material respects.

(D)    *Breakdown of Total Deemed Advance.* A breakdown setting forth the proposed source of funds (e.g. Advance, Additional Reserve, Required Equity Funds or otherwise) for each portion of such Total Deemed Advance.

(E)    *Lien Waivers.* Duly executed unconditional lien waivers (for all payments from prior Total Deemed Advances), as applicable, in the Connecticut statutory form, or, if such form is not applicable, in a form acceptable to Lender, from all Contractors under Construction Contracts (taking into account all Change Orders and aggregating all Contracts with Affiliates of the Contractor) for all work performed, and all equipment, labor or material supplied prior to the date of the Total Deemed Advance, including without limitation, such executed unconditional lien waiver as provided herein from Doherty Electric LLC for the sum of at least Three Hundred Thousand and 00/100 Dollars ($300,000.00) (the "**Doherty Electric Lien Waiver**").

(F)    *Intentionally Omitted.*

(G)    *Evidence of No Liens.* Lender shall have received evidence (in the form of a public records search and/or any other evidence reasonably acceptable to Lender) of all liens (if any) that have attached to the Property, including liens that are being contested by Borrower in accordance with this Agreement.

(H)    *Government Approvals.* Evidence that (1) any and all building permits required for the commencement of full construction of the Project Improvements in accordance with the Plans and Specifications have been obtained in accordance with all Legal Requirements, and (2) all other approvals from any Governmental Authority necessary for the construction of the Project Improvements as contemplated by the Plans and Specifications, have been obtained and are in full force and effect.

(I)    *Project Report.* The most recent Project Report delivered to Lender by the Construction Consultant shall be approved by Lender in its reasonable discretion exercised in good faith.

4938-8333-2636, v. 5

(J)    *Architect's Certifications.* Borrower shall have delivered to Lender a Certificate for Payment of Borrower's Architect pursuant to Section 2.13(a)(ii)(C) hereof.

(vi)    Construction Consultant Approval. Lender has received advice from the Construction Consultant, satisfactory to Lender, as to Construction Consultant's determination based on the Base Project Documents, on-site inspections of the Project Improvements and the data submitted to and reviewed by it as part of Borrower's Requisition of the value of the labor and materials in place, that the construction of the Project Improvements is proceeding satisfactorily and according to schedule and that the work on account of which the Total Deemed Advance is sought has been completed in a good and workmanlike manner and substantially in accordance with the Plans and Specifications and Legal Requirements.

(vii)    Retainage. For any Advance (or any Total Deemed Advance), in no event shall (x) (i) such Total Deemed Advance plus (ii) all previous Total Deemed Advances for Project Related Costs exceed (y) (i) all Project Related Costs incurred or to be incurred through the date of the Draw Request for such Advance plus (ii) the full amount of Project Related Costs actually paid with the proceeds of any previous Total Deemed Advance for Project Related Costs (together with any contract deposits funded with proceeds of a previous Advance in accordance with Section 2.13(g)) minus (iii) the applicable Retainage for each Construction Contract relating to the Project Related Costs in question. The Retainage shall be advanced on request by Borrower on a Contract by Contract basis when payable under the terms of each Construction Contract, subject to, where applicable, the occurrence of Final Completion and receipt by Lender of final lien waiver(s) for said Contract, and satisfaction of all other conditions precedent to such Total Deemed Advance set forth herein.

(viii)    Contracts. If in the judgment of Lender all Contracts and Major Contracts do not cover all of the work necessary for Final Completion, Borrower shall, prior to submitting any additional Draw Requests, cause to be furnished estimates and other information satisfactory to Lender, for the work not so covered, to enable Lender to ascertain the total estimated cost of all work done and to be done.

(ix)    Lender Review Fees. Lender shall have received payment of any outstanding Lender Review Fees.

(x)    Authorizations. Lender shall have received evidence reasonably satisfactory to Lender that all authorizations, permits, approvals, consents and licenses which are necessary for the construction and/or operation of the Property as presently improved in accordance with all applicable building, environmental, subdivision, land use, safety and zoning laws, ordinances, rules and regulations, including, without limitation, certificates of occupancy, have been obtained or can be obtained.

(xi)    Further Documents. Lender shall have received such other documents and further approvals, documents and information as Lender or its counsel may have reasonably requested, including the Loan Documents, in form and substance satisfactory to Lender.

Section 2.11    **Conditions of Final Construction Advance**. In addition to the conditions set forth in Section 2.10 above, Lender's obligation to make the Final Advance pursuant to this Agreement shall be subject to receipt by Lender of the following:

(b)    Final Completion of Improvements. Evidence satisfactory to Lender of Final Completion.

(c)    Approval by Construction Consultant. Notification from the Construction Consultant that Final Completion has occurred.

(d)    Certificates. Certificate of Borrower's Architect on AIA Document No. G704 containing the verifications and certifications set forth therein without modification and closeout letters from all other Major Contractors as reasonably required by Lender.

(e)    Lien Waivers. Duly executed unconditional lien waivers (for all payments from prior Total Deemed Advances), in the Connecticut statutory form, or, if such form is not applicable, in a form acceptable to Lender, from all Contractors under Construction Contracts (taking into account all Change Orders and aggregating all Contracts with Affiliates of the Contractor) for all work performed, and all equipment, labor or material supplied (and in each case billed) prior to the date of such Final Advance, including without limitation the Doherty Electric Lien Waiver.

(f)    "As-Built" Plans and Specifications and Survey. A full and complete set of "as built" Plans and Specifications certified to by Borrower's Architect and a complete "as-built" survey.

(g)    Other Documents. Such documents, letters, affidavits, reports and assurances, as Lender, Lender's counsel and the Construction Consultant may reasonably require, including, without limitation, an AIA Form G704 (Certificate of Final Completion) completed by Borrower's Architect, and all necessary Governmental Approvals from all applicable Governmental Authorities.

Section 2.12    **No Reliance**. All conditions and requirements of this Agreement are for the sole benefit of Lender and Lender and no other Person (including, without limitation, the Construction Consultant and subcontractors (including, without limitation, Major Contractors) and materialmen engaged in the construction of the Project Improvements) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Lender shall have the right, in its sole and absolute discretion, to waive any such condition or requirement and Borrower shall be authorized to rely on such waiver if and to the extent such waiver is in writing and signed by Lender.

Section 2.13    **Method of Disbursement of Loan Proceeds**.

(a)    **Draw Request to Be Submitted to Lender**.

(i)    At such time as Borrower shall desire to obtain an Advance (the date of such Advance being required to be a Business Day) or on each Payment Date (if no Advance is requested on such Payment Date or in the calendar month immediately preceding such Payment Date, in accordance with Section 2.10(a) hereof), Borrower shall complete, execute and deliver

31

to Lender a Borrower's Requisition in the form attached hereto as Exhibit "A" ("**Borrower's Requisition**").

(ii)    In addition to the conditions and deliverables described above in Section 2.10 and Section 2.11, with regard to Total Deemed Advances for Hard Costs, Borrower's Requisition shall be accompanied by:

(A)    a completed and itemized Application and Certificate for Payment in the form of AIA Document No. G702/703 or similar form approved by Lender, containing the certification of the Contractor to whom such payment is made, as applicable, and Construction Manager as to the accuracy of same, together with invoices relating to all items of Project Related Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Project Improvements to the date of the requisition. The cost breakdown shall also show the percentage of completion of each line item on the Project Budget, and the accuracy of the cost breakdown shall be certified by Borrower and by Construction Manager;

(B)    all such applications for payment shall also, with respect to (1) all Major Contractors, and (2) all other Contractors to the extent such information is readily available (understanding that such information may not always be available for suppliers), show all Contractors by name and trade, the total amount of each Contract, the amount theretofore paid to each Contractor as of the date of such application, and the amount to be paid from the proceeds of the Total Deemed Advance to each Contractor;

(C)    a Certificate for Payment of Borrower's Architect on AIA Document No. G702/703 containing the verifications and certifications set forth therein without modification; and

(D)    copies of all executed Change Orders, contracts and subcontracts, and, to the extent requested by Lender, of all inspection or test reports and other documents relating to the construction of the Project Improvements not previously delivered to Lender.

(b)    **Procedure of Advances**.

(i)    Each Draw Request shall be submitted to Lender at least ten (10) Business Days prior to the date of the requested Advance (the "**Requested Advance Date**"), and no more frequently than monthly (unless otherwise approved by Lender in its sole discretion). No Advance hereunder shall be in an amount less than the Minimum Advance Amount (other than the Final Advance hereunder) unless otherwise approved by Lender in its sole discretion. Lender shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied or waived.

(ii)    Not later than 3:00 P.M. New York City time on the Requested Advance Date, Lender shall make such Advance available to Borrower in accordance with the terms of this Section 2.13.

(iii)    Each Advance shall be made, subject to the conditions set forth in this Agreement, on such date as is reasonably requested by Borrower and approved by Lender in accordance with the terms of Sections 2.9, 2.10 and/or 2.11, as applicable.

(c)    **Funds Advanced**. Each Advance made directly to Borrower shall be made by Lender by wire transfer to the Borrower Operating Account. Borrower agrees that it shall have no other operating account or checking account other than the Borrower Operating Account and the other accounts provided for herein. All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made. Borrower shall not commingle such funds with other funds of Borrower.

(d)    **Direct Advances to Third Parties**. During the continuance of an Event of Default, Lender may make, at Lender's option, any or all Advances directly or through the Title Company to (i) any Contractor, (ii) Borrower's Architect, (iii) the Construction Consultant to pay its fees, (iv) Lender's or Lender's counsel to pay its fees, and (v) to pay (x) any expenses incurred by Lender which are reimbursable by Borrower under the Loan Documents (including, without limiting the generality of the foregoing, attorneys' fees and expenses and other fees and expenses incurred by Lender), or (y), any other sums due to Lender under the Note, this Agreement or any of the other Loan Documents, all to the extent that the same are not paid by the respective due dates thereof, and (vi) any other Person to whom Lender reasonably determines payment is due. Any portion of the Loan disbursed by Lender as set forth above shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. The execution of this Agreement by Borrower shall, and hereby does, during the continuance of an Event of Default, constitute an irrevocable authorization so to advance the proceeds of the Loan directly to any such Person or through the Title Company to such Persons in accordance with this Section 2.13(d) as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy *pro tanto* the obligations of Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Borrower.

(e)    **One Advance Per Month**. Lender shall have no obligation to make Advances of the Loan prior to the date of the Initial Advance or more often than once in each calendar month thereafter.

(f)    **Advances Do Not Constitute a Waiver**. No Advance shall constitute a waiver of any of the conditions of Lender's obligation to make further Advances nor, in the event Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default hereunder; provided however, that the inability or failure of Borrower to satisfy any such condition shall not constitute an Event of Default except to the extent expressly provided herein.

(g)    **Advances for Contract Deposits**. Notwithstanding anything to the contrary in this Agreement, subject to Lender's prior approval, Lender may permit Total Deemed Advances to be made for deposits required to be delivered by Borrower under Contracts in accordance with the approved Project Budget provided that Borrower shall have delivered to Lender a copy of the applicable Contract pursuant to which such deposit is to be delivered which shall be acceptable

33

to Lender. If requested by Lender, Borrower shall provide a Performance Letter with respect to such Contract.

(h)  **Advances and Disbursements Under Completion Guaranty**. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, Borrower hereby irrevocably and unconditionally authorizes Lender, to make any disbursements of proceeds of the Loan or of any Reserve Funds held by Lender to Guarantor to complete the Guaranteed Obligations (as defined in the Completion Guaranty), and grants to Guarantor all rights of access to the Property and materials relating to the Project necessary to enable Guarantor to complete the Guaranteed Obligations.

## ARTICLE 3
## CONSTRUCTION PROVISIONS

Section 3.01  **Approval of Project Documents.**

(a)  Borrower shall use best efforts in good faith to diligently pursue the development and finalization of a complete set of Base Project Documents which shall comply with all applicable Legal Requirements and all Governmental Approvals, and shall (if, as and when required) be approved by any applicable Governmental Authority or Architect as required for construction of the Project Improvements in accordance with this Agreement. The further development and finalization of the Base Project Documents shall be consistent in all material respects with the programmatic elements of the Base Project Documents delivered to Lender prior to the Closing Date, unless otherwise expressly agreed to in each instance in writing by Lender.

(b)  Borrower shall, within fifteen (15) days of the end of each calendar month (or such other more frequent schedule as may be mutually agreed), deliver a written update, in form and scope requested by Lender, regarding the then-current status of the Base Project Documents. Such update shall set forth all changes made to such Base Project Documents since the last update delivered to Lender. At any time and from time to time Lender may (but shall not be obligated to) provide notice to Borrower of any comments to the Base Project Documents; provided, however, if Lender is aware of significant material concerns with respect to any periodic update of the Base Project Documents or if, in Lender's determination, such periodic update is incomplete, contains insufficient information or details or there is inadequate development of such periodic update, in each case, Lender shall notify Borrower in writing of such matters with respect to a periodic update within thirty (30) days after receiving the relevant periodic update. Borrower shall promptly incorporate or otherwise address Lender's comments in subsequent updates to the Base Project Documents.

(c)  Upon Borrower's good faith belief that one or more Base Project Documents are in final form, Borrower shall make a written submission to Lender attaching the relevant "proposed final" Base Project Documents and Lender shall have thirty (30) days to review and provide its approval or disapproval of such submission subject to Section 3.01(e) hereof. Upon Lender's disapproval of any Base Project Documents which are "proposed final," Lender and Borrower shall cooperate in good faith to address Lender's comments. In no event shall Lender be deemed to approve or be obligated to approve any "proposed final" Base Project Documents which (i) do not reflect comments provided by Lender pursuant to Section 3.01(b), or (ii) do not

34

conform, in all material respects, to the initial Base Project Documents submitted to Lender as of the Closing Date (unless otherwise expressly agreed in each instance in writing by Lender). In no event shall Lender disapprove any "proposed final" Base Project Documents as a result of matters that Lender was required to provide Borrower with prior written notice of under Section 3.01(b), provided that Lender shall be permitted to disapprove any "proposed final" Base Project Documents to the extent Lender, in its written response to Borrower, reserved the right to disapprove, comment or object to a periodic update delivered under Section 3.01(b) because such periodic update, in Lender's determination, was incomplete, contained insufficient information or details or there was inadequate development of such periodic update.

(d)     Borrower shall submit for Lender's approval the "proposed final" Base Project Documents on or before the Closing Date, with any additional changes or updates to the Base Project Documents to be provided by Borrower to Lender no later than ten (10) days from the Closing Date.

(e)     Except as otherwise expressly set forth herein, in all instances in this Section 3.01 in which Lender is to approve or disapprove the development and finalization of the Base Project Documents or to decide whether other arrangements or terms related to the Base Project Documents are satisfactory or not satisfactory to Lender, such approval, disapproval or decision of Lender shall be determined in the sole discretion of Lender, and such decision shall not be deemed to have been given by Lender unless given in writing.

(f)     From time to time as the same are presented to Lender and the Construction Consultant, Borrower shall upload all Base Project Documents, the periodic updates thereto (including any subsequent updates thereto in response to comments by Lender), the "proposed final" Base Project Documents and the Final Project Documents required to be delivered by Borrower to Lender pursuant to Sections 3.01 and 3.02 hereof to a data room hosted by Borrower and accessible by Lender and the Construction Consultant and shall log the same into a register of documents including information of the date of each such upload and posting and provide a copy of each such update to Lender and the Construction Consultant, provided that such data room shall only contain such register log, the Base Project Documents, the periodic updates thereto, the "proposed final" Base Project Documents and the Final Base Project Documents.

Section 3.02     **Final Project Documents**. The Final Project Scope, the Approved Plans and Specifications, the Approved Construction Schedule and the Approved Project Budget, in each case as hereinafter defined, shall be referred to herein as the "**Final Project Documents**":

(a)     Final Project Scope. Upon Lender's approval of a final Project Scope pursuant to Section 3.01(c), such Project Scope shall be deemed the "**Final Project Scope**" hereunder, and such Final Project Scope shall not be subject to changes that would have an impact on the cost or value of the Project of the Approved Project Budget amount in the aggregate without Lender's written approval. All changes to the Project Scope that are implemented in accordance with the requirements of this Section 3.02(a) shall thenceforth replace and supersede the Project Scope, together with any subsequent changes thereto from time to time as approved in writing by Lender.

(b)     Approved Plans and Specifications. Borrower, based on the Final Project Scope, shall update and finalize the Plans and Specifications (through completed construction drawings

35

4938-8333-2636, v. 5

including, without limitation, any architectural, structural, mechanical, electrical, plumbing, fire protection and elevator plans and specifications, prepared by Borrower's Architect and the Other Design Professionals), and such Plans and Specifications, when approved by Lender pursuant to Section 3.01(c), shall be deemed the "**Approved Plans and Specifications**" hereunder, together with any subsequent changes thereto from time to time as approved in writing by Lender, and which shall comply with all applicable Legal Requirements and all Governmental Approvals, and which shall the basis for all Governmental Approvals required to construct the Project Improvements.

(c)    Approved Construction Schedule. Borrower, based on the Final Project Scope and the Approved Plans and Specifications, shall update and finalize the Construction Schedule (which schedules shall be a schedule, broken down by trade, of the dates of commencement and completion of the various stages of the Project Improvements and other milestones (including Final Completion)), and such Construction Schedule, when approved by Lender pursuant to Section 3.01(c), shall be deemed the "**Approved Construction Schedule**" hereunder, together with any subsequent changes thereto from time to time as approved in writing by Lender.

(d)    Approved Project Budget. Borrower, based on the Final Project Scope, the Approved Plans and Specifications and the Approved Construction Schedule, shall update and finalize the Project Budget (which shall include sufficient detail on a line item basis and a projected funding schedule on a monthly basis which details all Project Related Costs incurred since inception and to be incurred by Borrower until Final Completion), and such Project Budget, when approved by Lender pursuant to Section 3.01(c), shall be deemed the "**Approved Project Budget**" hereunder, together with any subsequent changes thereto from time to time as approved in writing by Lender.

(e)    Approval of Lender. Except as otherwise expressly set forth herein, in all instances in this Section 3.02 in which Lender is to approve or disapprove the development and finalization of the Final Project Documents or to decide whether other arrangements or terms related to the Final Project Documents are satisfactory or not satisfactory to Lender, such approval, disapproval or decision of Lender shall be determined in the sole discretion of Lender, and such decision shall not be deemed to have been given by Lender unless given in writing.

Section 3.03    **The Project Improvements.**

(a)    Except as expressly set forth in Section 3.07 hereof, each addition or modification to the Plans and Specifications shall be subject to approval in writing by Lender, and, to the extent required by law, by the appropriate Governmental Authorities. Borrower shall not commence any work on any stage or phase of the Project Improvements, unless all required Governmental Approvals have been issued or obtained from the appropriate Governmental Authorities with respect to the commencement of such stage or phase of construction. All Plans and Specifications as approved by Lender may be used by Lender with respect to the Project without the need or any consent by or payment to the Architect or any other Person after the occurrence of an Event of Default under the Loan Documents.

(b)    The Project Improvements shall be constructed and equipped in compliance with the requirements of the Governmental Authorities and the appropriate Board of Fire Underwriters, if any, or other similar body, if any, acting in and for the locality in which the

36

Property is situated. Compliance with the provisions of this paragraph and any other provisions of this Agreement relating to the construction and equipping of the Project Improvements shall be determined by Lender in its sole discretion.

(c)    At all times Lender, the Construction Consultant, and their respective agents and employees, shall have the right of entry and access to the Property to inspect the Project Improvements.

Section 3.04    **Commencement of Construction**. Borrower will continue construction of the Project Improvements after the Closing Date in accordance with the Construction Schedule and the Plans and Specifications.

Section 3.05    **Project Budget**. Each category of direct and indirect cost, including, without limitation, the major trades or project components within such category (the "**Line Items**"), shall be delineated in the Project Budget with those that are approved as Project Related Costs to be paid with Total Deemed Advances subject to availability and satisfaction of all applicable conditions to the making of Total Deemed Advances hereunder. Any changes to the Project Budget will be subject to Lender's approval. No portion of any Total Deemed Advance shall be paid (directly or indirectly) to any Borrower Party except as otherwise disclosed to Lender in writing.

Section 3.06    **Correction of Defects**. Borrower shall promptly correct (or cause the applicable Contractor to correct) all material defects in the Project Improvements or any material departure from the Plans and Specifications not previously approved by Lender to the extent required hereunder. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

Section 3.07    **Change Orders**. Borrower shall permit no Change Orders or deviations from the Plans and Specifications, Construction Schedule, Final Completion Date or Project Budget or any amendment, modification or supplement to any Major Contract (other than those of a *de minimis* nature) during construction without the prior written consent of Lender. Notwithstanding the foregoing or anything to the contrary in this Agreement, in no event will any Change Orders or deviations be permitted without Lender's prior written consent that (i) change the floor area or square footage of the Project (other than to a de minimis extent), (ii) change the basic layout of the Project Improvements, (iii) involve the use of materials, furniture, fixtures or equipment that is not at least of equal quality to that set forth in the final Plans and Specifications approved by Lender, (iv) constitutes a material change in the architectural or structural design or value of the Project, (iv) adversely affect the lien or priority of the lien of the Mortgage, (vi) are inconsistent with the requirements of any Legal Requirements or Operations Agreement, or would give any party under such agreements the right to terminate, rescind or modify the same, (vii) affect a structural element, building system or the exterior of the Project Improvements, or (viii) would affect the overall efficiency of operating systems of the Project. Any Change Orders shall clearly delineate the proposed changes to the Plans and Specifications with bubbles or other clear method of indicating revisions to the prior version.

37

Section 3.08    **Use of Cost Savings and Contingency**. (a) After the Initial Advance, Borrower may revise the Project Budget from time to time to reallocate Cost Savings available under any Line Item for costs in the Project Budget to the "Contingency" Line Item, provided that (i) Borrower shall deliver to Lender evidence satisfactory to Lender that the requirements set forth in the definition of "Cost Savings" have been satisfied and (ii) Borrower has obtained the prior written consent of Lender, which consent shall not be unreasonably withheld; and (b) after the Initial Advance, Borrower may use and reallocate "Contingency" in the Project Budget to other Line Items in the Project Budget, provided that, Borrower has obtained the prior written consent of Lender, which consent shall not be unreasonably withheld. After the Initial Advance, Borrower shall not have the right to reallocate as Cost Savings any amounts required to be set aside as Retainage for such Line Item.

Section 3.09    **Cost Overruns**. If Borrower becomes aware of any change in Project Related Costs which will increase a category or Line Item reflected on the Project Budget then allocated to such category or Line Item, Borrower shall notify Lender in writing and promptly submit to Lender a revised Project Budget no later than the submission of the next Draw Request, provided that such notice may be included in the next Draw Request. Lender shall not withhold or delay further Advances in connection with such cost increases so long as (i) such cost increases are properly allocated to Contingency, and (ii) Borrower funds any Shortfall if required pursuant to Section 2.01(f) hereof.

Section 3.10    **Review of Plans and Specifications**. Borrower hereby acknowledges and agrees that neither Lender nor the Construction Consultant's approval of any Plans and Specifications (or any revisions thereto), nor its inspection of the performance of the construction, nor its right to inspect such work, shall impose upon Lender, Lender and/or Construction Consultant any obligation or liability whatsoever with respect thereto, including, without limitation, any obligation or liability that might arise as a result of such work not being performed in accordance with applicable laws and/or requirements of public authorities or with the Plans and Specifications (and revisions thereto) approved by Lender and Construction Consultant or otherwise. The review or approval by Lender and Construction Consultant of any Plans and Specifications or any revisions thereto is solely for Lender's benefit, and is without any representation or warranty whatsoever with respect to the adequacy, correctness or efficiency thereof or otherwise. Neither the granting by Lender and/or Construction Consultant of its approval of any Plans and Specifications or any revisions thereto, shall in any manner constitute or be deemed to constitute a judgment or acknowledgment by Lender as to their legality or compliance with laws and/or requirements of public authorities.

Section 3.11    **Final Completion of the Improvements**. Borrower shall construct and complete the Project Improvements in accordance with the Plans and Specifications in all material respects (as may be amended in accordance with the Loan Documents), and shall construct and equip the Project Improvements in accordance with the Plans and Specifications, and in accordance with the provisions of this Agreement and free and clear of all liens, encumbrances and security instruments (other than the Permitted Encumbrances) and Final Completion shall occur by the Final Completion Date.

Section 3.12    **Final Completion**. Borrower shall achieve Final Completion by the Final Completion Date set forth in the most current version of the Approved Construction Schedule,

4938-8333-2636, v. 5

and Borrower shall deliver a certification to Lender (together with any available supporting documentation) on or before the achievement of Final Completion.

Section 3.13  **Close Out Items**. Borrower shall make available to Lender by electronic means copies of all operating manuals, warranties and other material documentation relating to the Property, the Improvements and any Personal Property used in accordance therewith to the extent in Borrower's possession or control and a final "as built" set of drawings and "as built" survey of the Project Improvements in a form acceptable to Lender within sixty (60) days of Final Completion.

Section 3.14  **Stored Materials**. Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Project Improvements (the "**Stored Materials**").

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants, as of the Closing Date as of the date of each Advance and each other date on which the representations and warranties set forth herein are required to be remade, that:

Section 4.01  **Legal Status and Authority**. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in the State; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property. Borrower has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Mortgage and the other Loan Documents on Borrower's part to be performed.

Section 4.02  **Validity of Documents**. (a) The execution, delivery and performance of this Agreement, the Note, the Mortgage and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to operate the Property, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Mortgage and the Assignment of Leases in appropriate land records in the State and except for Uniform Commercial Code filings relating to the security interest created hereby); (b) this Agreement, the Note, the Mortgage and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor; and (c) this Agreement, the Note, the Mortgage and the other Loan Documents constitute the

39

legal, valid and binding obligations of Borrower and Guarantor. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents.

Section 4.03  **Litigation**. There is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any Condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against any Borrower Party or against or affecting the Property or the Collateral.

Section 4.04  **Agreements**. Borrower is not a party to any agreement or instrument or subject to any restriction which would have a Material Adverse Effect. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property or the Collateral is bound. Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under this Agreement, the Mortgage, the Note and the other Loan Documents. There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations under the Loan Documents to an obligation owed to another party.

Section 4.05  **Financial Condition**.

(a)  Borrower is solvent and (i) Borrower has received reasonably equivalent value for the granting of the Mortgage; and (ii) Member has received reasonably equivalent value for the granting of the Pledge Agreement. No proceeding under Creditors Rights Laws with respect to any Borrower Party or the Property (or any portion thereof) or the Collateral (or any portion thereof) has been initiated.

(b)  No (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

(c)  No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

(d)  With respect to any loan or financing in which any Borrower Party or any Affiliate thereof has been directly or directly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety, none of such loans or financings has ever been (i) more than thirty (30) days in default or (ii) transferred to special servicing.

40

Section 4.06  **Disclosure**. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 4.07  **No Plan Assets**. As of the date hereof and until the Debt is repaid in accordance with the applicable terms and conditions hereof, (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, (c) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans and (d) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. As of the date hereof, neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

Section 4.08  **Not a Foreign Person**. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the IRS Code.

Section 4.09  **Business Purposes**. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes and the Mortgage provided in connection herewith does not fit within the definition of a "Mortgage" pursuant to Substitute House Bill No. 5577 Public Act No. 08-176.

Section 4.10  **Borrower's Principal Place of Business**. Borrower's principal place of business and its chief executive office as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct. Borrower does not have an organizational identification number assigned by the state of its incorporation or organization. Borrower is not subject to back-up withholding taxes.

Section 4.11  **Status of Property, Etc**.

(a)  Borrower has good, indefeasible and marketable title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same. Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements except for the Permitted Encumbrances.

(b)  Borrower has obtained all Permits, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(c)  The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar Legal Requirements.

(d)  Following Final Completion, the Property shall be served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

4938-8333-2636, v. 5

(e)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public. The Property has either direct access to such public roads or streets or access to such public roads or streets by virtue of a perpetual easement or similar agreement inuring in favor of Borrower and any subsequent owners of the Property.

(f)    The Property is served by public water and sewer systems.

(g)    The Property is free from damage caused by fire or other casualty. The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(h)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full. There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under applicable Legal Requirements could give rise to any such liens) affecting the Property which are or may be prior to or equal to the lien of the Mortgage.

(i)    Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created by this Agreement, the Note, the Mortgage and the other Loan Documents.

(j)    All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.

(k)    No portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts. No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

(l)    All the Improvements lie within the boundaries of the Land and any building restriction lines applicable to the Land and no improvements on adjoining properties encroach onto the Property.

(m)    To the best of Borrower's knowledge after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the

42

Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(n)    Borrower has not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been completed and paid for in full; (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full or (iii) attached any fixtures to the Property which have not been paid for in full. There are no outstanding or disputed claims for any Work Charges and there are no outstanding liens or security interests in connection with any Work Charges.

(o)    The Pledge Agreement will create valid first priority security interests in and to the Collateral, all in accordance with the terms thereof. Member's delivery of the certificates, together with the applicable undated limited liability company membership power, to Lender as set forth in Section 2 of the Pledge Agreement creates a first priority valid and perfected security interest in the Collateral.

Section 4.12    **Financial Information**. All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Guarantor and/or the Property (a) are true, complete and correct in all material respects; (b) accurately represent the financial condition of Borrower, Guarantor or the Property, as applicable, as of the date of such reports and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the GAAP throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or Guarantor from that set forth in said financial statements.

Section 4.13    **Condemnation**. No Condemnation or other similar proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of the access to the Property.

Section 4.14    **Separate Lots**. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 4.15    **Insurance**. Borrower has obtained and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

43

4938-8333-2636, v. 5

Section 4.16   **Use of Property**. The Property is to be used exclusively as a residential apartment building, and other appurtenant and related uses.

Section 4.17   **Leases and Rent Roll**. There are no Leases or other tenancies at the Property.

Section 4.18   **Filing and Recording Taxes**. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement, the Mortgage, the Note and the other Loan Documents, including, without limitation, the Mortgage, have been paid or will be paid, and, under current Legal Requirements, the Mortgage and the other Loan Documents are enforceable in accordance with their terms by Lender (or any subsequent holder thereof), except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.19   **Management Agreement**. The Property is self-managed by the Borrower and there is no Management Agreement in place.

Section 4.20   **Illegal Activity/Forfeiture**.

(a)   No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)   There has not been and shall never be committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Mortgage or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

Section 4.21   **Taxes**. Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 4.22   **Permitted Encumbrances**. None of the Permitted Encumbrances, individually or in the aggregate, materially interferes with the benefits of the security intended to be provided by this Agreement, the Mortgage, the Note and the other Loan Documents materially and adversely affects the value or marketability of the Property, impairs the use or the operation of the Property or impairs Borrower's ability to pay its obligations in a timely manner.

Section 4.23   **Third Party Representations**. Each of the representations and the warranties made by any Borrower Party in the other Loan Documents (if any) are true, complete and correct in all material respects.

4938-8333-2636, v. 5

Section 4.24   **Federal Reserve Regulations**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Mortgage, the Note or the other Loan Documents.

Section 4.25   **Investment Company Act**. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.26   **Fraudulent Conveyance**. Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

Section 4.27   **Embargoed Person**. As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, (a) none of the funds or other assets of any Borrower Party constitute (or will constitute) property of, or are (or will be) beneficially owned, directly or indirectly, by any Person or government that is the subject of economic sanctions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that transactions involving or the investment in any such Borrower Party (whether directly or indirectly) is prohibited by applicable law or the Loan made by Lender is in violation of applicable law ("**Embargoed Person**"); (b) no Embargoed Person has (or will have) any interest of any nature whatsoever in any Borrower Party, with the result that transactions involving or the investment in any such Borrower Party (whether directly or indirectly), is prohibited by applicable law or the Loan is in violation of applicable law; and (c) none of the funds of any Borrower Party have been (or will be) derived from any unlawful activity with the result that transactions involving or the investment in any such Borrower Party (whether directly or indirectly), is prohibited by applicable law or the Loan is in violation of

45

applicable law. Any violation of the foregoing shall, at Lender's option, constitute an Event of Default hereunder.

Section 4.28    **Anti-Money Laundering and Economic Sanctions**. Borrower hereby represents and warrants that each Borrower Party, each and every Person Affiliated with any Borrower Party and, to Borrower's knowledge, their directors, officers, employees or agents and any Person that has an economic interest in any Borrower Party, in each case, has not, and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, shall not: (a) itself be (or have been), be (or have been) owned or controlled by, or act for or on behalf of a Person or government that is the subject of, in each case, economic sanctions administered or enforced by the Office of Foreign Assets Control ("**OFAC**") of the Department of the Treasury, the Department of State, or other relevant sanctions authority ("**Sanctions**"); (b) fail to be (or have been) in full compliance with the requirements of the USA PATRIOT Act or other applicable anti-money laundering laws and regulations and all Sanctions; (c) fail to operate (or have operated) under policies, procedures and practices, if any, that are (i) in compliance with applicable anti-money laundering laws and regulations and Sanctions and (ii) available to Lender for Lender's review and inspection during normal business hours and upon reasonable prior notice; (d) be (or have been) in receipt of any notice from OFAC, the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States, in each case, claiming a violation or possible violation of applicable anti-money laundering laws and regulations and/or Sanctions; (e) be (or have been) the subject of Sanctions, including those listed as a Specially Designated National or as a "blocked" Person on any lists issued by OFAC and those owned or controlled by or acting for or on behalf of such Specially Designated National or "blocked" Person; (f) be (or have been) a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the USA PATRIOT Act; or (g) be (or have been) owned or controlled by or be (or have been) acting for or on behalf of, in each case, any Person who has been determined to be subject to the prohibitions contained in the USA PATRIOT Act. Borrower covenants and agrees that in the event Borrower receives any notice that any Borrower Party (or any of their respective beneficial owners or Affiliates) became the subject of Sanctions or is indicted, arraigned, or custodially detained on charges involving Sanctions, money laundering or predicate crimes to money laundering, Borrower shall immediately notify Lender. It shall be an Event of Default hereunder if any Borrower Party or any other party to any Loan Document becomes the subject of Sanctions or is indicted, arraigned or custodially detained on charges involving Sanctions, money laundering or predicate crimes to money laundering. All capitalized words and phrases and all defined terms used in the USA PATRIOT Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to applicable anti-money laundering laws and regulations (collectively referred as the "**Patriot Act**") are incorporated into this Section.

Section 4.29    **Bank Holding Company**. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

Section 4.30    **Intentionally Omitted**.

46

Section 4.31   **No Change in Facts or Circumstances; Disclosure**. All information submitted by (or on behalf of) any Borrower Party to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by any Borrower Party in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 4.32   **Intentionally Omitted**.

Section 4.33   **Construction Manager's Agreement**. (a) The Construction Manager's Agreement is in full force and effect and has not been amended; and (b) Borrower and Construction Manager are in compliance with their respective obligations under the Construction Manager's Agreement.

Section 4.34   **Major Contracts**. (a) Borrower is in compliance with its obligations under any subcontracts with Major Contractors; (b) the work to be performed by such subcontractors shall be the work called for by the Plans and Specifications; and (c) all work on the Project Improvements theretofore completed shall have been completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects.

Section 4.35   **Architect's Contract**. (a) The Architect's Contract shall be executed no later than the date of the second Advance hereunder (which agreement shall be acceptable to Lender in its sole discretion) and, upon execution thereof, the Architect's Contract is in full force and effect and has not been amended; (b) Intentionally Omitted; and (c) the work to be performed by Borrower's Architect under the Architect's Contract shall be the architectural services required to develop the Plans and Specifications and design the Project Improvements to be built in accordance with the Plans and Specifications and all architectural services required to complete the Project Improvements in accordance with the Plans and Specifications, all subject to and as provided for under the Architect's Contract.

Section 4.36   **Plans and Specifications**. Borrower has furnished to Lender true and complete sets of the current preliminary working drafts of the Plans and Specifications which, to Borrower's knowledge, comply in all material respects with all applicable Legal Requirements and all Governmental Approvals at the current stage of development of the Plans and Specifications.

Section 4.37   **Budget**. The current working version of the Project Budget which is subject to further development hereunder accurately reflects all presently anticipated Project Related Costs to achieve Final Completion (including, without limitation, issuance of a permanent certificate of occupancy). Upon the making of the Advances requested in Borrower's Requisition (or set forth in Borrower's Requisition with respect to Borrower Funds) in the manner set forth therein, all materials and labor therefore supplied or performed in connection with the Property will have been paid for in full (subject to the Retainage).

47

Section 4.38 **Feasibility**. The current working version of the Construction Schedule which is subject to further development hereunder is Borrower's most accurate and complete estimation of the schedule for Construction of the Improvements based upon the information presently available to Borrower and, to Borrower's knowledge, can be met as and when required thereunder.

Section 4.39 **Major Contracts**. (a) Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender; (b) each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto. None of Borrower or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute; (c) Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender; and (d) no Major Contract has as a party an Affiliate of Borrower and all fees and other compensation for services previously performed under contracts with Borrower Parties have been paid in full.

Section 4.40 **Construction Approvals**. Borrower represents and warrants to Lender that appropriate Governmental Authorities have issued all Governmental Approvals required for the commencement of construction of the Project Improvements in accordance with the Construction Schedule.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 4 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender. All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 5
## BORROWER COVENANTS

From the date hereof and until payment and performance in full of all obligations of Borrower under this Agreement, the Mortgage, the Note and the other Loan Documents or the earlier release of the lien of the Mortgage (and all related obligations) in accordance with the terms of this Agreement, the Mortgage, the Note and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

Section 5.01 **Existence**. Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution; (b) its rights to do business in the State and (c) its franchises and trade names, if any.

Section 5.02 **Legal Requirements**. Borrower shall promptly comply and shall cause the Property to comply with all Legal Requirements affecting the Property or the use thereof (which such covenant shall be deemed to (a) include Environmental Laws and (b) require Borrower to keep all Permits in full force and effect). Borrower shall from time to time, upon Lender's request, provide Lender with evidence satisfactory to Lender that the Property complies

48

with all Legal Requirements or is exempt from compliance with Legal Requirements. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

Section 5.03    **Maintenance and Use of Property**. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or altered (except for normal replacement of the Personal Property) without the prior written consent of Lender. Borrower shall perform (or shall cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 4.13 hereof and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land. Borrower shall operate the Property for the same uses as the Property is currently operated and Borrower shall not, without the prior written consent of Lender, (a) change the use of the Property or (b) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

Section 5.04    **Waste**. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the Loan. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

Section 5.05    **Taxes and Other Charges**.

(a)    Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 9.01 hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 9.01 hereof). Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in

49

4938-8333-2636, v. 5

good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Mortgage being primed by any related lien.

Section 5.06    **Litigation**. Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which might have a Material Adverse Effect.

Section 5.07    **Access to Property**. Borrower shall permit Lender, the Construction Consultant and their respective agents, representatives and employees to enter upon the Property, inspect the Project Improvements and all materials to be used in the construction thereof, to examine the Plans and Specifications or any Contracts, Governmental Approvals or other documentation relating to the Project requested by Lender or the Construction Consultant and to perform such testing as Lender or Construction Consultant deems necessary or desirable at the Project at all times at which Lender or the Construction Consultant deems necessary or desirable upon reasonable advance notice to Borrower. Borrower shall cooperate, and cause the Construction Manager and the Contractors to cooperate, with Lender and Construction Consultant to enable each Person to perform its functions hereunder.

Section 5.08    **Notice of Default**. Borrower shall promptly advise Lender of any material adverse change in Borrower's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

Section 5.09    **Cooperate in Legal Proceedings**. Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Mortgage or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

Section 5.10    **Performance by Borrower**. Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Mortgage, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

50

Section 5.11 **Awards**. Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements and the payment by Lender of the expense of an appraisal on behalf of Borrower in case of a Casualty or Condemnation affecting the Property) out of such Awards or Insurance Proceeds.

Section 5.12 **Books and Records; Reporting**.

(a)    Borrower shall furnish (or causes to be furnished) to Lender: (i) following Final Completion, quarterly certified rent rolls within ten (10) days after the end of each calendar quarter; (ii) quarterly operating statements of the Property detailing the revenues received, the expenses incurred and the components of cash flow before and after Debt Service and major capital improvements for the period of calculation and containing appropriate year-to-date information, within ten (10) days after the end of each calendar quarter; (iii) within ninety (90) days after the close of each fiscal year of Borrower, (A) with respect to Borrower, an annual balance sheet, and statement of cash flow (each of which shall not include any Person other than Borrower); and (B) an annual operating statement of the Property (detailing the revenues received, the expenses incurred and the components of cash flow before and after Debt Service and major capital improvements for the period of calculation and containing appropriate year-to-date information); (iv) within ninety (90) days after close of each calendar year, personal financial statements of the Guarantor; (v) within thirty (30) days of filing, but in any event, no later than November 15th of each calendar year, a copy of the signed income tax returns of the Borrower and Guarantor (with all schedules attached); (vi) by no later than December 1st of each calendar year, an annual operating budget for the next succeeding calendar year presented on a monthly basis consistent with the annual operating statement described above for the Property, including cash flow projections for the upcoming year and all proposed capital replacements and improvements; (vi) a property management report for the Property, showing the number of inquiries made and/or rental applications received from Tenants or prospective Tenants and deposits received from Tenants and any other information requested by Lender, but no more frequently than quarterly; and (vii) an accounting of all security deposits held in connection with any Lease of any part of the Property, including the name and identification number of the accounts in which such security deposits are held, the name and address of the financial institutions in which such security deposits are held and the name of the Person to contact at such financial institution, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions.

(b)    Borrower shall, within thirty (30) days of request, furnish Lender (and shall cause Guarantor to furnish to Lender) with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender. Borrower shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records.

(c)    Borrower agrees that (i) Borrower shall keep adequate books and records of account and (ii) all Required Financial Items to be delivered to Lender pursuant to this Section 5.12 shall: (A) be complete and correct; (B) present fairly the financial condition of the applicable Person; (C) disclose all liabilities that are required to be reflected or reserved against; and (D) be prepared in the form required by Lender and certified by Borrower or Guarantor, as

the case may be. Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower in a writing delivered to Lender. Borrower agrees that all Required Financial Items shall not contain any misrepresentation or omission of a material fact.

(d)    Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 5.12 and the other financial reporting items required by this Agreement (each, a "**Required Financial Item**" and, collectively, the "**Required Financial Items**"). In the event Borrower fails to deliver to Lender any of the Required Financial Items within the time frame specified herein (each such event, a "**Reporting Failure**"), the same shall, at Lender's option, constitute an immediate Event of Default hereunder.

Section 5.13    **Estoppel Certificates**.

(a)    After request by Lender, Borrower, within ten (10) days of such request, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan; (ii) the unpaid principal amount of the Loan; (iii) the rate of interest of the Loan; (iv) the terms of payment and maturity date of the Loan; (v) the date installments of interest and/or principal were last paid; (vi) that, except as provided in such statement, no Event of Default exists; (vii) that this Agreement, the Note, the Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification; (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof; (ix) that all Leases are in full force and effect and have not been modified (or if modified, setting forth all modifications); (x) the date to which the Rents thereunder have been paid pursuant to the Leases; (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases; and, if any of the lessees are in default, setting forth the specific nature of all such defaults; (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease; and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations created and evidenced hereby and by the Mortgage or the Property.

(b)    Intentionally Omitted.

(c)    In connection with any Secondary Market Transaction, at Lender's request, Borrower shall provide an estoppel certificate to any Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

(d)    Intentionally Omitted.

Section 5.14    **Leases and Rents**.

(a)    All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms with unaffiliated, third parties (unless otherwise consented to by

Lender), (iii) provide that such Lease is subordinate to the Mortgage and that the lessee will attorn to Lender and any purchaser at a foreclosure sale; (iv) not contain any terms which would have a Material Adverse Effect; and (v) is written on the standard form of lease approved by Lender. Notwithstanding anything to the contrary contained herein, Borrower shall not, without the prior written approval of Lender (which approval shall not be unreasonably withheld or delayed), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any Lease.

(b)      Without limitation of subsection (a) above, Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate Sections 5.14(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

Section 5.15   **Management Agreement**.

(a)      The management of the Property shall be by either: (i) Borrower or Affiliated Manager for so long as Borrower or the Affiliated Manager is managing the Property in a first class, professional and competent manner; or (ii) a professional property management company approved by Lender. Such management by an Affiliated Manager or a professional property management company shall be pursuant to a written agreement approved by Lender. Borrower shall give Lender prompt written notice of the occurrence of a default under any Management Agreement then in effect. In no event shall any Manager be appointed, removed or replaced or the terms of any Management Agreement modified or amended without the prior written consent of Lender.

(b)      If (i) the Borrower or an Affiliated Manager fails to manage the Property in a first class, professional and competent manner; (ii) an Event of Default shall have occurred and be continuing; (iii) a default shall have occurred under any Management Agreement then in effect; or (iv) if the Manager shall (A) be insolvent or a debtor in a bankruptcy proceeding, (B) be in default under its Management Agreement beyond any applicable notice and cure period or (C) have engaged in gross negligence, fraud or willful misconduct, then Lender shall have the right to terminate, or to direct Borrower to terminate, such Management Agreement and to retain, or to direct Borrower to retain, a New Manager approved by Lender.

(c)      All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to this Agreement, the Note and the other Loan Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any

53

other purpose unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied. If at any time Lender consents to the appointment of a New Manager, such New Manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender.

Section 5.16    **Payment for Labor and Materials**.

(a)    Subject to Section 5.16(b) below, Borrower will promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a "**Work Charge**") and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Mortgage, except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Work Charge, the applicability of any Work Charge to Borrower or to the Property or any alleged non-payment of any Work Charge and defer paying the same, provided that (i) no Event of Default has occurred and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay (or cause to be paid) any such contested Work Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Work Charge from the Property or Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Work Charge, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to pay for such Work Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Work Charge is finally established or the Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

Section 5.17    **Performance of Other Agreements**. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto.

Section 5.18    **Debt Cancellation**. Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

54

Section 5.19  **ERISA.**

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Mortgage, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true: (A) Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2); (B) Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or (C) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan". The terms in quotes above are defined in Section 4.07 of this Agreement.

Section 5.20  **No Joint Assessment**. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property; or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.21  **Alterations**. Borrower shall obtain Lender's prior written consent for any alterations or Improvements (other than for purposes of achieving Final Completion of the Project in accordance with this Agreement).

Section 5.22  **Intentionally Omitted**.

Section 5.23  **Insurance**. Borrower shall, subject to and in accordance with the terms of Section 8.01, cause all Policies to remain in full force and effect throughout the term of the Loan and shall pay or cause to be paid all Insurance Premiums in full on or prior to the applicable due dates therefor in accordance with the terms of the Policies.

Section 5.24  **Distributions**. Borrower agrees that there shall be no distributions to any of its direct or indirect owners (legal or beneficial) until Borrower satisfies all of its then current due and payable obligations hereunder and under the other Loan Documents, including without limitation, Borrower's obligation to pay Debt Service due in connection with the Loan, deposits

into Reserve Funds required pursuant to this Agreement, maintenance costs, and operating expenses of the Property set forth in the budget previously submitted to and, if required pursuant to the terms hereof, approved by Lender.

Section 5.25  **Financial Covenants**. The Maximum Loan Amount hereunder shall at no time exceed, (a) an "as stabilized" value of the Property after Final Completion and occupancy, as determined by Lender in its sole discretion, of seventy (70%) and/or (b) an accretive basis of the Project, as determined by Lender in its sole discretion, of ninety-five percent (95%).

Section 5.26  **Intentionally Omitted**.

Section 5.27  **Intentionally Omitted**.

Section 5.28  **Listing of Property**. On or before June 15, 2025, Borrower will list the Property for sale, with a reputable broker, until such time as the Property is sold in an arms-length agreement with a bona fide, independent third party.

Section 5.29  **Construction Contracts**.

(a)    Architect's Contract. Borrower shall (i) enforce the provisions of the Architect's Contract in the best interests of the Project using sound business judgment, (ii) waive none of the obligations of Borrower's Architect thereunder, (iii) do no act which would relieve Borrower's Architect from its obligations under the Architect's Contract and (iv) make no amendments to the Architect's Contract without the prior written approval of Lender. Upon request by Lender, Borrower shall cause Borrower's Architect to provide Lender with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Lender.

(b)    Construction Manager's Agreement. Borrower shall (i) enforce the provisions of the Construction Manager's Agreement and all Contracts in the best interests of the Project using sound business judgment, (ii) waive none of the obligations of Borrower's Construction Manager thereunder, (iii) do no act which would relieve Borrower's Construction Manager from its obligations under the Construction Manager's Agreement or any other Contract and (iv) make no amendments to the Construction Manager's Agreement or any other Contract without the prior written approval of Lender. Upon request by Lender, Borrower shall cause Borrower's Construction Manager to provide Lender with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Lender.

(c)    GMP/Fixed Price Contracts. Upon entering into any guaranteed maximum price or fixed price contract, Borrower shall (i) enforce the provisions of the such contract in the best interests of the Project using sound business judgment, (ii) waive none of the obligations of Borrower's Contractor thereunder, (iii) do no act which would relieve Borrower's Contractor from its obligations thereunder and (iv) make no amendments to such contract without the prior written approval of Lender. Upon request by Lender, Borrower shall cause Borrower's Contractor to provide Lender with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Lender.

Section 5.30  **Completion of Construction**. Borrower shall: (i) diligently pursue construction of all of the Project Improvements to Final Completion on or prior to the Final

56

Completion Date, all in accordance with the Plans and Specifications, Construction Schedule and in compliance with all restrictions, covenants and easements affecting the Property, all applicable Legal Requirements, and all applicable Governmental Approvals, and in accordance with all terms and conditions of the Loan Documents; and (ii) promptly pay all sums and to perform such duties as may be necessary to complete such construction of the Project Improvements substantially in accordance with the Plans and Specifications and in compliance with all restrictions, covenants and easements affecting the Property, all Legal Requirements and all applicable Governmental Approvals, and in accordance with all terms and conditions of the Loan Documents free from any Liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith. Borrower agrees to use commercially reasonable good faith efforts to obtain a permanent certificate of occupancy for the entire Property as soon as reasonably practicable.

Section 5.31    **Construction Consultant**.

(a)    Borrower shall permit Lender to retain the Construction Consultant at the cost of Borrower to perform the following services on behalf of Lender: (i) prepare the Project Reports; (ii) to review and advise Lender whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory; (iii) to review Draw Requests and Change Orders; (iv) to make inspections and visits in accordance with Section 5.07; (v) to attend all meetings of any nature relating to the construction of the Project; (vi) to review any Contracts, Governmental Approvals or other documentation relating to the Project requested by Lender or the Construction Consultant; and (vii) to take such other actions deemed necessary by Lender or the Construction Consultant in order to effectively administer and review the Project.

(b)    The fees of the Construction Consultant shall be paid by Borrower (and expenses incurred by Lender on account thereof shall be reimbursed to Lender) as part of the next Advance, and if not requested by Borrower, Lender can approve Advances to pay such costs, after Borrower receives the Construction Consultant's invoice approved by Lender for payment to the extent such fees are set forth in the Project Budget or, if not set forth in the Project Budget, within ten (10) days of request therefor, but none of Lender or the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Project Improvements. None of Lender or the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Project Improvements or the absence therefrom of defects.

(c)    Borrower acknowledges that (i) the Construction Consultant shall be retained by Lender to act as a consultant and only as a consultant to Lender in connection with the construction of the Project Improvements and has no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender or Borrower, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not

57

given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Lender reserves the right in its sole discretion exercised in good faith to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other Person, and (v) Lender reserves the right to replace the Construction Consultant with another Construction Consultant at any time and without prior notice to or approval by Borrower.

Section 5.32  **Laborers, Subcontractors and Materialmen**. Borrower shall notify Lender immediately, and in writing, if Borrower receives any default notice, notice of lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen. Borrower will also furnish to Lender at any time and from time to time upon demand by Lender, lien waivers in conformity with the applicable Legal Requirements and otherwise in form satisfactory to Lender bearing a then current date from the Contractors.

Section 5.33  **Ownership of Personalty**. Borrower shall furnish to Lender, if Lender so requests, photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

Section 5.34  **Purchase of Material Under Conditional Sale Contract**. Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Property, unless previously authorized by Lender in writing.

Section 5.35  **Construction Management**.

(a)    Construction Management Agreement. Borrower shall (i) cause the Construction Manager to manage the development and construction of the Project Improvements and perform its duties under and in accordance with the Construction Manager's Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Construction Manager's Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Construction Manager's Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Construction Manager's Agreement, (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by the Construction Manager under the Construction Manager's Agreement, (vi) cause Construction Manager to ensure that the work to be performed by each Contractor under each Construction Contract is the work called for by the Plans and Specifications (other than *de minimis* changes to reflect site conditions) and (vii) ensure that all work on the Project Improvements shall be completed in substantial accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects. Borrower shall, upon request by Lender, cause Construction Manager to provide Lender and Construction Consultant with reports in regard to the status of construction of the Project Improvements, in such form and detail and in such intervals as may be requested by Lender. If Borrower shall default in the

58

performance or observance of any material term, covenant or condition of the Construction Manager's Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Construction Manager's Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Construction Manager's Agreement on the part of Borrower to be performed or observed.

(b)    Prohibition Against Termination or Modification of Construction Contracts. Except as otherwise permitted herein, Borrower shall not (i) surrender, terminate, cancel, materially modify, renew or extend the Construction Manager's Agreement, the Architect's Contract, or the Major Contracts, (ii) enter into any other agreement relating to the development or construction of the Project Improvements with the Construction Manager, Borrower's Architect, or any other Person, (iii) consent to the assignment by the Construction Manager of its interest or obligations under the Construction Manager's Agreement, (iv) consent to the assignment by the Architect of its interest or obligations under the Architect's Contract, or (v) waive or release any of its rights and remedies under the Construction Manager's Agreement, the Architect's Contract or the Major Contracts, in each case, without the express written consent of Lender.

Section 5.36    **Minimum Invested Equity**. Guarantor shall at all times from and after Final Completion have and maintain an indirect equity contribution and investment in Borrower of no less than the Minimum Invested Equity.

Section 5.37    **Protection of the Property**. Borrower shall employ suitable means to protect the Property and all tools and building materials stored on the Property from theft or vandalism.

Section 5.38    **Signage**. Promptly following the date hereof, Borrower shall erect, at Borrower's sole cost and expense and subject to applicable Legal Requirements, a sign satisfactory to Lender at a location on the Property satisfactory to Lender, which sign shall be furnished by Borrower, at Borrower's sole cost and expense, and which shall contain Lender's address and otherwise conform to Lender's specifications and shall recite, among other things, that Lender is providing the financing for the Project.

## ARTICLE 6
## ENTITY COVENANTS

Section 6.01    **Single Purpose Entity/Separateness**.

(a)    Borrower has not and will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

4938-8333-2636, v. 5

(iii)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(iv)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent is first obtained);

(v)    own any subsidiary, or make any investment in, any Person;

(vi)    commingle its funds or assets with the funds or assets of any other Person;

(vii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt. No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(viii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates). Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (A) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (B) such assets shall be listed on Borrower's own separate balance sheet. Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(ix)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(x)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xi)    assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(xii)    make any loans or advances to any Person;

(xiii)    fail to file its own tax returns (unless prohibited by applicable Legal Requirements from doing so);

4938-8333-2636, v. 5

(xiv)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) conduct its business solely in its own name, (C) hold its assets in its own name or (D) correct any known misunderstanding regarding its separate identity;

(xv)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so);

(xvi)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, the prior unanimous written consent of its board of directors or managers, as applicable (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Borrower;

(xvii)    fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(xviii)    fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds or fail to maintain a sufficient number of employees in light of its contemplated business operations (in each case to the extent there exists sufficient cash flow from the Property to do so);

(xix)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable; or

(xx)    identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it.

(b)    Intentionally Omitted.

Section 6.02    **Change of Name, Identity or Structure**. Borrower shall not change (or permit to be changed) Borrower's (a) name; (b) identity (including its trade name or names); (c) principal place of business set forth on the first page of this Agreement or (d) if not an individual, Borrower's organizational structure or state of formation, without, in each case, notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's organizational structure or state of formation, without first obtaining the prior written consent of Lender. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

Section 6.03    **Business and Operations**. Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership,

61

maintenance, management and operation of the Property. Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

## ARTICLE 7
## NO SALE OR ENCUMBRANCE

Section 7.01  **Transfer Definitions**. As used herein and in the other Loan Documents, "**Restricted Party**" shall mean Borrower, Guarantor, Member any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Guarantor, Member, any Affiliated Manager or any non-member manager; and a "**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

Section 7.02  **No Sale/Encumbrance**.

(a)    It shall be an Event of Default hereof if, without the prior written consent of Lender, a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents) occurs, a Sale or Pledge of an interest in any Restricted Party occurs and/or Borrower shall acquire any real property in addition to the real property owned by Borrower as of the Closing Date (each of the foregoing, collectively, a "**Prohibited Transfer**"), other than (i) pursuant to Leases of space in the Improvements to Tenants in accordance with the provisions of Section 5.14 and (ii) as may be permitted pursuant to the express terms of this Article 7.

(b)    A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any (A) Leases or any Rents or (B) Intentionally Omitted; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of Manager or the engagement of a New Manager, in each case, other than in accordance with Section 5.15; or (viii) Intentionally Omitted.

62

Section 7.03    **Assumptions**. The Loan is not assumable.

Section 7.04    **Lender's Rights**. Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed Prohibited Transfer; (b) payment of a transfer fee and all of Lender's expenses incurred in connection with such Prohibited Transfer; (c) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Article 5; and/or (d) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender. All expenses incurred by Lender shall be payable by Borrower whether or not Lender consents to the Prohibited Transfer. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent. This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

Section 7.05    **Economic  Sanctions,  Anti-Money  Laundering  and  Transfers**. Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Sections 4.27 and 4.28 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 7 to be complied with at all times. Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party.

## ARTICLE 8
### INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

Section 8.01    **Insurance**.

(a)    Borrower shall obtain and maintain, or cause to be obtained and maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)    following Final Completion of the Project Improvements, insurance with respect to the Improvements and the Personal Property insuring against any peril now or hereafter included within the classification "All Risk" or "Special Perils" (including, without limitation, fire, lightning, windstorm, hail, terrorism and similar acts of sabotage, explosion, riot, riot attending a strike, civil commotion, vandalism, aircraft, vehicles and smoke), in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings), with a waiver of depreciation; (B) containing an agreed amount endorsement waiving all co-insurance provisions; (C) providing for no deductible in excess of $5,000; (D) at all times insuring against at least those hazards that are commonly insured against under a "special causes of loss" form of policy, as the same shall exist on the date hereof, and together with any increase in the scope of coverage provided under such form after the date hereof; and (E) providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an

63

"Ordinance or Law Coverage" endorsement. The Full Replacement Cost shall be re-determined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this subsection;

(ii)    commercial general liability insurance against all claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 and a per occurrence limit of not less than $1,000,000, with no deductible or self-insured retention; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; (5) contractual liability covering the indemnities contained in Article 12 hereof to the extent the same is available; and (6) acts of terrorism and similar acts of sabotage;

(iii)    following Final Completion of the Project Improvements, loss of rents and/or business interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Sections 8.01(a)(i), (iv) and (vi) through (viii); (C) in an amount equal to one hundred percent (100%) of the projected gross income from the Property (on an actual loss sustained basis) for a period continuing until the Restoration of the Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on Lender's determination of the projected gross income from the Property for a twelve (12) month period; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. All insurance proceeds payable to Lender pursuant to this Subsection (the "**Rent Loss Proceeds**") shall be held by Lender in an account (which shall be deemed to be included within the definition of the "Accounts" hereunder) and shall be applied to the Obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents except to the extent such amounts are actually paid out of the Rent Loss Proceeds of such loss of rents and/or business interruption insurance;

(iv)    at all times prior to Final Completion of the Project Improvements and at any time during which other structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in Section 8.01(a)(i) written

64

in a so-called builder's risk completed value form (1) on a non-reporting basis; (2) against all risks insured against pursuant to Section 8.01(a)(i); (3) including permission to occupy the Property and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)     workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    comprehensive boiler and machinery insurance covering all mechanical and electrical equipment and pressure vessels and boilers in an amount not less than their replacement cost or in such other amount as shall be reasonably required by Lender;

(vii)   if any portion of the Improvements is at any time located in an area identified by (A) the Federal Emergency Management Agency in the Federal Register as an area having special flood hazards and/or (B) the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "**Flood Insurance Acts**"), flood hazard insurance in an amount equal to the maximum limit of coverage available for the Property under the Flood Insurance Acts (or such higher amount as Lender may require in its sole discretion);

(viii)  earthquake, sinkhole and mine subsidence insurance, if required, in amounts equal to two times (2x) the probable maximum loss of the Property as determined by Lender in its sole discretion and in form and substance satisfactory to Lender, provided that the insurance pursuant to this Subsection (viii) shall be on terms consistent with the all risk insurance policy required under Section 8.01(a)(i); and

(ix)    such other insurance and in such amounts as Lender from time to time may reasonably request.

(b)     All insurance provided for in Section 8.01(a) hereof shall be obtained under valid and enforceable policies (the "**Policies**" or in the singular, the "**Policy**"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized and admitted to do business in the state in which the Property is located and approved by Lender. The insurance companies must have a general policy rating of "A" or better and a financial class of "VIII" or better by A.M. Best Company, Inc. (each such insurer shall be referred to below as a "**Qualified Insurer**"). Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 8.01(a), Borrower shall deliver certified copies of the Policies marked "premium paid" accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"); provided, however, that in the case of renewal Policies, Borrower may furnish Lender with binders and Acord Forms 25 and 28 Certificates therefor to be followed by the original Policies when issued.

4938-8333-2636, v. 5

(c)    Borrower shall not obtain (or permit to be obtained) (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender, Lender's interest is included therein as provided in this Agreement, such Policy is issued by a Qualified Insurer and such Policy includes such changes to the coverages and requirements set forth herein as may be required by Lender (including, without limitation, increases to the amount of coverages required herein) or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 8.01(a) to be furnished by, or which may be required to be furnished by, Borrower. In the event Borrower obtains (or causes to be obtained) separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 8.01(a). Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 8.01.

(d)    All Policies of insurance provided for or contemplated by Section 8.01(a), shall name Borrower as the insured and, in the case of liability Policies (except for the Policy referenced in Section 8.01(a)(v)), shall name Lender as an additional insured, as their respective interests may appear, and, in the case of property damage Policies (including, but not limited to, terrorism, rent loss, business interruption, boiler and machinery, earthquake and flood insurance), such Policies shall name Lender as mortgagee/lender's loss payable by a standard noncontributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All Policies of insurance provided for in Section 8.01(a) shall contain clauses or endorsements to the effect that:

(i)    the following shall in no way affect the validity or enforceability of the Policy insofar as Lender is concerned: (A) any act or negligence of Borrower, of anyone acting for Borrower or of any other Person named as an insured, additional insured and/or loss payee; (B) any foreclosure or other similar exercise of remedies and (C) the failure to comply with the provisions of the Policy which might otherwise result in a forfeiture of the insurance or any part thereof;

(ii)    the Policy shall not be changed (other than to increase the coverage provided thereby), terminated or cancelled without at least thirty (30) days' written notice (via certified mail, postage prepaid, return receipt requested) to Lender and any other party named therein as an insured;

(iii)    the issuer(s) of the Policy shall give written notice to Lender (via certified mail, postage prepaid, return receipt requested) if the Policy has not been renewed ten (10) days prior to its expiration;

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments or commissions thereunder and that the related issuer(s) waive any related claims to the contrary;

66

4938-8333-2636, v. 5

(v)    Lender shall, at its option and with no obligation to do so, have the right to directly pay Insurance Premiums in order to avoid cancellation, expiration and/or termination of the Policy due to non-payment of Insurance Premiums; and

(vi)    the Policy shall not exclude coverage for acts of terror or similar acts of sabotage.

(f)    Within five (5) days of written request by Lender, Borrower shall furnish to Lender a statement certified by Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender. Borrower shall promptly forward to Lender a copy of each written notice received by any Borrower Party of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage and shall bear interest at the Default Rate.

(h)    In the event of a foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest exclusively in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

(i)    Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or insurance proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of a Casualty or Condemnation affecting the Property or any part thereto) out of such Awards or insurance proceeds.

Section 8.02    **Casualty**. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property and otherwise comply with the provisions of Section 8.04. Borrower shall pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds. Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

Section 8.03    **Condemnation**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property of which

67

Borrower has knowledge and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 8.04. Borrower shall pay all costs of Restoration whether or not such costs are covered by the Net Proceeds. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 8.04    **Restoration**. The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Lender in its sole discretion, agrees to provide the Net Proceeds to Restoration, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 8.04.

(i)    The Net Proceeds shall be made available for Restoration provided that each of the following conditions are met throughout the term of the Restoration: (A) no Event of Default shall have occurred and be continuing; (B) as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs), Borrower shall engage a duly licensed, bonded and insured architect and general contractor for the Restoration, pursuant to architectural and construction contracts approved by Lender and shall commence (or shall cause the commencement of) the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after the issuance of a building permit with respect thereto) and shall diligently pursue the same to completion in compliance with all applicable Legal Requirements, including, without limitation, all applicable Environmental Laws; (C) as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs), Borrower shall deliver to Lender all plans and specifications required in connection with the Restoration, which such plans shall be subject to the prior review and acceptance in all respects by the Casualty Consultant; (D) the Restoration will be completed on or before the earliest to occur of (1) twelve (12) months prior to the Maturity Date, (2) six (6) months after the occurrence of such Casualty or Condemnation, (3) such time as may be required under applicable Legal Requirements, or (4) the expiration of any Rent Loss Proceeds maintained for the Property; (E) Borrower and Guarantor shall execute and deliver to Lender a completion guaranty in form and substance satisfactory to Lender and its counsel pursuant to the provisions of which Borrower and

68

Guarantor shall jointly and severally guaranty to Lender the lien-free completion by Borrower of the Restoration in accordance with the provisions of this Section 8.04; (F) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (G) Borrower shall deliver to Lender any documents requested by Lender in connection with the Restoration.

(ii)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 8.04, shall constitute additional security for the Debt and other obligations under this Agreement, the Mortgage, the Note and the other Loan Documents. The Net Proceeds (other than the Rent Loss Proceeds) shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (i) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the related Restoration item have been paid for in full, and (ii) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration shall be subject to prior review and acceptance by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower. Borrower shall have the right to settle all claims under the Policies jointly with Lender, provided that (i) no Event of Default exists, (ii) Borrower promptly and with commercially reasonable diligence negotiates a settlement of any such claims and (iii) the insurer with respect to the Policy under which such claim is brought has not raised any act of the insured as a defense to the payment of such claim. If an Event of Default exists, Lender shall, at its election, have the exclusive right to settle or adjust any claims made under the Policies in the event of a Casualty.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Restoration Retainage. The term "**Restoration Retainage**" as used in this Section 8.04 shall mean an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant. The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 8.04, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Restoration Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 8.04 and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental

authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage, provided, however, that Lender will release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of the Mortgage. If required by Lender, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 8.04 shall constitute additional security for the Debt and other obligations under this Agreement, the Mortgage, the Note and the other Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 8.04, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under this Agreement, the Mortgage, the Note or any of the other Loan Documents.

(b)     All Net Proceeds not (i) made available for the Restoration or (ii) returned to Borrower as excess Net Proceeds pursuant to Section 8.04(vii) above shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper. If Lender shall receive and retain Net Proceeds, the lien of the Mortgage shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

## ARTICLE 9
## RESERVE FUNDS

Section 9.01    **Tax and Insurance Funds**. Borrower shall pay (or cause to be paid) to Lender on each Monthly Payment Date, at the option of Lender following the occurrence of an

70

4938-8333-2636, v. 5

Event of Default, an amount equal to (a) one-twelfth (1/12th) of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months assuming that said Taxes are to be paid in full on the Tax Payment Date (the "**Monthly Tax Deposit**"); and (b) one-twelfth (1/12th) of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the "**Monthly Insurance Deposit**"), each of which such deposits shall be held in the Tax Account or the Insurance Account, as applicable (amounts held in the Tax Account and the Insurance Account are collectively herein referred to as the "**Tax and Insurance Funds**"). If, at any time, Lender determines that amounts on deposit or scheduled to be deposited in (i) the Tax Account will be insufficient to pay all applicable Taxes in full on the Tax Payment Date and/or (ii) the Insurance Account will be insufficient to pay all applicable Insurance Premiums in full on the Insurance Payment Date, Borrower shall make a payment sufficient to cover such shortfall amount into the Tax Account or the Insurance Account, as applicable. Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes or Insurance Premiums, as applicable directly from the appropriate taxing authority or insurance provider, as applicable. Provided there are sufficient amounts in the Tax Account and Insurance Account, respectively, and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Tax and Insurance Funds to the payment of such Taxes and Insurance Premiums. If the amount of the Tax and Insurance Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 5.05 and 8.01 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Funds.

Section 9.02  **Rebalancing Reserve Funds**. As and when required under Section 2.01(f) Borrower shall deposit into an account controlled by Lender (the "**Rebalancing Reserve Account**") such amounts as required to be deposited by Borrower pursuant to Section 2.01(f) to be disbursed to Borrower in express accordance with Section 2.01(f). Provided no Default Event of Default has occurred and is continuing and that there is no Shortfall or Interest Shortfall, amounts on deposit in the Rebalancing Reserve Account from time to time shall be disbursed to Borrower in the same manner as if the same were Advances under this Agreement (and, for the avoidance of doubt, subject to the same conditions precedent to the receipt of Advances hereunder). So long as any amounts are on deposit in the Rebalancing Reserve Account from time to time, Lender shall not make any further Advances of the Loan until all such amounts are utilized in accordance with the immediately preceding sentence. Amounts deposited from time to time in the Rebalancing Reserve Account pursuant to this Section 9.02 are referred to herein as the "**Rebalancing Reserve Funds**".

Section 9.03  **Interest Reserve Funds**. On the Closing Date, Borrower shall deposit into an account maintained and controlled by Lender, Four Hundred Thirty-One Thousand Seven Hundred Eighty-Six and 67/100 Dollars ($431,786.67) (the "**Interest Reserve Account**") provided that, such amount shall be increased by Borrower upon five (5) days written request therefor by Lender, following Lender's review of the operating statements of the Borrower evidencing its ability to service the Debt. At any time that Lender estimates in its sole discretion that the Interest Reserve Funds will not be sufficient to pay at least three (3) months of the

71

Monthly Debt Service Payment Amounts due on each Payment Date through the Maturity Date, Lender shall notify Borrower (the "**Interest Shortfall Notice**") of such determination and Borrower shall deposit such additional amount that Lender notifies Borrower it estimates in its sole discretion is sufficient to make up such deficiency in the Interest Reserve Account within five (5) days of the delivery of the Interest Shortfall Notice (the amount of such deficiency being herein referred to as the "**Interest Shortfall**"). For the avoidance of doubt, an Interest Shortfall may exist whether or not Lender delivers an Interest Shortfall Notice to Borrower. Failure to make such deposit as set forth herein shall be an immediate Event of Default. Amounts deposited from time to time in the Interest Reserve Account pursuant to this Section 9.03 are referred to herein as the "**Interest Reserve Funds**". Provided no Default or Event of Default has occurred and is continuing, Lender shall apply amounts, if any, in the Interest Reserve Account toward the Monthly Debt Service Payment Amount due under each Note on each Monthly Payment Date in accordance with the terms of this Agreement.

Section 9.04    **The Accounts Generally**.

(a)    Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security for the Debt. The provisions of this Section (together with the other related provisions of the other Loan Documents) are intended to give Lender "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC. Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein. The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender. Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) Reserve Funds on account of the liabilities, costs, work and other matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

(b)    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

4938-8333-2636, v. 5

(c)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence and during the continuance of an Event of Default, without notice from Lender (i) Borrower shall have no rights in respect of the Accounts and (ii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Mortgage, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Mortgage, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)     The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorney's fees and expenses) arising from or in any way connected with the Accounts, the sums deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; provided however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)     Interest accrued on any Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.

(g)     Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the fees and expenses of legal counsel to Lender or Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

## ARTICLE 10
## EVENTS OF DEFAULT; REMEDIES

Section 10.01 **Event of Default**. The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)     if (i) any monthly Debt Service payment is not paid within five (5) days of when due; (ii) the Debt is not paid in full on the Maturity Date; (iii) any deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid within five (5) days of when due or (iv) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

73

4938-8333-2636, v. 5

(b)    if any of the Taxes or Other Charges are not paid when the same are due and payable except to the extent (i) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender failed to pay the Taxes or Other Charges in question when required hereunder; (ii) Lender's access to such sums was not restricted or constrained in any manner and (iii) no Event of Default was continuing;

(c)    if the Policies are not kept in full force and effect or if evidence of the same is not delivered to Lender as provided in Section 8.01 hereof;

(d)    if any of the representations, warranties or covenants contained in Sections 4.30, 5.22, 5.25 or 5.28 or Article 6 or Article 7 hereof are breached or violated;

(e)    if any representation or warranty made herein, in the Guaranty or in the ADA and Environmental Indemnity or in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made;

(f)    if (i) Borrower, Member or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) Borrower or any managing member or general partner of Borrower, Member or Guarantor shall make a general assignment for the benefit of its creditors; (iii) there shall be commenced against Borrower or any managing member or general partner of Borrower, Member or Guarantor any case, proceeding or other action of a nature referred to in clause (i)(A) or (i)(B) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; (iv) there shall be commenced against Borrower, Member or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (v) Borrower, Member or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), (iii) or (iv) above; (vi) Borrower, Member or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vii) any Restricted Party is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving any Guarantor or their respective subsidiaries (if any); or (viii) a Bankruptcy Event occurs;

(g)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Mortgage;

74

(h)     if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(i)     if any federal tax lien is filed against Borrower, any Member, any Guarantor or the Property and same is not discharged of record (by payment, bonding or otherwise) within thirty (30) days after same is filed;

(j)     if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the ADA and Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable grace periods, if any;

(k)     if any Guarantor dies, becomes or is declared incompetent or of unsound mind, or is indicted or convicted of any crime;

(l)     if any Loan Document shall fail to be in full force and effect or to convey the material liens, rights, powers and privileges purported to be created thereby and Borrower shall fail to promptly remedy such failure in accordance with Article 15;

(m)     if any representation and/or covenant herein relating to ERISA matters is breached;

(n)     if a Reporting Failure shall occur;

(o)     Intentionally Omitted;

(p)     (i) if Final Completion of the Project Improvements has not occurred on or prior to Final Completion Date; (ii) if any voucher or invoice is fraudulently submitted by Borrower or in connection with any Advance for services performed or for materials used in or furnished for, the Property; (iii) if there is any cessation at any time in construction of the Project Improvements for more than thirty (30) consecutive days other than as a result of Force Majeure; (iv) if Borrower expressly confesses in writing to Lender its inability to continue or complete construction of the Project Improvements in accordance with this Agreement; (v) if Lender, the Construction Consultant or either of their representatives are denied permission to enter upon and/or inspect the Improvements and the construction thereof, and all materials, fixtures and articles used or to be used in the construction and to examine the Plans and Specifications, or if Borrower shall fail to furnish to any of such parties, when requested, copies of the Plans and Specifications and any other information required to be delivered to Lender pursuant to the Loan Documents, and in each case, the same is not cured within ten (10) days of written notice from Lender; and/or (vi) if any Permit is withdrawn, suspended or cancelled, terminated or modified to the detriment of the Borrower, the Property or the construction of any of the Project Improvements, unless Borrower reinstates and confirms in all respects, such Permit within a period of thirty (30) days thereafter;

(q)     with respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through (p) above or subsections (r) through (u) below or not otherwise specifically specified as an Event of Default in this Agreement, if the same is not cured (i) within ten (10) days after notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after notice

75

from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of sixty (60) days;

(r)    if any default shall exist under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(s)    the occurrence of any event or circumstance set forth herein or in any other Loan Document that is stated to be an Event of Default;

(t)    all of the post closing undertakings set forth on Schedule "A" attached hereto have not been completed by the applicable date to complete for each such undertaking; or

(u)    if any Borrower Party or any Affiliate thereof, defaults beyond any applicable notice and cure periods under any other agreement or Indebtedness with Lender or its Affiliates.

Section 10.02 **Remedies**.

(a)    Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.01(f) above with respect to Borrower) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Mortgage, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Mortgage, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity. Upon any Event of Default described in Section 10.01(f) above with respect to Borrower, the Debt and all other obligations of Borrower under this Agreement, the Mortgage, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Mortgage, the Note and the other Loan Documents to the contrary notwithstanding.

(b)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Mortgage, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Mortgage, the

Note or the other Loan Documents with respect to the Property. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Mortgage, the Note or the other Loan Documents. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

(c)    Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments; or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(d)    Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents.

(e)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Property or any other collateral for the Loan and/or paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

77

4938-8333-2636, v. 5

(f)     Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

(g)     In addition to all remedies conferred it by law and by the terms of this Agreement and the other Loan Documents, upon the occurrence and during the existence of an Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other, and with full rights to reimbursement from Borrower and any Guarantor: (i) take possession of the Property and complete any construction work at the Property, including, without limitation, the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others and to employ watchmen to protect the Property from injury. Without restricting the generality of the foregoing and for the purposes aforesaid to be exercised during the existence and continuance of an Event of Default, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution to complete any construction work at the Property in the name of Borrower; (ii) withdraw any amounts in the Accounts and apply as Lender may determine in its sole discretion; (iii) use Reserve Funds to complete any construction work at the Property; (iv) enter into Change Orders which shall be necessary or desirable to complete any construction work at the Property in substantially the manner contemplated by the Approved Plans and Specifications; (v) retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which may be liens or security interests, or to avoid such bills and claims becoming liens against the Property, or as may be necessary or desirable for the completion of any construction work at the Property or for the clearance of title to the Property; (vi) execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vii) prosecute and defend all actions or proceedings in connection with any construction work at the Property; and (viii) take any action and require such performance as it deems necessary to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction.

**ARTICLE 11**
**SECONDARY MARKET**

4938-8333-2636, v. 5

Section 11.01 **Transfer of Loan**. Lender shall have the right, at any time, without the consent of Borrower or any other Person, to sell, transfer or assign the Note, this Agreement and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "**Participations**") or issue mortgage pass through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"). The transactions referred to above shall hereinafter be referred to collectively as "**Secondary Market Transactions**".

Section 11.02 **Dissemination of Information**. Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in the Loan, such Participations and/or Securities or any of their respective successors and/or assigns (collectively, an "**Investor**"), each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower and the Property, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under applicable Legal Requirements to prohibit such disclosure, including but not limited to any right of privacy.

Section 11.03 **Cooperation**. Borrower agrees to cooperate with Lender in connection with any transfer made, or such Participations and/or Securities created, pursuant to this Article 11, including, without limitation, the taking, or refraining from taking, of such action as may be necessary to satisfy all of the conditions of any Investor, the delivery of an estoppel certificate required in accordance with Section 5.13 hereof and such other documents as may be reasonably requested by Lender, and the execution of amendments to the Note, this Agreement and other Loan Documents as reasonably requested by Lender. Borrower shall also furnish and Borrower consents to Lender furnishing to such Investors or prospective Investors any and all information concerning the Property, and the financial condition of Borrower as may be requested by Lender, any Investor or any prospective Investor in connection with any such transfer made, or such Participations and/or Securities created, pursuant to this Article 11.

## ARTICLE 12
## INDEMNIFICATIONS

Section 12.01 **General Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease or management agreement; (f) the payment of any commission, charge or brokerage fee to anyone (other than a broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the

79

Mortgage; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts. Any amounts payable to Lender by reason of the application of this Section 12.01 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

Section 12.02 **Mortgage and Intangible Tax Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Mortgage, the Note or any of the other Loan Documents.

Section 12.03 **ERISA Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.07 or 5.19 of this Agreement.

Section 12.04 **Duty to Defend, Legal Fees and Other Fees and Expenses**. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

Section 12.05 **Survival**. The obligations and liabilities of Borrower under this Article 12 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Mortgage.

Section 12.06 **ADA and Environmental Indemnity**. Simultaneously herewith, Borrower and Guarantor have executed and delivered the ADA and Environmental Indemnity to Lender, which ADA and Environmental Indemnity is not secured by the Mortgage.

## ARTICLE 13
## RECOURSE

Section 13.01 **Recourse**. Notwithstanding anything to the contrary set forth in this Agreement or the other Loan Documents, (a) the Borrower is personally liable for all Obligations under this Agreement, the Note, the Mortgage and the other Loan Documents. The existence of such personal obligations shall not limit or impair Lender's enforcement of its rights against any

80

Guarantor under any guaranty, indemnity and/or security agreement (including, but not limited to, the Guaranty and/or the ADA and Environmental Indemnity, subject however, to the limitations set forth in the Guaranty signed in conjunction with this transaction); and (b) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations owing to Lender in accordance with the Loan Documents.

**ARTICLE 14**
**NOTICES**

Section 14.01 **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted or desired to be given hereunder shall be in writing and shall be sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 14.01. Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed if sent by registered or certified mail, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Borrower: | 47 Poplar Owners LLC<br>399 Knollwood Road Ext.<br>Elmsford, New York 10523<br>Attn: Thomas Lee, Administrative Member |
| With a copy to: | John M. Crane, P.C.<br>342 North Main Street<br>Port Chester, New York 10573<br>Attn: John M. Crane, Esq. |
| If to Lender: | Fairbridge Credit LLC<br>330 Post Road, Suite 230<br>Darien, CT 06820<br>Attn: John Lettera and Steven J. Wissak |
| With a copy to: | Braunstein Turkish LLP<br>7600 Jericho Turnpike, Suite 402<br>Woodbury, New York 11797<br>Attn: Vincent L. Georgetti, Esq. |

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 14.01. Notices shall be deemed to have been given on the date set forth above, even if there is an inability to actually deliver any Notice because of a changed address of which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery. Notice for any party may be given by its respective counsel.

81

## ARTICLE 15
## FURTHER ASSURANCES

Section 15.01 **Replacement Documents.** Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

Section 15.02 **Recording of Mortgage, Etc.** Borrower forthwith upon the execution and delivery of the Mortgage and thereafter, from time to time, will cause the Mortgage and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Mortgage, this Agreement, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Mortgage, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by applicable law so to do.

Section 15.03 **Further Acts, Etc.** Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Mortgage, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 15.03.

Section 15.04 **Changes in Tax, Debt, Credit and Documentary Stamp Laws.**

82

(a) If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable.

(b) Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Mortgage or the Debt. If such claim, credit or deduction shall be required by applicable law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c) If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Mortgage, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

## ARTICLE 16
## WAIVERS

Section 16.01 **Remedies Cumulative; Waivers**. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Mortgage, the Note or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 16.02 **Modification, Waiver in Writing**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Mortgage, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

83

4938-8333-2636, v. 5

Section 16.03 **Delay Not a Waiver**. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Mortgage, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Mortgage, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Mortgage, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 16.04 **Waiver of Trial by Jury**. BORROWER AND LENDER EACH HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE MORTGAGE OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

Section 16.05 **Waiver of Notice**. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 16.06 **Remedies of Borrower**. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Mortgage, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 16.07 **Marshalling and Other Matters**. Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Mortgage of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Mortgage on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of the Mortgage and on behalf of all Persons to the extent permitted by applicable Legal Requirements.

84

Section 16.08 **Statute of Limitations**. To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, the Mortgage or other Loan Documents.

Section 16.09 **Waiver of Counterclaim**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 16.10 **Sole Discretion of Lender**. Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove; (b) any arrangement or term is to be satisfactory to Lender or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

**ARTICLE 17**
**MISCELLANEOUS**

Section 17.01 **Survival**. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Mortgage, the Note or the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 17.02 **Governing Law; Jurisdiction**.

(a)   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WERE NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE

85

4938-8333-2636, v. 5

OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> JOHN M. CRANE, P.C.
> 342 NORTH MAIN STREET
> PORT CHESTER, NEW YORK 10573
> ATTN: JOHN M. CRANE, ESQ.

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE STATE OF CONNECTICUT OR NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN THE STATE OF CONNECTICUT OR NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY

86

OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.

Section 17.03 **Headings**. The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 17.04 **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 17.05 **Preferences**. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 17.06 **Expenses**. Borrower covenants and agrees to pay its own costs and expenses and pay, or, if Borrower fails to pay, to reimburse, Lender, upon receipt of written notice from Lender, for Lender's costs and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) in each case, incurred by Lender in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Mortgage, the Note and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement, the Mortgage, the Note and the other Loan Documents with respect to the Property); (b) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement, the Mortgage, the Note and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement, the Mortgage, the Note and the other Loan Documents on its part to be performed or complied with after the Closing Date (including, without limitation, those contained in Article 8 hereof); (d) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement, the Mortgage, the Note and the other Loan Documents and any other documents or matters requested by Lender; (e) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the lien in favor of Lender pursuant to this Agreement, the Mortgage, the Note and the other

87

Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the Mortgage, the Note, the other Loan Documents, the Property, or any other security given for the Loan; (h) servicing the Loan (including, without limitation, enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the Mortgage, the Note and the other Loan Documents or with respect to the Property) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; and (i) the preparation, negotiation, execution, delivery, review, filing, recording or administration of any documentation associated with the exercise of any of Borrower's rights hereunder and/or under the other Loan Documents regardless of whether or not any such right is consummated; provided however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise solely by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender as determined by a court of competent jurisdiction in a final, non-appealable order. Any amounts payable to Lender pursuant to this Section 17.06 shall become immediately due and payable upon written demand and, if the same is not paid within ten (10) days from such written demand, shall bear interest at the Default Rate from the date of such written demand until the date such amounts have been paid.

Section 17.07 **Cost of Enforcement**. In the event (a) that the Mortgage is foreclosed in whole or in part; (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors or (c) Lender exercises any of its other remedies under this Agreement, the Mortgage, the Note and the other Loan Documents, Borrower shall be charged with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes. Any amounts payable to Lender pursuant to this Section 17.07 shall become immediately due and payable upon written demand and, if the same is not paid within ten (10) days from such written demand, shall bear interest at the Default Rate from the date of such written demand until the date such amounts have been paid.

Section 17.08 **Schedules Incorporated**. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 17.09 **Offsets, Counterclaims and Defenses**. Any assignee of Lender's interest in and to this Agreement, the Mortgage, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 17.10 **No Joint Venture or Partnership; No Third Party Beneficiaries.**

88

(a)    Borrower and Lender intend that the relationships created under this Agreement, the Mortgage, the Note and the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement, the Mortgage, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Mortgage, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

(c)    The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

(d)    Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases); or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property is subject.

(e)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Mortgage, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)    Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Mortgage and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 4 of this Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept the this Agreement, the Note, the Mortgage and the other Loan Documents in the absence of the warranties and representations as set forth in Article 4 of this Agreement.

89

4938-8333-2636, v. 5

Section 17.11 **Publicity**. Borrower hereby agrees that Lender, at its option, may announce and publicize the financing of the Property by means selected by Lender, at no expense to the Borrower.

Section 17.12 **Limitation of Liability**. No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

Section 17.13 **Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Agreement and the Mortgage, the Note or any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Mortgage and the other Loan Documents and this Agreement, the Note, the Mortgage and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Mortgage and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

Section 17.14 **Entire Agreement**. This Agreement, the Note, the Mortgage and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Mortgage and the other Loan Documents.

Section 17.15 **Liability**. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 17.16 **Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

4938-8333-2636, v. 5

Section 17.17 **Brokers**. Borrower agrees (a) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each, a "**Broker**") hired or contracted by any Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (b) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person. The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt.

Section 17.18 **Retention of Servicer**. Lender may delegate any and all rights and obligations of Lender under the Loan Documents to the Servicer upon notice by Lender to Borrower, whereupon any notice or consent from the Servicer to Borrower, and any action by Servicer on Lender's behalf shall have the same force and effect as if Servicer were Lender and Servicer shall be bound by all obligations of Lender hereunder, including, whenever expressly provided for hereunder, not to unreasonably withhold, condition or delay any consent or approval of Lender.

Section 17.19 **Set-Off**. In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided however, Lender may only exercise such right during the continuance of an Event of Default. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Section 17.20 **Appraisal**. Borrower recognizes and agrees that formal written appraisals of the Property by a licensed independent appraiser may be required by Lender pursuant to Section 5.25 hereof or Lender's internal procedures and/or regulatory reporting requirements on an annual and/or specialized basis and that Lender may, at its option, require inspection of the Property by an independent supervising architect and/or cost engineering specialist at least semi-annually. Notwithstanding the foregoing, Borrower shall not be required to pay for more than one appraisal in any twelve (12) month period unless an Event of Default occurs and is continuing or as otherwise required by law.

*[Remainder of this Page is Intentionally Left Blank –
Signature Page Follow]*

4938-8333-2636, v. 5

**IN WITNESS WHEREOF,** the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**47 POPLAR OWNERS LLC,** a Connecticut limited liability company

By: _____
Name: Thomas Lee
Title:   Administrative Member

State of ~~Connecticut~~ New York

County of Westchester                    ss. (Town/City)

On this the ⎯21⎯ day of February, 2025, before me, ⎯Lina C. Dadio⎯, the undersigned officer, personally appeared **Thomas Lee**, who acknowledged himself to be an Administrative Member of 47 Poplar Owners LLC, a (member managed or manager managed) limited liability company, and that he, as such Administrative Member, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company by himself as Administrative Member.

In witness whereof I hereunto set my hand.

_____
Signature of Notary Public
Date Commission Expires: 10/4/2028

Lina C. Dadio
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6116620
Qualified in Westchester County
Commission Expires October 4, 20 28

*Signature Page to Amended and Restated*
*Construction Loan Agreement*

**LENDER:**

**FAIRBRIDGE CREDIT LLC**, a Delaware limited
liability company

By: _____
    Name:  John Lettera
    Title:   Partner

*Signature Page to Amended and Restated*
*Construction Loan Agreement*

## Schedule "A"

## Post Closing Undertakings

| Undertaking | Date to Complete |
|---|---|
| Not applicable | |

*Schedule "A" to Amended and Restated*
*Construction Loan Agreement*

**Exhibit "A"**

**Form of Borrower's Requisition**

[Letterhead of Borrower]

_____, 202__

Fairbridge Credit LLC
330 Post Road, Suite 230
Darien, CT 06820
Attention: [_____]

Re:  47 Poplar Street, New Milford, CT

Ladies and Gentlemen:

This Certificate is being furnished in accordance with that certain Amended and Restated Construction Loan Agreement (the "**Loan Agreement**") dated as of February 21, 2025, among 47 Poplar Owners LLC, a Connecticut limited liability company ("**Borrower**") and Fairbridge Credit LLC, a Delaware limited liability company ("**Lender**"). This Certificate will serve as Borrower's Requisition requesting the sum of $_____ under the Loan Agreement. Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings ascribed thereto in the Loan Agreement.

The draw amount for this month is as follows:
Current Total Draw Amount:

less Lender holdbacks for reimbursements:

Net Amount of Wire:

Please wire the funds on [DATE] as follows:
Amount:
Bank:
ABA#:
Account:
Account Number:

The support for the above Advances is provided in the attached draw schedules. Please advise the undersigned as soon as the Advance has been credited.

Borrower represents and warrants to Lender and Lender as of the date hereof as follows:

*Exhibit "A" to Amended and Restated*
*Construction Loan Agreement*

4938-8333-2636, v. 5

(i)      The undersigned is an authorized officer of Borrower.

(ii)     This Certificate and the requisition contained herein meets all applicable conditions contained in the Loan Agreement (as applicable to such Advance).

(iii)    All amounts shown on all previous Borrower's Requisitions have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the disbursement requested hereby. The amount requested to be disbursed does not exceed the amount available to Borrower as an Advance as of the date of this Certificate and the date on which such disbursement is to be made, such that at no time shall Lender be obligated to pay amounts to Borrower in excess of the total amount available to Borrower as an Advance at the time of disbursement.

(iv)    All work on the Property to the date of this Certificate has been performed in substantial accordance with the Plans and Specifications and otherwise in accordance with the terms and conditions set forth in the Loan Documents and there have been no changes to the Plans and Specifications except as approved by Lender in writing.

(v)     All labor, materials, and/or services shown on each draw schedule, for which funds have been or are requested, are incorporated into the Property at this date, or in the case of Stored Materials, have been stored in accordance with, and otherwise satisfy the requirements of, the Loan Agreement.

(vi)    None of the amounts for which payment is requested in this Certificate have been included in any prior Borrower's Requisition. All Construction Costs for which the current disbursement is sought have been incurred and are included as part of the most recently approved Project Budget.

(vii)   All required Governmental Approvals of the Plans and Specifications by any Governmental Authority have been obtained.

(viii)  All building permits required for the commencement of construction of the Improvements in accordance with the Plans and Specifications and Construction Schedule, to the extent the same may be issued given the stage of construction, have been obtained in accordance with all Legal Requirements and are in full force and effect.

(ix)    To the best of Borrower's knowledge, all work on the Property, which has been completed or which is in progress as of this date does not violate any applicable Legal Requirement.

(x)     There is no Event of Default continuing.

(xi)    The representations and warranties reaffirmed by this request for disbursement of Loan proceeds pursuant to the Loan Agreement are true and correct in all material respects on and as of the date of this Certificate and will be true and correct in all material respects on and as of the date of such disbursement.

*Exhibit "A" to Amended and Restated*
*Construction Loan Agreement*

4938-8333-2636, v. 5

(xii)    The Improvements have not been injured or damaged by fire, explosion, accident, flood or other casualty, except as previously disclosed in writing to Lender.

Very truly yours,

**47 POPLAR OWNERS LLC,** a Connecticut limited liability company

By:    _____
                 Name: Thomas Lee
                 Title:   Administrative Member

*Exhibit "A" to Amended and Restated*
*Construction Loan Agreement*

4938-8333-2636, v. 5